# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALVIN BROWN, in his official capacity,<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; JENNIFER HOMENDY, in her official capacity as Chairman of the National Transportation Safety Board; NATIONAL TRANSPORTATION SAFETY BOARD,<br><br>*Defendants*. | Case No. 1:25-cv-01764-DLF |

# PLAINTIFF'S OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ........................................................... 3

LEGAL STANDARD ........................................................................................................ 8

   I.    Mr. Brown Has Plausibly Alleged A Claim of Intentional Racial Discrimination ............ 9

      A.   The FAC's Allegations Satisfy The Standards For A Disparate Treatment
          Comparator Claim .................................................................................................. 9

      B.   Defendants Fail To Show That Mr. Brown Has Not Stated A Proper Claim Under
          The Proper Legal Standard..................................................................................... 13

   II.   Plaintiff's Claim Is Legally Cognizable ........................................................................ 18

      A.   The President's Removal Decisions Can Be Reviewed By Courts For Compliance
          With The Constitution ........................................................................................... 18

      B.   Courts Can Reasonably Assess a President's Intent In Removal Decisions................. 22

      C.   Courts, Not The Senate, Are The Proper Forum For Reviewing Removal
          Decisions .............................................................................................................. 25

CONCLUSION.................................................................................................................. 25

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Ames v. Dep't of Ohio Youth Servs.*,
605 U.S. 303 (2025)................................................................................. 9, 10, 14, 16, 22

*Andrews v. Warden*,
958 F.3d 1072 (11th Cir. 2020) ......................................................................... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................8, 11

*Barber v. Dist. of Columbia*,
394 F. Supp. 3d 49 (D.D.C. 2019) ....................................................................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................. 8

*Brown v. Sessoms*,
774 F.3d 1016 (D.C. Cir. 2014)......................................................................10, 11

*CASA de Md., Inc. v. Trump*,
355 F. Supp. 3d 307 (D. Md. 2018) ................................................................... 23

*Clinton v. Jones*,
520 U.S. 681 (1997)........................................................................................... 19

*Cones v. Shalala*,
199 F.3d 512 (D.C. Cir. 2000)........................................................................... 15

*Delgado v. Chavez*,
140 U.S. 586 (1891)........................................................................................... 25

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997)............................................................................. 8

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)........................................................................................... 19

*Ginger v. Dist. of Columbia*,
527 F.3d 1340 (D.C. Cir. 2008)......................................................................... 10

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)........................................................................................... 17

ii

*Holbrook v. Reno*,
    196 F.3d 255 (D.C. Cir. 1999)...................................................................... 9

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006)................................................................... 15

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977)................................................................................. 9

*Jiggetts v. Cipullo*,
    774 F. Supp. 3d 168 (D.D.C. 2025) .......................................................... 15

*Joyner v. Morrison & Foerster LLP*,
    140 F.4th 523 (D.C. Cir. 2025) ........................................................... *passim*

*Joyner v. Morrison & Foerster LLP*,
    No. 20-1440, 2023 WL 6313194 (D.D.C. Sept. 27, 2023) ..............................11

*Korematsu v. United States*,
    323 U.S. 214 (1944)............................................................................... 19

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803).................................................................. 25

*McCreary Cnty. v. ACLU of Kentucky*,
    545 U.S. 844 (2005)............................................................................... 22

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)....................................................................... *passim*

*McNair v. Dist. of Columbia*,
    213 F. Supp. 3d 81 (D.D.C. 2016) ............................................................ 8

*Moore-Davis v. U.S. Dep't of the Navy*,
    694 F. Supp. 3d 116 (D.D.C. 2023) ..........................................................11

*Myers v. United States*,
    272 U.S. 52 (1926)............................................................................ 18, 25

*N. Am. Butterfly Ass'n v Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020)................................................................. 8

*Nanko Shipping, USA v. Alcoa, Inc.*,
    850 F.3d 461 (D.C. Cir. 2017)..................................................................11

*Nat'l TPS All. v. Noem*,
    773 F. Supp. 3d 807 (N.D. Cal. 2025) ............................................................ 23

*Omnipoint Corp. v. FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ........................................................................ 14

*Peele v. Country Mut. Ins. Co.*,
    288 F.3d 319 (7th Cir. 2002) ......................................................................... 15

*Ponce v. Billington*,
    679 F.3d 840 (D.C. Cir. 2012) ....................................................................... 10

*Rosemond v. Hudgins*,
    92 F.4th 518 (4th Cir. 2024) .......................................................................... 20

*Saget v. Trump*,
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) ............................................................ 23

*Schick v. Reed*,
    419 U.S. 256 (1974) ....................................................................................... 20

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ................................................................................. 20, 24

*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023) ...................................................................... 25

*Stella v. Mineta*,
    284 F.3d 135 (D.C. Cir. 2002) ....................................................................... 15

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ....................................................................................... 21

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ................................................................................. 10, 11

*Tex. Dep't of Cmty. Affs. v. Burdine,*
    450 U.S. 248 (1981) ....................................................................................... 10

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ....................................................................... 2, 19, 21, 23

*Trump v. United States,*
    603 U.S. 593 (2024) ................................................................................. 18, 19

iv

*Trump v. Vance*,
     591 U.S. 786 (2020)................................................................................................ 19

*Trump v. Wilcox*,
     145 S. Ct. 1415 (2025)........................................................................................... 24

*U.S. Postal Serv. Bd. of Governors v. Aikens*,
     460 U.S. 711 (1983)............................................................................................... 22

*United States v. Burr*,
     25 F. Cas. 30 (C.C.D. Va. 1807) (No. 14692D) ................................................... 19

*United States v. Nixon*,
     418 U.S. 683 (1974).......................................................................................... 21, 23

*United States v. Virginia*,
     518 U.S. 515 (1996)............................................................................................... 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
     429 U.S. 252 (1977)......................................................................................... 13, 14

*Washington v. Davis*,
     426 U.S. 229 (1976)............................................................................................. 9, 14

*Watson v. Fort Worth Bank & Tr.*,
     487 U.S. 977 (1988)................................................................................................. 9

*Yick Wo v. Hopkins*,
     118 U.S. 356 (1886)............................................................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
     343 U.S. 579 (1952)............................................................................................... 21

## US CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 2, cl. 2……………………………………………………………………………...25

## FEDERAL STATUTES

49 U.S.C.
     § 1101................................................................................................................... 12
     § 1111 ..................................................................................................................... 7
     § 1111(a) ............................................................................................................. 3, 4
     § 1111(b) ........................................................................................................... 3, 12
     § 1111(c)............................................................................................................. 3, 4
     § 1116...................................................................................................................... 4

§ 1117 ............................................................................................................... 4

§ 1131(a)(1) ..................................................................................................... 4

§ 1131(e) .......................................................................................................... 4

Department of Transportation Act,
Pub. L. No. 89-670, 80 Stat. 931 (1966) .......................................................... 3

**FEDERAL RULES**

Fed. R. Civ. P.
Rule 12(b)(6) .................................................................................................... 8

**OTHER AUTHORITIES**

NTSB, *NTSB Accident Investigations: Information for survivors, families & friends*,
https://perma.cc/WM6X-BKHG ......................................................................... 4

## INTRODUCTION

The second cause of action in Plaintiff Alvin Brown's First Am. Compl. ("FAC"), Dkt. No. 25, alleges that Defendants violated the Fifth Amendment by removing Mr. Brown from his seat on the National Transportation Safety Board ("NTSB") because he is Black. Contrary to Defendants' contentions, *see* Mem. of Law in Support of Defs.' Mot. to Dismiss Am. Compl. ("Memorandum") 15–31, Dkt. No. 30-1, the FAC plausibly alleges that Mr. Brown's removal was motivated by race, and his discriminatory removal is not immune from judicial review.

Under the Supreme Court's seminal decision regarding disparate-treatment employment claims like Mr. Brown's, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequent cases applying it, Mr. Brown's burden is quite modest at the pleadings stage. He need only allege that at least one other person of a different race who was similarly positioned to him in at least some relevant aspects was not removed. The FAC here alleges there are two such comparators, fellow NTSB members Jennifer Homendy and Thomas Chapman, who are white and were not removed. Mr. Brown and his two comparators were appointed under the same statutory process, their duties as NTSB members were the same, and they are all Democrats. Indeed, because Mr. Chapman's term expired in 2023, he could have been replaced without violating the NTSB statute, whereas Mr. Brown's removal violated the NTSB statute. These allegations more than meet the governing requirement that an employee claiming discrimination must allege facts about comparators of different races that are "similarly positioned to the plaintiff in at least some relevant respects" and who were treated differently. *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 531 (D.C. Cir. 2025).

Defendants do not even mention *McDonnell Douglas* or its application in cases like *Joyner*. Nor can they deny that the FAC alleges some relevant respects in which Mr. Brown is similarly positioned to Ms. Homendy or Mr. Chapman. That is all Mr. Brown needs to plausibly allege a

claim. Defendants instead devote almost their entire argument to disputing Mr. Brown's additional allegations of discriminatory conduct, but those arguments relate to whether Mr. Brown has proven discriminatory treatment under the third step of the *McDonnell Douglas* test, which is not required at the motion to dismiss stage.

Defendants' arguments that Mr. Brown's Fifth Amendment claim against the President is not legally cognizable are equally unavailing. It is well established that courts can review the President's actions to ensure they comply with the Constitution. And while Defendants argue that such review should not be available for the President's exercise of "conclusive and preclusive" powers, controlling precedent allows courts to review even core presidential powers when those powers are exercised in unconstitutional ways. The implication of Defendants' contrary arguments would be a system where Presidents can freely violate constitutional rights without any accountability in court. Nothing in the Constitution supports that result.

Allowing the Fifth Amendment claim to proceed would not necessitate the intrusive inquiry into the President's motivations that Defendants forewarn. Defendants' practical concerns about the scope of potential testimony or disclosures are better reserved for disputes during discovery than a motion to dismiss, but in any event, the argument misstates what is required to prove race discrimination under the Fifth Amendment. A plaintiff can establish a race discrimination claim based on circumstantial evidence even if discovery of the President and his aides is limited. Courts routinely engage in similar analyses for Fifth Amendment claims against the President. And in the only case Defendants cite in support of their argument, *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court allowed for consideration of the President's public statements and actions, and the Court expressly affirmed that the constitutional right to equal protection under the law in fact constrains presidential action.

2

Defendants' policy arguments likewise fail. Defendants argue that allowing Mr. Brown's claim to proceed will open the floodgates for claims challenging presidential appointments as discriminatory in the future. But that ignores key differences between removals and appointments and conflates an adverse action taken against one person because of his race with nondiscriminatory efforts by past Presidents to seek cabinets that are representative of the country. And Defendants' remaining argument, unsupported by any legal citation—that the Constitution allows only a political check on removals via the Senate—ignores that courts can and do review the scope of constitutional rights and provide remedies for wrongly removed officials in a way the Senate cannot. Such an opportunity to vindicate his constitutional rights is precisely what Mr. Brown here seeks.

## BACKGROUND AND PROCEDURAL HISTORY

The NTSB is an independent government agency tasked with securing the safety of American transportation by investigating accidents, performing studies, issuing safety recommendations, and assisting the victims and survivors of transportation disasters. FAC ¶ 19.

The Board consists of five members "appointed by the President, by and with the advice and consent of the Senate," and "[n]ot more than 3 members may be appointed from the same political party." 49 U.S.C. § 1111(b). Members serve five-year terms. *Id.* § 1111(c). The terms are staggered so that each year the term of one member ends. Department of Transportation Act, Pub. L. No. 89-670, § 5(i), 80 Stat. 931, 936 (1966). When the term ends, the member may continue to serve until a successor is appointed and qualified. 49 U.S.C. § 1111(c). The President may remove a member only for "inefficiency, neglect of duty, or malfeasance in office." *Id.*

Congress explicitly established the NTSB as an independent agency: "The National Transportation Safety Board is an independent establishment of the United States Government." *Id.* § 1111(a). The NTSB's primary function is to "investigate or have investigated" and "establish

3

the facts, circumstances, and cause[s]" of major accidents involving transportation. *Id.* § 1131(a)(1). The Board "shall report on the facts and circumstances of each accident investigated by it." *Id.* § 1131(e). In addition, the Board issues an annual report to Congress about its work and periodic reports to Congress and other federal and state transportation safety agencies and conducts special studies and investigations about transportation safety. *Id.* §§ 1116–17. As part of these investigatory, reporting, and recommending functions, the NTSB "has no regulatory or enforcement authority and does not investigate criminal activity." NTSB, *NTSB Accident Investigations: Information for survivors, families & friends*, https://perma.cc/WM6X-BKHG (archived June 3, 2025). The NTSB has no authority to enforce any safety recommendations it makes. FAC ¶ 30.

President Biden nominated Plaintiff Alvin Brown as a Democratic member of the NTSB in August 2022 and renominated him on January 23, 2023. He was confirmed by the Senate by voice vote on March 8, 2024, to a term expiring on December 31, 2026. FAC ¶ 32.

Prior to his appointment as a NTSB Member, Mr. Brown had a long and distinguished career as a public servant in urban planning, public administration, and transportation. He served as senior advisor to former Commerce Secretary Ron Brown, Vice President Al Gore's Senior Advisor for Urban Policy, and executive director of the White House Community Empowerment Board. FAC ¶ 33. He was the first-ever Black person elected as mayor of Jacksonville, Florida and served from 2011 to 2015. During his mayoral tenure, he served as Chair of the Port and Exports Council and Vice-Chair of the Transportation Committee for the United States Conference of Mayors. FAC ¶ 33. He also served as senior advisor for community infrastructure opportunities at the United States Department of Transportation. FAC ¶ 33.

On May 5, 2025, at 6:57 p.m., Mr. Brown received an email from Trent Morse, the Deputy Director of Presidential Personnel at the White House. The entire body of the email reads as follows:

> Alvin,
>
> On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Transportation Safety Board is terminated effective immediately.
>
> Thank you for your service.
>
> Trent Morse
> Deputy Director
> Presidential Personnel

FAC ¶ 34. As the email reflects, Mr. Brown was not removed for inefficiency, neglect of duty, or malfeasance in office. Mr. Brown was given no further reasons for his removal. FAC ¶ 34.

Defendants Homendy and NTSB cut off Mr. Brown's access to NTSB systems, email, and offices on May 6, 2025, and Mr. Brown has not been able to perform his duties as a Board Member since that date. FAC ¶ 35.

On September 10, 2025, President Trump nominated John DeLeeuw, a white man, to Mr. Brown's position. Mr. DeLeeuw's nomination is pending before the Senate. FAC ¶ 36.

Mr. Brown is a Black man. FAC ¶ 37. At the time of his removal from the NTSB there were four other members on the Board: Defendant Chair Jennifer Homendy and Members Michael E. Graham, Thomas B. Chapman, and J. Todd Inman. FAC ¶ 37. Homendy, Graham, Chapman, and Inman are all white. FAC ¶ 37. Homendy and Chapman are Democratic members. Graham and Inman are Republicans. FAC ¶ 37. All four remain current members of the Board. FAC ¶ 37. At the time of Mr. Brown's removal, Member Chapman's term on the NTSB had already expired on December 31, 2023. FAC ¶ 38. Since that time, Member Chapman has continued serving in his seat on the NTSB despite his expired term. FAC ¶ 38. Had President Trump simply wished to remove a Democrat and exert Republican control over the Board, President Trump could have

nominated Mr. DeLeeuw or somebody else to the seat in which Mr. Chapman is serving as a holdover. FAC ¶ 38. He could have also removed Ms. Homendy. FAC ¶ 38.

Mr. Brown's removal was the first time that a sitting member of the NTSB has been removed prior to the expiration of their term in the Board's history. FAC ¶ 39.

Mr. Brown's firing fits within a pattern of the Trump Administration disproportionately removing Black government officials, and particularly presidentially appointed and Senate-confirmed Board members of independent multimember agencies. FAC ¶ 40. Since the beginning of President Trump's second term in office, approximately 75 percent of Black federal officials leading multimember agencies have been removed from office. FAC ¶ 40. In contrast, only approximately 27 percent of white federal officials on multimember agencies have been removed. FAC ¶ 40. President Trump has removed or attempted to remove six Black members of multi-member agencies. FAC ¶ 40.

The removal of Mr. Brown and other Black independent agency board commissioners reflects a broader pattern across the government of President Trump removing high-level Black officials. FAC ¶ 42. On May 8, 2025, he removed Carla Hayden, a Black woman, as the Librarian of Congress. FAC ¶ 42. On February 21, 2025, he removed Gen. Charles Q. Brown, Jr., a Black man, as the Chairman of the Joint Chiefs of Staff. In General Brown's case, President Trump replaced him with Lieutenant General Dan Caine, a white man, who did not have the statutory requirement of status as a five-star general and could serve only because the President waived that requirement. FAC ¶ 42.

President Trump and high government officials have made several public statements indicating that he and his administration are seeking to dismantle efforts promoting diversity throughout the federal government. FAC ¶ 43–47. In some of the President's firings of Black

6

officials, White House representatives have made statements explicitly linking the choice to remove the individual to their relationship to ideas of diversity and inclusion. FAC ¶ 48. After Mr. Trump terminated Ms. Hayden as Librarian of Congress, the White House Press Secretary referenced the "quite concerning things that she had done at the Library of Congress in pursuit of DEI" in explaining the decision on May 5, 2025. FAC ¶ 48. Before his appointment, Secretary of Defense Pete Hegseth suggested that General Brown had obtained his appointment because of his race and stated that General Brown needed to be fired because of his commitment to diversity, equity, and inclusion. FAC ¶ 48.

Under President Trump, the Executive Branch has also at times made a clear and demonstrable emphasis on hiring white men, including in Department of Labor workforce posters featuring almost exclusively white men. FAC ¶ 49. More generally, Black officials and Black employees across the federal government have been removed from their jobs at disproportionate rates. FAC ¶ 50. And in the Trump Administration's first 200 days, only two percent of all of President Trump's Senate-approved appointees have been Black individuals. FAC ¶ 51.

Mr. Brown filed this action on June 4, 2025, against President Trump, Ms. Homendy, and the NTSB. Compl. for Declaratory & Injunctive Relief, Dkt No. 1. The Complaint included one cause of action alleging that Defendants had violated 49 U.S.C. § 1111 by removing Mr. Brown without a showing of inefficiency, neglect of duty, or malfeasance in office. The parties cross-moved for summary judgment.

On December 4, 2025, Mr. Brown filed the First Amended Complaint, adding a second cause of action alleging that Defendants had violated the Fifth Amendment of the United States Constitution by removing Mr. Brown because of his race.

On December 5, 2025, Defendants moved for a stay pending the Supreme Court's resolution of *Trump v. Slaughter*, No. 25-332. Mot. to Stay, Dkt. No. 26. Mr. Brown did not oppose the motion to stay the first cause of action but opposed it as to the second cause of action. The Court issued an order staying the first cause of action and ordering the parties to propose a schedule for briefing Defendants' motion to dismiss on the second cause of action. Subsequently, the parties proposed a joint schedule and the Court adopted it.

**LEGAL STANDARD**

Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint "does not need detailed factual allegations" to survive but does need "more than labels and conclusions." *Twombly*, 550 U.S. at 555. While reviewing a motion to dismiss, courts act on the "assumption that all the allegations in the complaint are true." *Id.* All "reasonable inferences" from the allegations must be drawn "in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). And the Court cannot consider any information outside "the facts alleged in the complaint, any documents either attached to or incorporate in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Courts in the D.C. Circuit have "'consistently recognized the ease with which a plaintiff claiming employment discrimination can survive a motion to dismiss.'" *Barber v. Dist. of Columbia*, 394 F. Supp. 3d 49, 57 (D.D.C. 2019) (quoting *McNair v. Dist. of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016)).

8

**ARGUMENT**

**I.      Mr. Brown Has Plausibly Alleged A Claim of Intentional Racial Discrimination**

      **A.  The FAC's Allegations Satisfy The Standards For A Disparate Treatment Comparator Claim**

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). To establish an equal protection violation, a plaintiff must establish that the defendants had a discriminatory intent. *Id.* In the context of employment discrimination, intentional discrimination cases are known as "'disparate treatment'" cases where "an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

As the Supreme Court reaffirmed last year in *Ames v. Department of Ohio Youth Services*, 605 U.S. 303, 308 (2025), the "familiar" three-step burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used to evaluate disparate treatment claims based on circumstantial evidence at trial and summary judgment. At step one, "the plaintiff bears the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to support an inference of discriminatory motive." *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802). In a case where an employee claims that he was discriminated against compared to another employee (a comparator case), the elements of a prima facie case are: "(1) that [plaintiff] is a member of a protected class; (2) that [plaintiff] was similarly situated to an employee who was not a member of the protected class; and (3) that [plaintiff] and the similarly situated person were treated disparately." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). "For most

plaintiffs, the first step of the *McDonnell Douglas* framework—the prima facie burden—is 'not onerous.'" *Ames*, 605 U.S. at 309 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

"If the plaintiff clears [the first step], the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802). "Finally, if the employer articulates such a justification, the plaintiff must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Ames*, 605 U.S. at 309 (quoting *McDonnell Douglas*, 411 U.S. at 804). To ultimately prevail, the plaintiff has to show that "unlawful discrimination was 'a factor motivating the adverse action.'" *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012) (quoting *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)).

Importantly, the *McDonnell Douglas* test is an evidentiary test, not a pleading requirement. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510–511 (2002); *Brown v. Sessoms*, 774 F.3d 1016, 1022–23 (D.C. Cir. 2014). To survive a motion to dismiss, a plaintiff proceeding on a "comparator" theory need only "plead enough facts about th[e] comparators and the relevant context to allow a plausible inference that he was treated differently because of his race." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025). The D.C. Circuit's analysis in *Joyner* is particularly instructive because that case, like this one, was a "comparator" racial discrimination employment case. In *Joyner*, the plaintiff was hired by a legal staffing firm to fill a temporary role at a law firm. *Joyner*, 140 F.4th at 527–28. He alleged that he was treated adversely compared to other temporary staffers because of his race. *Id.* at 528. The D.C. Circuit stated that "[i]n our cases addressing motions to dismiss . . . we have emphasized that the plaintiff's 'burden at the summary judgment stage and at trial is different and substantially more onerous than the pleading burden.'"

*Id.* at 530 (quoting *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017)).

For the pleading burden, "[t]he complaint 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Joyner*, 140 F.4th at 530 (quoting *Iqbal*, 556 U.S. at 678). Complaints that the D.C. Circuit has "found sufficient to proceed on a comparator theory [have] contained allegations that a comparator was similarly positioned to the plaintiff in at least some relevant respects, and included enough detail that we could plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff." *Joyner*, 140 F.4th at 531; *see Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 123–24 (D.D.C. 2023) (a complaint alleging disparate treatment that "'detail[s] the events leading to'" the adverse action, "'provide[s] relevant dates,'" and "'include[s] the' race . . . 'of at least some relevant persons'" who were treated differently, "'states claims upon which relief can be granted'" (quoting *Swierkiewicz*, 534 U.S. at 510, 514). Conversely, the D.C. Circuit has "never required a complaint to include factual allegations showing that the comparator's circumstances are 'nearly identical' to the plaintiff's in 'all relevant aspects.'" *Joyner*, 140 F.4th at 531 (quoting *Joyner v. Morrison & Foerster LLP*, No. 20-1440, 2023 WL 6313194, at *5 (D.D.C. Sept. 27, 2023) (vacated in part by *Joyner*, 140 F.4th 523)). The ultimate "question is always whether there are enough facts pleaded to make it 'plausible,' as opposed to just 'speculative,' to infer that a defendant was motivated by the plaintiff's race rather than the myriad other reasons that might affect an employment decision." *Id.* at 531 (quoting *Brown*, 774 F.3d at 1023).

Here, Mr. Brown's disparate-treatment claim is pleaded as a "comparator" claim and readily satisfies the pleading standard as articulated in *Joyner* and similar cases: "As a Black person, Mr. Brown is in a protected class. His removal is an adverse employment action, and he was treated differently from similarly situated people, the other members of the Board, and

11

particularly the white Democratic members." FAC ¶ 60; *see also* FAC ¶ 8. The FAC alleges that Mr. Brown is Black, and his comparators, Ms. Homendy and Mr. Chapman, are white. FAC ¶ 37. And the FAC alleges that Mr. Brown and his comparators are similarly positioned in several relevant respects. Before his removal, Mr. Brown and his comparators were all members of the National Transportation Safety Board. FAC ¶ 37. They all gained their seats on the NTSB through the Presidential appointment and Senate confirmation process as provided by statute. 49 U.S.C. § 1111(b). Their duties as Board members are the same and provided by statute. *Id.* §§ 1101 *et seq*. Mr. Brown and his comparators are all Democrats. FAC ¶ 37. Indeed, as opposed to Mr. Brown, President Trump could have removed Mr. Chapman by appointing a successor without violating 49 U.S.C. § 1111(b) because Mr. Chapman's term ended more than two years ago and he is serving as a holdover. FAC ¶ 38. These allegations more than meet the showing of alleging facts about comparators of different races that are "similarly positioned to the plaintiff in at least some relevant respects." *Joyner*, 140 F.4th at 531.

Indeed, while Mr. Brown was not required to go any further than that at the pleading stage, the FAC also includes allegations of actions and statements by President Trump and his administration that place Mr. Brown's removal in a broader context that goes beyond the NTSB. FAC ¶¶ 40–50. This includes allegations regarding: (1) the disproportionate removal of "presidentially appointed and Senate-confirmed Board members of independent multimember agencies" who are Black, FAC ¶ 40; (2) the removal of other high-level Black officials, FAC ¶ 43; (3) public statements from Mr. Trump and high government officials "indicating that he and his administration are seeking to remove people of color throughout the federal government," FAC ¶ 43, including several statements from President Trump about ending diversity, equity, and inclusion (DEI) programs because they allegedly create lower standards, FAC ¶¶ 44–47; (4) the

12

disproportionate removal of Black officials and Black employees across the federal government FAC ¶ 50; (5) the low percentage of President Trump's Senate-approved appointees that are Black; FAC ¶ 51; and (6) the emphasis of the Trump Administration on hiring white men. FAC ¶ 49.

Although, at the pleading stage, Mr. Brown is not required to establish that any nondiscriminatory reasons Defendants might offer for Mr. Brown's removal are pretextual, these allegations support the inference that Mr. Brown was in fact removed instead of Ms. Homendy or Mr. Chapman because of his race.

### B. Defendants Fail To Show That Mr. Brown Has Not Stated A Proper Claim Under The Proper Legal Standard

In arguing that Mr. Brown has not properly pleaded a claim, Defendants completely ignore *McDonnell Douglas* and the requirements for pleading a comparator theory under *Joyner*. They rely instead on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), but as discussed below, that is not the correct framework for analyzing a comparator claim of intentional discrimination in employment. Memorandum 15. Under the proper standard, the FAC's allegations regarding similarity situated NTSB members who were not removed are sufficient, and Defendants offer virtually no argument to the contrary. To the extent Defendants do take issue with the FAC's allegations, their arguments are either irrelevant or premature at the motion to dismiss stage. In particular, while Defendants dispute the inferences to be drawn from the FAC's allegations concerning this administration's pattern of discriminatory conduct outside the context of the NTSB, those arguments address whether Mr. Brown has ultimately established that he was in fact removed because of his race. But it is not his burden to do so at the pleadings stage. Finally, even if *Arlington Heights* were the controlling framework, Defendants fail to apply it faithfully. The allegations in the FAC state a claim for race discrimination even under that standard.

13

Turning first to the governing framework, although Mr. Brown's second cause of action is unmistakably pleaded as a disparate-treatment employment-discrimination case proceeding on a comparator theory, Defendants ignore the legal principles that apply to such a claim at the pleading stage. They do not acknowledge that such claims are analyzed under *McDonnell Douglas* as the Supreme Court recently reaffirmed in *Ames*. 605 U.S. at 306. And they do not acknowledge that, under *Joyner* and the precedent it synthesizes, a plaintiff bringing such a claim defeats a motion to dismiss by plausibly alleging that there are comparators, similarly positioned to the plaintiff in at least some relevant respects, who were treated differently and create a plausible inference of disparate treatment based on race. 140 F.4th at 530.

While *Arlington Heights*, on which Defendants instead rely, assesses the same ultimate question as *McDonnell Douglas*—whether the defendant intentionally discriminated against the plaintiff on the basis of race—the two cases and their progeny set out distinct analytical frameworks for identifying intentional discrimination that apply in distinct contexts. The *Arlington Heights* inquiry is generally applied to assess whether a facially neutral law or policy was enacted or applied with a discriminatory intent, *see Omnipoint Corp. v. FCC*, 78 F.3d 620, 634 (D.C. Cir. 1996), as reflected in the non-exhaustive *Arlington Heights* factors for assessing discrimination: (1) "whether" the "impact of the official action . . . 'bears more heavily on one race than another,'" which "may provide an important starting point"; (2) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) the sequence of events leading to the decision; (4) procedural and substantive departures from the norm; and (5) the legislative and administrative history. *Arlington Heights*, 429 U.S. at 266–68 (quoting *Davis*, 426 U.S. at 242). Unlike the *McDonnell Douglas* standard, the *Arlington Heights* factors are not tailored for a comparator claim. Accordingly, the Supreme Court, as

14

recently reiterated in *Ames*, has applied *McDonnell Douglas* consistently in comparator employment discrimination cases rather than the *Arlington Heights* factors. The lower federal courts have likewise looked to *McDonnell Douglas* in comparator employment discrimination cases, including cases brought under the Fifth Amendment, *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168, 186 (D.D.C. 2025), and cases brought by federal employees, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002); *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000).

Because Defendants do not acknowledge or apply the *McDonnell Douglas* framework, very little of their motion bears on what a plaintiff must allege to plead a plausible comparator claim under that framework. They devote only one paragraph to addressing the adequacy of Mr. Brown's allegations comparing his removal to similarly situated members of the NTSB, focusing on the pre-NTSB careers of Mr. Brown, Ms. Homendy, and Mr. Chapman to suggest that they are not proper comparators for Mr. Brown. Memorandum 25. In doing so, Defendants improperly introduce allegations outside the Complaint. Memorandum 25. Moreover, the proper focus in determining who is an appropriate comparator is their performance in the current position, not their experience in previous positions. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002).[1] Defendants note that President Trump originally appointed Ms. Homendy and Mr. Chapman whereas President Biden appointed Mr. Brown, but do not explain why that should matter as to whether that makes them comparators. In any event, those arguments all go to the

---

[1] Defendants similarly rely improperly on allegations outside the FAC in discussing Mr. DeLeeuw, whom President Trump has nominated as Mr. Brown's successor. Memorandum 25; *see id.* at 10–11 & n.4. In any event, the sufficiency of a complaint on a motion to dismiss turns on whether it plausibly alleges that a similarly situated comparator was treated differently, not on the supposed status and qualifications of the plaintiff's replacement. *Stella v. Mineta*, 284 F.3d 135, 145–46 (D.C. Cir. 2002).

15

second step of *McDonnell Douglas*—the employer's burden to identify "legitimate, nondiscriminatory reason[s] for the employee's rejection," *Ames*, 605 U.S. at 308–09 (quoting *McDonnell Douglas*, 411 U.S. at 802)—which does not come into play at the motion to dismiss stage. Thus, Defendants' limited arguments relating to comparators do nothing to diminish Mr. Brown's showing that Ms. Homendy and Mr. Chapman are similarly situated to him for the purposes of overcoming a motion to dismiss.

Indeed, even leaving aside Defendants' failure to engage with the governing legal framework, Defendants' arguments are premature at the pleading stage, improperly introduce allegations outside of the FAC, and mischaracterize Mr. Brown's allegations. Most notably, Defendants devote several pages, Memorandum 16–20, to addressing the FAC's allegations regarding the Trump Administration's disproportionate removal of Black independent agency board members compared to white independent agency board members. Defendants critique these allegations because they claim that "evidence of disparate outcomes, without more" rarely demonstrate discriminatory intent. Memorandum 16. But Mr. Brown does not rely on these allegations "without more." As discussed above, the FAC alleges that Mr. Brown was treated differently from other members of the NTSB based on his race and includes allegations specific to the NTSB and similarly situated NTSB members who were not removed. No more is required at this stage. The FAC's allegations regarding the disproportionate removal of Black members of independent agencies provide context to the NTSB-specific allegations and support the inference of intentional racial discrimination, but that will be the ultimate question at summary judgment or at trial—not at the pleadings stage. And because Mr. Brown's claim relies on a comparator theory under the *McDonnell Douglas* disparate-treatment framework—not on a showing of statistical disparities—Defendants' discussion of the statistical showings made in *Yick Wo v. Hopkins*, 118

16

U.S. 356 (1886), and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), *see* Memorandum 16–20, are irrelevant. Defendants also introduce allegations that President Trump has removed white independent agency commissioners and has appointed some Black officials in agencies other than the NTSB. Memorandum 17–20. These allegations are not germane in determining whether Mr. Brown has adequately pled a comparator employment discrimination claim. To the extent they are relevant, it would be at a later stage of the case in a potential effort to counter Plaintiffs' evidence regarding the disproportionate removal of Black officials outside of the NTSB.

The same holds true with respect to the FAC's other non-NTSB specific allegations, which Defendants characterize as a "constellation of discrete circumstantial facts." Memorandum 20. These include allegations regarding President Trump's hostility to diversity, equity, and inclusion initiatives; his firing of Black officials associated with DEI; the Trump Administration's emphasis on hiring white men, as reflected in materials produced by the Department of Labor; the Trump Administration's disproportionate firing of Black employees; and the miniscule percentage of Trump appointees that are Black. Memorandum 21–25. Defendants contend that these allegations should be disregarded because, "[u]ltimately, these facts are insufficient, even taken as true," to establish an intentional discrimination claim. Memorandum 21. But again, the FAC does not rely on those allegations alone. Mr. Brown plausibly alleges that he is Black and was treated differently from his similarly situated white colleagues on the NTSB, and those allegations are sufficient to survive a motion to dismiss. Defendants' efforts to dispute whether President Trump and his administration are in fact hostile to Black employees and to diversity, equity, and inclusion principles are premature and would (if true) be relevant only to issues at the later stages of the case, such as whether any nondiscriminatory explanations Defendants might offer for Mr. Brown's removal are pretextual.

Finally, even if the *Arlington Heights* framework applied, the FAC would survive at the pleading stage. Indeed, Defendants make little attempt to apply the *Arlington Heights* factors to the allegations in this case. The allegations of the FAC in fact address several of the *Arlington Heights* factors, beginning with the important starting point that the President's decision had a racial impact. FAC ¶¶ 37–38. Additionally, the FAC alleges that Mr. Brown's removal was made in the context of the President having removed other Black officials and the administration having taken actions and made statements that could be viewed as disadvantageous to Black employees. FAC ¶¶ 41–51. Moreover, the FAC alleges that Mr. Brown's removal was both a substantive and procedural departure from the norm: Mr. Brown was the first NTSB member removed from the Board in its history, and his removal contravened the NTSB statute. FAC ¶¶ 39, 54. These allegations are sufficient to state a claim for intentional discrimination at this stage under any applicable standard.

## II.    Plaintiff's Claim Is Legally Cognizable

Defendants' alternative argument, that Mr. Brown lacks a cognizable Fifth Amendment claim, asks this Court to declare that a President can violate the Constitution without any judicial review or accountability when that violation occurs in the exercise of the President's core constitutional powers. Such a rule cannot be, is not, and has never been, this country's law.

### A. The President's Removal Decisions Can Be Reviewed By Courts For Compliance With The Constitution

The Defendants begin by arguing that removal decisions fall within the President's "conclusive and preclusive" authority and thus cannot be "reviewed by the courts." Memorandum 27 (citing *Trump v. United States*, 603 U.S. 593, 620–21 (2024) (quoting *Myers v. United States*, 272 U.S. 52, 106 (1926))). Under this theory, any removal decision, no matter how discriminatory

or otherwise unconstitutional, could never be the basis for a cognizable claim. This argument fails across multiple fronts.

The Supreme Court has repeatedly underscored that "[t]he President . . . does not 'stand exempt from the general provisions of the Constitution,'" including those preserving individual rights. *Trump v. Vance*, 591 U.S. 786, 795 (2020) (quoting *United States v. Burr*, 25 F. Cas. 30, 33–34 (C.C.D. Va. 1807) (No. 14692D)). And the Court has long held that "when the President takes official action, [courts] ha[ve] the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("[T]he President's actions may . . . be reviewed for constitutionality."). This precept was reaffirmed by the Supreme Court's ruling in *Trump v. United States*, with the Court concluding that when a President exercises authority beyond the law, "courts may say so." 603 U.S. at 608.

This principle does not change when the President exercises a "conclusive and preclusive" power. In *Trump v. Hawaii*, the Supreme Court reviewed a President's national security and border-entry policies—acts falling "well within executive authority"—to evaluate whether "the actions of [a] particular President" made such "otherwise valid" uses of presidential power unconstitutional. 585 U.S. 667, 710 (2018). In doing so, the Court made clear that a President engaging in disparate treatment based on race violates the Constitution, even when exercising a core executive power. *Id.* (overruling *Korematsu v. United States*, 323 U.S. 214 (1944)). The Court stated for example that "the forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority," and "'has no place in law under the Constitution.'" *Hawaii*, 585 U.S. at 710 (quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)). Moreover, where courts have reviewed other

19

"plenary" Presidential powers, like the pardon power, they have consistently found that such acts are exempt from court review only insofar as their use "does not otherwise offend the Constitution." *See Schick v. Reed*, 419 U.S. 256, 266 (1974); *Rosemond v. Hudgins*, 92 F.4th 518, 525, 526 (4th Cir. 2024); *Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020). The Defendants cite no decision holding that the removal power stands alone and apart in this regard, and they offer no reason why it should.

It is therefore irrelevant to Mr. Brown's Fifth Amendment claim whether the limits on the President's removal power recognized in *Humphrey's Executor* retain any ongoing vitality. *Cf.* Memorandum 26–27. Even if the Supreme Court were to overrule *Humphrey's Executor*—and it remains good law unless and until that occurs—a holding that Congress cannot validly impose statutory limits on the President's constitutional exercise of his removal powers, *see Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020), would not mean that the President can remove someone in violation of constitutional limits.

Contrary to Defendants' suggestion, allowing judicial review of the President's exercise of core Article II powers for compliance with the Constitution would not lead to intolerable consequences in the context of the appointments power. Memorandum 27. According to Defendants, allowing courts to review a President's appointment of principal officers for race- and sex-based discrimination would mean that past Presidents' efforts to create diverse and representative cabinets were in fact "trampling the Bill of Rights in broad daylight." Memorandum 29. But the process of appointing officers is different from removing officers, and exercising the appointment power is far less likely to transgress constitutional limits. When the President removes an officer, he unilaterally takes adverse action against a specific person; and if that action is based on the removed officer's race, that would give rise to a constitutional violation. In contrast, the

20

process of choosing one nominee from a pool of potential candidates, none of whom has any particular claim to the office, is fundamentally different. Even if publicly promoting the goal of a diverse and representative executive branch could be relevant context for supporting a discrimination claim as Defendants suggest, Memorandum 29, those statements by themselves would not constitute unconstitutional discrimination in the absence of an adverse action being taken against a particular person or persons because of race. And the appointment context does not clearly lend itself to such constitutional concerns unless (at a minimum) particular candidates could show that they would have instead been selected over other potential nominees but for their race. Defendants cite the uncontroversial propositions that people of all races and sexes are protected from intentional discrimination, *see* Memorandum 27–28 (citing *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023); *United States v. Virginia*, 518 U.S. 515, 531–34 (1996)), but those cases do not suggest that efforts to create diverse presidential cabinets violate the Fifth Amendment unless someone was discriminated against. And they certainly do not suggest that subjecting the exercise of the appointments power to constitutional review in the event unconstitutional discrimination did occur would be particularly problematic.

To the contrary, the implications of Defendants' argument are far more unsettling than Mr. Brown's. Defendants' view, if accepted, would imply that the President is immune from judicial review or accountability for any violation of constitutional rights committed through the exercise of any Article II power—a precept that not only contradicts the Supreme Court's own holdings that courts can intervene when the President violates equal protection rights, see *Hawaii*, 585 U.S. at 710, but also flouts the foundational ideal that no President is "above the law," *United States v. Nixon*, 418 U.S. 683, 715 (1974); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 646 (1952) (Jackson, J., concurring) ("No penance would ever expiate the sin against free government

21

of holding that a President can escape control of executive powers by law through assuming his military role.").

**B.  Courts Can Reasonably Assess a President's Intent In Removal Decisions**

Defendants' concern that courts should be "wary" of inquiring into the President's intent when making a removal decision does not warrant the conclusion that the Constitution simply should not apply. Memorandum 30.

To begin with, Defendants' speculation about testimony being required from the President is premature. Memorandum 30. A plaintiff can prove race discrimination through a range of circumstantial and direct evidence and is not required to show direct statements by the decisionmaker. *See Ames*, 605 U.S. at 306 (writing that *McDonnell Douglas* claims "rest on circumstantial evidence"); *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983) ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence. The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves."). In *McCreary County v. ACLU of Kentucky*, for example, the Supreme Court, in reviewing a county's efforts to display the ten commandments in their courthouse, found that courts are capable of looking to "readily discoverable fact" and available context to discern why the government acted the way it did, without engaging in any "psychoanalysis of [the actor's] heart of hearts." 545 U.S. 844, 862, 866 (2005). Here, if permitted to proceed, Mr. Brown would initially seek only limited discovery, narrowly cabined to information relevant to his claims, such as interrogatories directed to the NTSB defendants seeking the reason for Mr. Brown's removal and any evidence of purported insufficiencies in his performance or misalignment with the President's policy goals.

What's more, Defendants themselves point to the very legal structure that would prevent discovery from improperly invading the interests and duties of the President: privilege.

22

Memorandum 30. If discovery proceeds to the point where Mr. Brown's requests are met with assertions of privilege, this Court can rely on determinations of executive privilege, as other courts have done, to ensure that discovery is properly limited. *Nixon*, 418 U.S. at 707 (concluding that while the "the legitimate needs of the judicial process may outweigh Presidential privilege," courts must "resolve those competing interests in a manner that preserves the essential functions of each branch"). Questions about the scope and details of specific discovery requests are better reserved for a later stage of litigation.

Defendants invoke the Supreme Court's ruling in *Trump v. Hawaii*, 585 U.S. 667 (2018), to argue that judicial inquiries into the President's motives are improper, Memorandum 30, but this argument stumbles upon the very doctrine it cites. The Court was clear in its ruling in *Hawaii*, which assessed the propriety of relying on President Trump's public statements to determine if he acted with animus in passing his "Muslim Ban," that the Court had to act with more caution than for a typical constitutional claim because the case implicated the particularly sensitive issues of "foreign affairs" and a national security directive. *Hawaii*, 585 U.S. at 704. And yet, even in that sensitive context, the Court still allowed for a review of the President's public statements—along with other circumstantial and extrinsic evidence—to determine if he acted with impermissible animus. *Id.* at 704–05. Lower courts have invoked the same logic and consistently upheld Fifth Amendment claims against the President over motions to dismiss where Plaintiffs relied upon the President's public statements and other circumstantial evidence to indicate the President's intent. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 862–64, 866 (N.D. Cal. 2025); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 323–26, 328–29 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297, 302–04 (E.D.N.Y. 2018). The same rule should apply here.

23

Defendants' contrary approach—which would close the courthouse doors to any claims turning on the President's motivations for removing an independent agency official—effectively seeks an end run around the statutory limits on the President's authority to remove members of the Federal Reserve Board of Governors. If the President's reasons for removing an officer were exempt from judicial review, as Defendants claim, any effort to ensure that for-cause removal protections for members of the Federal Reserve are preserved so that the President cannot "try[] to win [an election] from manipulating interest rates," *Seila Law*, 591 U.S. at 283 (Kagan, J., concurring), would be meaningless, since such protections could be easily bypassed if a plaintiff could not challenge a removal in court. Concern over the Federal Reserve's independence has featured prominently in the Supreme Court's reconsideration of *Humphrey's Executor*. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (writing the Court's review of *Humphrey's Executor* does not "necessarily implicate the constitutionality of for-cause removal protections for members of the Federal Reserve's Board of Governors"); Transcript of Oral Argument at 17, *Trump v. Slaughter*, No. 25-332 (U.S. Dec. 8, 2025) ("The other side says that your position would undermine the independence of the Federal Reserve and they have concerns about that, and I share those concerns." (Kavanaugh, J.)); *id.* at 55 (stating that if there was no reinstatement remedy available for wrongly removed officials "that really would be an end run around the exceptions you had identified earlier for the Federal Reserve" (Kavanaugh, J.)). And the government itself has not argued that the restrictions on at-will removal of Federal Reserve Board members are unconstitutional. *See* Application for Stay at 2 n.1, *Trump v. Cook*, No. 25-5326 (2025) ("This application does not contest the constitutionality of the Federal Reserve Board's for-cause removal provision."). But Defendants' position in this case, if accepted, would make such restrictions meaningless.

24

### C. Courts, Not The Senate, Are The Proper Forum For Reviewing Removal Decisions

Finally, Defendants cite no support for their assertion that the Senate provides the only proper forum for checking unconstitutional presidential removals. Memorandum 30–31. But their argument highlights the very difference between appointments and removals that makes court review essential. For while there is an explicit constitutional provision balancing the power of appointment between the President (who nominates) and the Senate (which confirms), U.S. Const. art. II, § 2, cl. 2, there is no constitutional provision regarding the removal power. Even if the Senate retains some authority to limit removals through legislation, it cannot block removals the same way it can block appointments. *See Myers v. United States*, 272 U.S. 52, 107, 176 (1926) (finding law requiring Senate advice and consent prior to presidential removals unconstitutional). Instead, courts remain as the only body that can ensure the President exercises his removal powers within the bounds of constitutional limits. Courts are empowered, in a way that the Senate is not, to return improperly removed officials to their office through mandamus, injunctive relief, or the writ of quo warranto. *See Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *see also Delgado v. Chavez*, 140 U.S. 586, 590 (1891). And it remains the sole province of the courts to authoritatively say "what the law is." *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The tool that Defendants claim the Senate does have—the ability to refuse to appoint a replacement for an improperly removed officer, Memorandum 30–31—does nothing to prevent an illegal removal. Our Constitution allows, and requires, more.

### CONCLUSION

For these reasons, Mr. Brown respectfully requests that the Court deny Defendants' Motion to Dismiss.

Dated: February 18, 2026

Respectfully submitted,

*/s/ Catherine M.A. Carroll*
Catherine M.A. Carroll (D.C. Bar 497890)
Cynthia Liao (D.C. Bar No. 90036947)
Victoria S. Nugent (D.C. Bar No. 470800)
Ross Snyder (D.C. Bar No. 90037922)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982
ccarroll@democracyforward.org

Jon M. Greenbaum (D.C. Bar No. 489887)
**JUSTICE LEGAL STRATEGIES PLLC**
P.O. Box 27015
Washington, D.C. 20038
(202) 601-8678
jgreenbaum@justicels.com

*Counsel for Plaintiff*

26