**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALVIN BROWN,<br><br>      *Plaintiff*,<br><br>  v.<br><br>DONALD J. TRUMP, et al.<br><br>      *Defendants*. | Case No. 1:25-cv-01764-DLF<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

   I.  Statutory background ........................................................................................................ 2

      A.  History of the NTSB as an independent agency ........................................................... 2

      B.  NTSB's structure ........................................................................................................... 4

      C.  NTSB's functions .......................................................................................................... 5

   II.  Factual background ......................................................................................................... 7

   III. Procedural history ........................................................................................................ 9

LEGAL STANDARD ............................................................................................................... 10

ARGUMENT ............................................................................................................................ 10

   I.  Mr. Brown's removal violates 49 U.S.C. § 1111(c). ...................................................... 11

   II. NTSB members' removal protections are constitutional. ............................................... 11

      A.  *Slaughter* does not apply to offices with investigative and informative powers and purely adjudicatory functions. ............................................................................ 11

      B.  NTSB exercises investigative and informative powers in aid of Congress's legislative function. ..................................................................................................... 12

      C.  NTSB's appellate function is purely adjudicatory. ...................................................... 15

   III. The Court should award relief to Mr. Brown. .................................................................. 17

      A.  The Court should declare Mr. Brown's removal unlawful. .......................................... 17

      B.  The Court should issue a writ of mandamus. .............................................................. 18

      C.  Alternatively, the Court should grant a permanent injunction. .................................... 20

CONCLUSION ......................................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Berry v. Reagan*,
  No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ........................................................ 20

*Boyle v. Trump*,
  791 F. Supp. 3d 585 (D. Md. 2025) ...................................................................................... 18

*\*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..................................................................................... 10, 12, 13, 15

*Chiron Corp. & PerSeptive Biosystems v. NTSB*,
  198 F.3d 935 (D.C. Cir. 1999) ...................................................................................... 2, 5, 13

*Clinton v. New York*,
  524 U.S. 417 (1998) .................................................................................................. 17

*Collins v. Yellen*,
  594 U.S. 220 (2021) .................................................................................................. 16

*Crim v. Comm'r of Internal Revenue*,
  66 F.4th 999 (D.C. Cir. 2023) ...................................................................................... 16

*\*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) .................................................................................................. 14

*Garvey v. NTSB*,
  190 F.3d 571 (D.C. Cir. 1999) ...................................................................................... 7, 15

*Grundmann v. Trump*,
  770 F. Supp. 3d 166 (D.D.C. 2025) ........................................................................... 18, 20, 21

*Grundmann v. Trump*,
  No. 25-5165, 2026 WL 303730 (D.C. Cir. Feb. 4, 2026) ........................................................ 18

*Grundmann v. Trump*,
  No. 25-5165, 2025 WL 1840641 (D.C. Cir. July 3, 2025) ...................................................... 23

*Hanes Corp. v. Millard*,
  531 F.2d 585 (D.C. Cir. 1976) ...................................................................................... 17, 18

*Harper v. Bessent*,
  795 F. Supp. 3d 28 (D.D.C. 2025) ...................................................................................... 18

*Harris v. Besent*,
  2026 WL 1871323 (S. Ct. June 30, 2026) ........................................................................... 14, 18

*Harris v. Bessent,*
  160 F.4th 1235 (D.C. Cir. 2025) ............................................................ 14, 15, 16, 18

*Harris v. Bessent,*
  775 F. Supp. 3d 164 (D.D.C. 2025) ............................................................ 17, 18, 20

*Hinson v. NTSB,*
  57 F.3d 1144 (D.C. Cir. 1995).................................................................... 15, 16

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935).................................................................................. 11, 12

*Illinois v. Ferriero,*
  60 F.4th 704 (D.C. Cir. 2023) .......................................................................... 18

*In re Nat'l Nurses United,*
  47 F.4th 746 (D.C. Cir. 2022) .......................................................................... 18

*In re Sawyer,*
  124 U.S. 200 (1888)........................................................................................ 19

*Joshi v. NTSB,*
  791 F.3d 8 (D.C. Cir. 2015) ..................................................................... 5, 6, 13

*Kalbfus v. Siddons,*
  42 App. D.C. 310 (D.C. Cir. 1914) .................................................................. 19

*Kennedy v. Braidwood Mgmt., Inc.,*
  606 U.S. 748 (2025)........................................................................................ 12

*Kuretski v. Comm'r of Internal Revenue,*
  755 F.3d 929 (D.C. Cir. 2014) ........................................................................ 16

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016)............................................................................. 21

*Lovitky v. Trump,*
  949 F.3d 753 (D.C. Cir. 2020) ........................................................................ 18

*Marbury v. Madison,*
  5 U.S. 137 (1803)............................................................................................ 17

*Martin v. Occupational Safety & Health Rev. Comm'n,*
  499 U.S. 144 (1991)........................................................................................ 15

*McGrain v. Daugherty,*
  273 U.S. 135 (1927)........................................................................................ 14

*Mistretta v. United States,*
   488 U.S. 361 (1989)..................................................................................................... 14

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010)..................................................................................................... 20

*Morrison v. Olson,*
   487 U.S. 654 (1988)..................................................................................................... 16

*Muthana v. Pompeo,*
   985 F.3d 893 (D.C. Cir. 2021) ..................................................................................... 18

*New York v. Biden,*
   636 F. Supp. 3d 1 (D.D.C. 2022) ................................................................................. 17

*President v. Vance,*
   627 F.2d 353 (D.C. Cir. 1980) ..................................................................................... 17

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.,*
   No. 19-cv-3629, 2021 WL 1198047 (D.D.C. Mar. 30, 2021)........................................ 1

*Schweiker v. McClure,*
   456 U.S. 188 (1982)..................................................................................................... 16

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020)................................................................................................ 16, 22

*Severino v. Biden,*
   71 F.4th 1038 (D.C. Cir. 2023)................................................................................. 2, 20

*Singh v. Berger,*
   56 F.4th 88 (D.C. Cir. 2023)........................................................................................ 20

*Slaughter v. Trump,*
   791 F. Supp. 3d 1 (D.D.C. 2025) ...................................................................... 18, 20, 21

*Swan v. Clinton,*
   100 F.3d 973 (D.C. Cir. 1996).............................................................................. 2, 19, 20

*Trump v. Boyle,*
   145 S. Ct. 2653 (2025).................................................................................................. 22

*Trump v. Cook,*
   No. 25A312, 2026 WL 1855613 (U.S. June 29, 2026)................................................. 19

*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020)..................................................................................................... 14

*Trump v. Slaughter,*
  146 S. Ct. 18 (2025) ................................................................................................ 18

*Trump v. Slaughter,*
  No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) ...................... 9, 10, 11, 12, 13, 14, 15, 16

*Trump v. Wilcox,*
  145 S. Ct. 1415 (2025) ........................................................................................ 22, 23

*United States v. Kirst,*
  54 F.4th 610 (9th Cir. 2022) ...................................................................................... 7

*Vasquez v. District of Columbia,*
  110 F.4th 282 (D.C. Cir. 2024) ................................................................................ 10

*Wiener v. United States,*
  142 F. Supp. 910 (Ct. Cl. 1956) ................................................................................. 3

*\*Wiener v. United States,*
  357 U.S. 349 (1958) ............................................................................................ 3, 15

*Wilcox v. Trump,*
  775 F. Supp. 3d 215 (D.D.C. 2025) .......................................................... 18, 20, 21, 22

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................................... 20

**Statutes**

2 U.S.C. § 437f ..................................................................................................... 12

28 U.S.C. § 2201 ................................................................................................... 17

28 U.S.C. § 516 ..................................................................................................... 14

28 U.S.C. § 519 ..................................................................................................... 14

49 U.S.C. § 1111 .................................................................. 1, 2, 4, 5, 9, 10, 11, 17

49 U.S.C. § 1113 ...................................................................................................... 6

49 U.S.C. § 1116 ...................................................................................................... 6

49 U.S.C. § 1131 ................................................................................................... 5, 6

49 U.S.C. § 1132 ...................................................................................................... 6

49 U.S.C. § 1133 ................................................................................................... 6, 15

49 U.S.C. § 1134 .................................................................................................................... 6

49 U.S.C. § 1136 .................................................................................................................... 5

49 U.S.C. § 1139 .................................................................................................................... 5

49 U.S.C. § 1151 ................................................................................................................ 6, 14

49 U.S.C. § 1154 .................................................................................................................... 6

49 U.S.C. § 1155 .................................................................................................................... 6

49 U.S.C. § 40101 .................................................................................................................. 7

Air Commerce Act of 1926, Pub. L. No. 69-254, 44 Stat. 568 ........................................... 2

Civil Aeronautics Act of 1938, Pub. L. No. 75-706, 52 Stat. 973 ................................... 2, 3

Department of Transportation Act, Pub. L. No. 89-670, 80 Stat. 931 (1966) .................. 3, 4

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 ........................................ 3

Independent Safety Board Act of 1974, Pub. L. No. 93-633, 88 Stat. 2156 (1975) ........... 4, 5, 21

Reorganization Plan No. IV, 54 Stat. 1234 (1940) .............................................................. 3

## Regulations

49 C.F.R. § 830.10 ................................................................................................................ 6

49 C.F.R. § 830.5 .................................................................................................................. 6

49 C.F.R. § 831.22 ................................................................................................................ 5

49 C.F.R. § 831.4 ............................................................................................................... 5, 6

49 C.F.R. § 835.3 .................................................................................................................. 6

## Other Authorities

Edwin Borchard, *Declaratory Judgments* (2d ed. 1941) ................................................... 17

Fed. R. Civ. P. 56 ................................................................................................................ 10

Glenn Kessler, *Trump Launched Air Controller Diversity Program That He Now Decries*,
    Wash. Post (Jan. 30, 2025), https://perma.cc/693L-JZ5R ........................................... 21

H.R. Rep. No. 89-1701 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 3362 ....................... 3

*Investigation Report*, NTSB, https://perma.cc/K6KN-MY87 (last visited July 12, 2026) ............ 6

vi

*Member DeLeeuw*, NTSB, https://perma.cc/NJL4-8FHT (last visited July 12, 2026) .................. 8

Nominations, Congress.gov, *PN114—Alvin Brown—National Transportation Safety Board*, https://perma.cc/7TKD-EBNT (last visited July 12, 2026) ....................................... 7

Nominations, Congress.gov, *PN2448—Alvin Brown—National Transportation Safety Board*, https://perma.cc/7KWT-TN8L (last visited July 12, 2026) ................................ 7

Nominations, Congress.gov, *PN730-19—John DeLeeuw—National Transportation Safety Board*, https://perma.cc/VQ4P-RVZ8 (last visited July 12, 2026) ................................ 8

NTSB, Aviation Investigation Rep. AIR-26-02, *Midair Collision over the Potomac River PSA Airlines Flight 5342, Mitsubishi Heavy Industries (MHI) RJ Aviation CL-600-2C10 (CRJ700), and US Army Priority Air Transport Flight 25, Sikorsky UH-60L*, 299 (Jan. 29, 2025), https://perma.cc/S62Y-UBBD .................................... 22

NTSB, *Contact of Containership Dali with Francis Scott Key Bridge and Subsequent Bridge Collapse*, https://perma.cc/V28G-UCDA (last visited July 12, 2026) ......... 1

NTSB, *Fiscal Year 2027 Budget Request* (2026), https://perma.cc/U98C-NGMU .................. 7, 21

NTSB, *Midair Collision PSA Airlines Bombardier CRJ700 Airplane and Sikorsky UH-60 Military Helicopter*, https://perma.cc/7HU4-QF64 (last visited July 12, 2026) ......................... 1

NTSB, *Midair Collision PSA Airlines Bombardier CRJ700 Airplane and Sikorsky UH-60 Military Helicopter*, https://perma.cc/7HU4-QF64 (last visited July 12, 2026) ....... 1, 13

Press Release, S. Comm. on Com., Sci. & Transp., *FAA to Testify on Latest Post-DCA Crash Safety Measures* (May 6, 2026), https://perma.cc/8BYT-XUTZ ................................... 13

Samuel L. Bray, *Remedies in the Officer Removal Cases*, 17 J. Legal Analysis 236 (2025) ............................................................................ 19

*The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 56-57 (1982) ............................................................................. 14

**INTRODUCTION**

On January 29, 2025, a U.S. Army helicopter collided with an American Airlines plane over the Potomac River near Washington Reagan National Airport, killing 67 people. A year before, a ship crashed into the Francis Scott Key Bridge in Baltimore, causing it to collapse and kill 6 people. After each of these accidents, as it has done in thousands of transportation accidents over the decades, the National Transportation Safety Board (NTSB) came to investigate the probable cause of the accidents, so that it could recommend ways to prevent future accidents.[1]

The NTSB's primary function is to conduct thorough, objective investigations and make unbiased safety recommendations, even if they are critical of other agencies. To serve that end, in 1974, Congress moved the NTSB out of the Department of Transportation (DOT) and created it as an independent agency headed by five Board members with staggered, five-year terms, only three of whom can be from any one political party. To further ensure that the NTSB could perform that function without undue political influence, the President can remove Board members only for "inefficiency, neglect of duty, or malfeasance in office." 49 U.S.C. § 1111(c). At the same time, however, there is no intrusion on the President's ability to enforce laws. Unlike DOT, the NTSB has no authority to promulgate or enforce any safety regulations against private companies or other agencies.

On May 5, 2025, Defendant Donald Trump violated 49 U.S.C. § 1111(c) when he suddenly fired Board member Plaintiff Alvin Brown over 18 months before his term was to expire on December 31, 2026. The termination email provided no reason for his termination. Within less than 24 hours, Mr. Brown was forced to return his government equipment and ID. He is no longer

---

[1] *See* NTSB, *Midair Collision PSA Airlines Bombardier CRJ700 Airplane and Sikorsky UH-60 Military Helicopter*, https://perma.cc/7HU4-QF64 (last visited July 12, 2026); NTSB, *Contact of Containership Dali with Francis Scott Key Bridge and Subsequent Bridge Collapse*, https://perma.cc/V28G-UCDA (last visited July 12, 2026). Courts may take judicial notice of "publicly available materials and information, such as . . . information available on government websites." *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. 19-cv-3629, 2021 WL 1198047, at *2 n.2 (D.D.C. Mar. 30, 2021).

able to access his office or to perform the duties that he was Presidentially appointed and Senate confirmed to do.

Because it is clear that his removal without cause violates § 1111(c) and that § 1111(c) is constitutional, Mr. Brown is entitled to summary judgment. As a remedy, the Court should declare that his removal was unlawful. The Court should also issue a writ of mandamus or in the alternative enjoin Defendants NTSB and Jennifer Homendy, Chair of the NTSB, from giving effect to his unlawful firing, a remedy that the D.C. Circuit has recognized is available in such cases. *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996). Mr. Brown respectfully requests that this Court consider this motion without delay so that this case and any appeals may be resolved and he may resume work before his term ends on December 31, 2026.

## BACKGROUND

### I.   Statutory background

#### A.  History of the NTSB as an independent agency

"The NTSB is a uniquely independent federal agency responsible for investigating airplane accidents, determining the probable cause of accidents, and making recommendations to help protect against future accidents." *Chiron Corp. & PerSeptive Biosystems v. NTSB*, 198 F.3d 935, 937 (D.C. Cir. 1999).

In 1926, Congress vested the Department of Commerce with the responsibility to investigate aircraft accidents in the United States. Air Commerce Act of 1926, Pub. L. No. 69-254, ch. 344, § 2(e), 44 Stat. 568, 569. But Congress soon recognized the importance of having an independent agency investigate aircraft accidents. In 1938, Congress created a new multimember Civil Aeronautics Authority outside of the Department of Commerce, whose members were removable by the President only for "inefficiency, neglect of duty, or malfeasance." Civil Aeronautics Act of 1938, Pub. L. No. 75-706, § 201(a), 52 Stat. 973, 981. Within the Authority was an Air Safety Board whose role was to investigate accidents and make safety

2

recommendations to the Authority. *Id.* §§ 701, 702, 52 Stat. at 1012-13. Congress directed the Board to "exercise and perform its powers and duties independently of the Authority." *Id.* § 702(b), 52 Stat. at 1014.

In 1940, President Roosevelt consolidated the Air Safety Board into the Civil Aeronautics Authority; changed the Authority's name to the Civil Aeronautics Board; and moved the Civil Aeronautics Board into the Department of Commerce. Reorganization Plan No. IV, § 7 (a)-(b), 54 Stat. 1234, 1235 (1940). Although the aircraft accident investigation function thus was once again placed within the Department of Commerce, the Civil Aeronautics Board "exercise[d] its functions . . . independently of the Secretary of Commerce." *Id.* § 7(c), 54 Stat. at 1236. The new Board's members retained their previous removal protections. *See Wiener v. United States*, 142 F. Supp. 910, 914 (Ct. Cl. 1956) (noting the 1938 act included removal protections for the Civil Aeronautics Board), *rev'd on other grounds,* 357 U.S. 349 (1958); *see also* Federal Aviation Act of 1958, Pub. L. No. 85-726, § 201(a), 72 Stat. 731, 741 (providing that the Board would continue and that "[t]he members of the Board may be removed by the President for inefficiency, neglect of duty, or malfeasance in office").

In 1966, Congress consolidated various transportation agencies into a new Department of Transportation (DOT) and established within it the National Transportation Safety Board, which, similar to its predecessors, was to operate "independent of the Secretary [of Transportation] and the other offices and officers of the Department." Department of Transportation Act, Pub. L. No. 89-670, § 5(f), 80 Stat. 931, 936 (1966). To make the NTSB "truly independent," the Board members were "removable only for cause." H.R. Rep. No. 89-1701 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 3362, 3370. Specifically, the President could remove Board members only "for inefficiency, neglect of duty, or malfeasance in office." Pub. L. No. 89-670, § 5(h), 80 Stat. at 936.

In 1974, Congress enacted the Independent Safety Board Act of 1974 and moved the NTSB out of DOT altogether. Congress found that the NTSB needed to be independent of DOT and all other agencies in order to conduct independent accident investigations and formulate safety improvement recommendations that at times may be critical of agencies and their officials:

3

(1) The National Transportation Safety Board was established by statute in 1966 (Public Law 89-670; 80 Stat. 935) as an independent Government agency, located within the Department of Transportation, to promote transportation safety by conducting independent accident investigations and by formulating safety improvement recommendations.

(2) Proper conduct of the responsibilities assigned to this Board requires vigorous investigation of accidents involving transportation modes regulated by other agencies of Government; demands continual review, appraisal, and assessment of the operating practices and regulations of all such agencies; and calls for the making of conclusions and recommendations that may be critical of or adverse to any such agency or its officials. *No Federal agency can properly perform such functions unless it is totally separate and independent from any other department, bureau, commission, or agency of the United States.*

Independent Safety Board Act of 1974, Pub. L. No. 93-633, § 302, 88 Stat. 2156, 2166-67 (1975) (emphasis added). Consistent with its findings, Congress explicitly recognized the NTSB as "an independent establishment of the United States Government." 49 U.S.C. § 1111(a). Notably, although Congress intended for NTSB to independently assess other agencies' safety-related practices and regulations and to make recommendations for improvement, Congress did not give NTSB power to compel other agencies to make changes. *See* Pub. L. No. 93-633, § 304, 88 Stat. at 2168-71 (listing NTSB's duties). Congress ensured that the authority to adopt and implement safety policies—or not—remained with the DOT, a traditional Executive Branch agency whose head is removable at will by the President. *See id.* § 307, 88 Stat. at 2172.

### B. NTSB's structure

Today, the NTSB is led by five Board members "appointed by the President, by and with the advice and consent of the Senate." 49 U.S.C. § 1111(b). "Not more than 3 members may be appointed from the same political party." *Id.* At least three of the members must be "appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in accident reconstruction, safety engineering, human factors, transportation safety, or transportation regulation." *Id.*

The members serve five-year terms. *Id.* § 1111(c). The terms are staggered so that each year the term of one member ends. Pub. L. No. 89-670, § 5(i), 80 Stat. at 936. When a term ends,

4

the member may continue to serve until a successor is appointed and qualified. 49 U.S.C. § 1111(c).

The President may only "remove a member for inefficiency, neglect of duty, or malfeasance in

office." *Id.*

The President designates a Chairman to the Board with the advice and consent of the

Senate. *Id.* § 1111(d). The Chairman serves as the chief executive and administrative officer of the

Board. *Id.* § 1111(e). The President also designates a Vice Chairman. *Id.* § 1111(d). Both the

Chairman and Vice Chairman serve three-year terms in those positions. *Id.* The statute is silent as

to whether the President can de-designate a Chair or Vice Chair. *See id.*

### C. NTSB's functions

The NTSB's primary function is limited to "conducting independent accident

investigations" and to "formulating safety improvement recommendations." Pub. L. No. 93-633,

§ 302(1), 88 Stat. at 2166. Its investigations "are not conducted for the purpose of determining the

rights or liabilities of any person." *Joshi v. NTSB*, 791 F.3d 8, 11 (D.C. Cir. 2015) (quoting 49

C.F.R. § 831.4). And the NTSB has no mechanism for requiring private parties or other agencies

to follow its recommendations. It "neither promulgates nor enforces any . . . safety regulations."

*Chiron Corp.*, 198 F.3d at 937.

The NTSB investigates major transportation accidents including aircraft accidents,

highway accidents, railroad accidents, pipeline accidents, major marine casualties, and any other

accidents where the accident is catastrophic or involves a problem of a recurrent nature. 49 U.S.C.

§ 1131(a).[2] In aircraft and rail accidents involving fatalities, the NTSB helps to recover and identify

the bodies of fatally injured passengers and serves as a point of contact for their families, helping

them connect to a designated non-profit with experience in disaster assistance, and to the airline

or rail carrier. *Id.* §§ 1136, 1139.

---

[2] If a foreign state invites the United States' participation, the United States designates NTSB to participate in international aviation accident investigations under Annex 13 of the Convention on International Civil Aviation (the "Convention" or "Chicago Convention") "in coordination with and consistent with the requirements of the United States Department of State." 49 C.F.R. § 831.22(b)(1).

Of course, to investigate the cause of an accident, the NTSB must first know that an accident has occurred and must be able to examine the wreckage, cockpit voice recordings, and other information relevant to the accident. Accordingly, Congress allowed NTSB to prescribe regulations to carry out its duties, such as "regulations governing the notification and reporting of accidents" and regulations to preserve the wreckage and accident site. *Id.* §§ 1113(a), (f); 1132(b); 1134(b); *see, e.g.*, 49 C.F.R. §§ 830.5, 830.10. The NTSB may also issue subpoenas under the signature of the Chair or the Chair's delegate. 49 U.S.C. § 1113(a)(1), (3). The NTSB cannot enforce its own subpoenas, however. Rather, the Attorney General may bring civil actions in district court to enforce subpoenas or the other statutory provisions that prohibit interference with the Board's ability to provide assistance to accident victims. *See id.* §§ 1113(a)(4), 1151, 1155.[3]

Following an investigation, the NTSB issues a public report that outlines the NTSB's findings regarding the facts and circumstances of the accident, as well as the probable cause of the accident and safety recommendations for preventing similar accidents in the future. *Id.* § 1131(a)(1), (e); 49 C.F.R. § 831.4(a)-(b).[4] The NTSB may also issue safety improvement recommendations in annual and periodic reports to Congress or other special reports. 49 U.S.C. § 1116. "[N]o part of an NTSB accident report that relates to an accident investigation may be admitted as evidence or for any other use in civil litigation." *Joshi*, 791 F.3d at 11; 49 U.S.C. § 1154(b); 49 C.F.R. § 835.3. "Thus, no legal consequences of any kind result from the NTSB's factual report or probable cause determinations." *Joshi*, 791 F.3d at 11.

Aside from investigating accidents and recommending improvements, another discrete duty of the NTSB is to review on appeal the denial, amendment, modification, suspension, or revocation of certificates issued by the Federal Aviation Administration (FAA) or Coast Guard, and certain civil penalties issued by the FAA. 49 U.S.C. § 1133. The NTSB acts as an "impartial

---

[3] These cases appear to be very rare. Earlier in this litigation, the government identified only five instances of the NTSB bringing civil actions between 1989 and 2025. Defs.' Cross-MSJ at 15-16 n.6, Dkt. 19-1.

[4] The NTSB's investigation reports are available on its website. *Investigation Report*, NTSB, https://perma.cc/K6KN-MY87 (last visited July 12, 2026).

adjudicator" in these appeals, similar to a court. *Garvey v. NTSB*, 190 F.3d 571, 573-74 (D.C. Cir. 1999) ("The Federal Aviation Act, 49 U.S.C. §§ 40101 *et seq.*, establishes a 'split-enforcement' regime in which the FAA has regulatory and enforcement authority, while the NTSB acts as an impartial adjudicator."); *see also United States v. Kirst*, 54 F.4th 610, 614 (9th Cir. 2022) ("The NTSB has no regulatory or enforcement authority. The FAA has enforcement authority to revoke a pilot's airman certificate."). This discrete appellate function represents approximately 2% of the NTSB's budget and personnel.[5]

## II.    Factual background

Alvin Brown was nominated by President Biden to serve as a member of the NTSB on August 3, 2022. After the Senate adjourned without taking action on the nomination, Mr. Brown was renominated on January 23, 2023, and was unanimously confirmed by voice vote by the Senate on March 8, 2024, to a term expiring December 31, 2026. Brown Decl. ¶¶ 1-3, Dkt. 17-3.[6] He was sworn in on March 13, 2024. *Id.* ¶ 4. He was designated as Vice Chair in December 2024. *Id.* ¶ 5.

Before serving on the NTSB, Mr. Brown had served as mayor of Jacksonville, Florida from 2011 to 2015. He was the first African American elected to that position. *Id.* ¶ 9. As mayor, he worked with federal, state, and local governments on initiatives to reduce bicycle and pedestrian fatalities and won federal grants to modernize and improve safety in Jacksonville's ports. *Id.* ¶ 10. He had also worked as a senior adviser in the U.S. Department of Transportation for community infrastructure opportunities and had previously worked in the White House and in the U.S. Departments of Commerce, Agriculture, Housing and Urban Development. *Id.* ¶¶ 8, 11. As a young

---

[5] According to NTSB's latest annual budget submission, in FY 2026, the Office of Administrative Law Judges, which issues initial decisions that are then sent to the Board for final decision, had only 7 of the agency's 445 full-time equivalent employees (1.5%). The Office's budget was $3.1 million out of the agency's total budget of $145 million (2.1%). NTSB, *Fiscal Year 2027 Budget Request* 13-14 (2026), https://perma.cc/U98C-NGMU.

[6] *See also* Nominations, Congress.gov, *PN114—Alvin Brown—National Transportation Safety Board*, https://perma.cc/7TKD-EBNT; Nominations, Congress.gov, *PN2448—Alvin Brown—National Transportation Safety Board*, https://perma.cc/7KWT-TN8L.

man, he worked full-time as a meat-cutter at Winn-Dixie and he eventually became the first in his family to graduate from college. Later in life, he became a reverend and returned to school at Duke University Divinity School. *Id.* ¶¶ 7, 15.

Mr. Brown's past experiences helped him better serve the public from the NTSB. Within two weeks of his swearing in, the Francis Scott Key Bridge collapsed in Baltimore's port, killing 6 people. Mr. Brown immediately went to the site with Chairman Homendy and other NTSB employees to begin the investigation, assist victims' families, and coordinate responses to the disaster with other federal agencies and state and local governments. *Id.* ¶ 12. He also led responses to a massive highway pileup in Austin, Texas involving a semi-truck and 16 other cars, which killed 5 and injured 11 people, and to a car crash in Belle Glade, Florida that killed 6 children and 3 adults. *Id.* ¶ 13.

After business hours on May 5, 2025—over 18 months before his term was to expire—Mr. Brown suddenly learned that he had been terminated by President Trump. He had no advance warning. The one-sentence email from the White House did not state any reason for terminating him. Sent from Trent M. Morse, Deputy Director, Presidential Personnel, the email stated: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Transportation Safety Board is terminated effective immediately." *Id.* ¶¶ 16-18. The next day, Mr. Brown was required to turn in his government ID, phone, and laptop. His assistant was also terminated. Mr. Brown has not been able to perform his duties as an NTSB member since being terminated. *Id.* ¶¶ 19-21.

On January 13, 2026, John DeLeeuw was nominated ostensibly to fill Mr. Brown's seat. He was confirmed by the Senate by a 50-45 vote on February 25.[7] On March 16, Mr. DeLeeuw took an oath of office as an NTSB member and has been holding himself out as an NTSB member.[8]

---

[7] Nominations, Congress.gov, *PN730-19—John DeLeeuw—National Transportation Safety Board*, https://perma.cc/VQ4P-RVZ8.
[8] *Member DeLeeuw*, NTSB, https://perma.cc/NJL4-8FHT (last visited July 12, 2026).

### III.    Procedural history

Mr. Brown filed suit in this Court on June 4, 2025, and filed an amended complaint on December 4, 2025. Compl., Dkt. 1; First Amended Compl. ("FAC"), Dkt. 25. In Count I of the operative complaint, Mr. Brown alleges that his removal violated 49 U.S.C. § 1111(c), as he was not removed for inefficiency, neglect of duty, or malfeasance in office, the only reasons for which an NTSB member can be removed. FAC ¶¶ 52-57. In Count II, Mr. Brown alleges that his removal was racially discriminatory, in violation of the Fifth Amendment. *Id.* ¶¶ 58-63. Litigation on Count I was stayed pending a Supreme Court decision in *Trump v. Slaughter*, which concerned the constitutionality of the Federal Trade Commissioners' statutory removal protections. Minute Order (Dec. 29, 2025). In the meantime, "to preserve any relief to which the plaintiff may be entitled before the end of his statutory term," the Court permitted litigation on Count II to proceed. *Id.* Defendants moved to dismiss Count II, which Plaintiff opposed. Dkts. 30, 31, 32.

On April 14, 2026, Mr. Brown filed a petition for writ of quo warranto. As explained in the petition and discussed further *infra*, "[u]nder D.C. Circuit precedent Mr. Brown maintains that he can obtain complete relief, including reinstatement," through this case. He nevertheless filed the petition for a writ of quo warranto "out of an abundance of caution in the event the *Brown I* defendants argue that Mr. DeLeeuw's confirmation precludes Mr. Brown from obtaining relief except through a writ of quo warranto." Pet. ¶ 5, *Brown v. DeLeeuw*, 1:26-cv-01249-DLF ("*Brown II*"), Dkt. 1.

On June 29, 2026, the Supreme Court decided *Slaughter*, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026). This Court subsequently denied Defendants' pending motion to dismiss Count II without prejudice and ordered the parties to propose a schedule for dispositive briefing on both counts. Minute Order (June 30, 2026). In accordance with the briefing schedule that the parties proposed and the Court adopted, in this motion, Mr. Brown seeks summary judgment on Count I. *See* Minute Order (July 3, 2026).

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. *Vasquez v. District of Columbia*, 110 F.4th 282, 287 (D.C. Cir. 2024).

## ARGUMENT

Mr. Brown is entitled to summary judgment because his removal without cause violated 49 U.S.C. § 1111(c) and that statute is constitutional as a matter of law. Regarding the statutory violation, the material facts are indisputable. Mr. Brown was a sitting member of the NTSB; President Trump removed him from that position on May 5, 2025, without cause; and he has not been able to fulfill his duties since. The statute permits the President to remove NTSB members only "for inefficiency, neglect of duty, or malfeasance in office," and Mr. Brown was not removed for any of those reasons; indeed, President Trump has given no reason at all for firing Mr. Brown. Thus, his removal violated the statute.

Section 1111(c) is constitutional. The NTSB's primary function is to investigate transportation accidents and to write reports recommending safety improvements. The NTSB's work in this area is purely "of an investigative and informative nature," which may "be regarded as merely in aid of the legislative function of Congress." *Slaughter*, 2026 WL 1855612, at *18 (quoting *Buckley v. Valeo*, 424 U.S. 1, 137 (1976) (per curiam)). The NTSB has no power to turn its recommendations into regulations, nor to prosecute enforcement actions in-house or before a court, nor to otherwise regulate agencies or private parties' primary conduct.

Because the President's removal of Mr. Brown violates § 1111(c) and is inconsistent with the Constitution and Supreme Court precedent, the Court should declare the removal null and void. The Court should also issue a writ of mandamus or alternatively enjoin Defendants NTSB and Jennifer Homendy, the Chair of the NTSB, from preventing Mr. Brown from performing the duties of his office. Such relief is the only way to provide adequate relief to Mr. Brown and to restore the separation of powers after President Trump's overreach.

10

## I.    Mr. Brown's removal violates 49 U.S.C. § 1111(c).

The unambiguous language of the Independent Safety Board Act and the undisputed facts clearly demonstrate that Mr. Brown's removal violates 49 U.S.C. § 1111. Under § 1111(c), "the term of office of each member is 5 years" and the President may remove a member only "for inefficiency, neglect of duty, or malfeasance in office." *See Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935) (reading similar language in the FTC Act as intended "to limit the executive power of removal to the causes enumerated"), *overruled in other respects by Trump v. Slaughter*, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026). Mr. Brown was removed on May 5, 2025, over a year and a half before his term was to end on December 31, 2026. The President has offered no reason for removing Mr. Brown, let alone a reason that satisfies the statutory standard. Thus, Mr. Brown's removal violated the statute.

## II.    NTSB members' removal protections are constitutional.

The removal protection provision in 49 U.S.C. § 1111(c) is constitutional.

### A.    *Slaughter* does not apply to offices with investigative and informative powers and purely adjudicatory functions.

In 1935, *Humphrey's Executor* upheld the constitutionality of FTC's removal protections. On June 29, 2026, *Slaughter* overturned *Humphrey's Executor* and held that the FTC's for-cause removal provision violated the separation of powers because of the executive nature of the tasks the FTC undertakes. *Slaughter*, 2026 WL 1855612, at *15, *17. "First, the FTC has the power to promulgate substantive rules that carry the force of law." *Id.* at *17. "Second, the FTC not only investigates businesses to ensure they comply with its statutes and rules, but enforces those statutes and rules through in-house adjudications." *Id.* (citation omitted). "And third, the FTC files civil suits on behalf of the United States in federal court." *Id.*

*Slaughter* recognized, however, that "not all offices created by Congress necessarily come with executive or even sovereign power attached," *id.* at *18, and that Congress remains free "to establish independent agencies to assist it with its functions," so long as it does not "foist those agencies upon the President, and thus deprive him of 'the executive power vested [in him] by the

11

Constitution,'" *id.* at \*14 (citing *Buckley*, 424 U.S. at 137-38, and quoting *Humphrey's Executor*, 295 U.S. at 628). The Court noted, for example, the difference between the "discretionary power to seek judicial relief," a quintessential executive power, and "powers 'of an investigative and informative nature,' which may 'be regarded as merely in aid of the legislative function of Congress.'" *Id.* at \*18 (again citing *Buckley*, 424 U.S. at 137-38). The Court also noted that it was not "determin[ing] the fate of officials not before us." *Id.* In particular, the Court left for another day "the permissibility of tenure protections for the judges of 'non-Article III courts,' such as the Tax Court and the Court of Federal Claims," which "poses a 'different set of questions.'" *Id.*

### B. NTSB exercises investigative and informative powers in aid of Congress's legislative function.

Under *Slaughter* and other Supreme Court precedent, the NTSB's statutory removal protections do not violate the separation of powers because the NTSB does not wield the kind of executive power that requires at-will removal.

The Supreme Court has repeatedly distinguished between investigative and informative powers in aid of legislation and "more substantial" powers that belong to the Executive. *Buckley*, 424 U.S. at 137-38. *Buckley*, for example, distinguished the Federal Election Commission's powers to collect and disseminate information and to investigate, which could validly be exercised by an entity insulated from the President's control, from its ability to enforce the law through rulemaking and civil lawsuits, which could not.[9] *Id.* at 137-41. *Slaughter* similarly emphasized that the FTC has "substantive" rulemaking authority and that it not only investigates whether businesses are complying with statutes and rules but also enforces those statutes and rules through in-house adjudications or lawsuits in court. 2026 WL 1855612, at \*17. *See also Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025) (noting that, before 2010, "members of the

---

[9] *Buckley* put the FEC's power to issue "advisory opinions" in the latter bucket, but those particular opinions had binding legal effect in that the FEC's statute created a legal presumption that the person who received the opinion and followed it in good faith was compliant with the provision of Federal Election Campaign Act addressed in the opinion. 424 U.S. at 111 (quoting 2 U.S.C. § 437f(b) (1970 ed., Supp. IV)). The NTSB statute does not contain such a provision.

12

Preventive Services Task Force were not officers at all" and did not exercise "significant governmental authority" because "[t]he Task Force was an advisory body, and the Task Force members made only non-binding recommendations").

Unlike the FEC in *Buckley* and the FTC in *Slaughter*, the NTSB has no power to make substantive transportation safety rules or to investigate, adjudicate, or litigate businesses' or other entities' compliance with such rules. The NTSB's primary responsibility is to investigate accidents and make non-binding safety improvement recommendations in reports disseminated to the public and to Congress. Its investigations "are not conducted for the purpose of determining the rights or liabilities of any person," and "no legal consequences of any kind result from the NTSB's factual report or probable cause determinations." *Joshi*, 791 F.3d at 11. Once the NTSB issues recommendations, other agencies or private parties can freely choose to follow them or not. The NTSB cannot compel compliance, as it "neither promulgates nor enforces any . . . safety regulations." *Chiron Corp.*, 198 F.3d at 937. The NTSB's "investigative" and "informative" powers "fall[] in the same general category as those powers which Congress might delegate to one of its own committees," *Buckley*, 424 U.S. at 137, and like a congressional committee, the NTSB's powers are used "merely in aid of the legislative function of Congress," *id.* at 138. Indeed, congressional committees have built upon the NTSB's work to investigate and determine whether legislative measures were needed to prevent future safety problems—including, recently, investigating the Boeing 737 MAX after an exit door plug blew out during a flight in January 2024 and the FAA's response to the January 2025 DCA crash.[10]

Earlier in this case, Defendants contended that the NTSB has rulemaking authority. Defs.' Cross-MSJ at 15. The NTSB does have authority to promulgate rules to carry out its statutory

---

[10] Press Release, S. Comm. on Com., Sci. & Transp., *FAA to Testify on Latest Post-DCA Crash Safety Measures* (May 6, 2026), https://perma.cc/8BYT-XUTZ; NTSB, *Midair Collision PSA Airlines Bombardier CRJ700 Airplane and Sikorsky UH-60 Military Helicopter*, https://perma.cc/7HU4-QF64; H. Comm. on Transp. & Infrastructure, Investigations, *Boeing 737 MAX Investigation*, https://perma.cc/SUF6-D5RR (last visited July 12, 2026); NTSB, *In-Flight Separation of Left Mid Exit Door Plug, Alaska Airlines Flight 1282, Boeing 737-9, N704AL*, https://perma.cc/X3JJ-N3BF (last visited July 12, 2026).

duties, but rulemaking authority is not inherently executive. *See Mistretta v. United States*, 488 U.S. 361, 386 (1989) ("None of our cases indicate that rulemaking *per se* . . . is a function exclusively committed to the Executive Branch."). What matters under *Slaughter* is the "substantive" nature of the rulemaking authority. 2026 WL 1855612, at \*17; *see also Harris v. Bessent*, 160 F.4th 1235, 1254 (D.C. Cir. 2025) (focusing on MSPB's "substantive rulemaking power" over "primary conduct"), *cert. denied,* 2026 WL 1871323 (S. Ct. June 30, 2026). The NTSB's rulemaking authority supports its main tasks of investigating accidents and making safety recommendations, which aid Congress's legislative function.

Similarly, the NTSB has authority to issue subpoenas as part of its investigations, but subpoena power is not inherently executive either. Indeed, "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975); *see also McGrain v. Daugherty*, 273 U.S. 135, 174-75 (1927) (upholding Congress's "attachment" of a witness who refused to testify because "the power of inquiry," including process to enforce it, is "a necessary and appropriate attribute of the power to legislate" and is inherent in it); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) (describing "[t]he congressional power to obtain information" as "'broad' and 'indispensable'" and "encompass[ing] inquiries into the administration of existing laws, studies of proposed laws, and "surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them").

Moreover, unlike the FTC, the NTSB lacks independent litigating authority. The NTSB statute does not authorize NTSB attorneys to represent it in court. Thus, the NTSB is wholly dependent on the Attorney General to enforce subpoenas. *See* 28 U.S.C. §§ 516, 519; *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 56-57 (1982) (to grant independent litigating authority, "it is necessary that Congress use language authorizing agencies to employ outside counsel (or to use their own attorneys) to represent them in court."). The same is true of lawsuits to prevent interference with the NTSB's duties. *See* 49 U.S.C. § 1151. Thus, to the extent that the power to bring such lawsuits is executive, it is wielded by the Attorney General,

not the NTSB. *See Slaughter*, 2026 WL 1855612, at *17 (using examples where FTC has independent litigating authority); *Buckley*, 424 U.S. at 137 (contrasting "investigative and informative" powers possessed by Congress, such as the power to issue subpoenas, with the executive power of bringing a lawsuit to seek judicial relief); *Harris*, 160 F.4th at 1253, 1256 (emphasizing NLRB's and MSPB's independent litigating authority).

Under *Slaughter*, Congress remains free "to establish independent agencies to assist it with its functions." 2026 WL 1855612, at *14 (citing *Buckley*, 424 U.S. at 137-38). Thus, the NTSB's removal protections remain constitutional.

### C. NTSB's appellate function is purely adjudicatory.

An additional small, discrete function of the NTSB is to adjudicate appeals from FAA decisions denying airmen certificate and the like and similar decisions by the Coast Guard. 49 U.S.C. § 1133. Unlike regulatory schemes like the FTC's in which "rulemaking, enforcement, and adjudicative powers are combined in a single administrative authority," in relation to these appeals, the NTSB's role is "purely adjudicatory." *Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995). The D.C. Circuit has described the NTSB appellate system as a "split-enforcement" regime, *id.*, in which "Congress separated enforcement and rulemaking powers from adjudicative powers, assigning these respective functions to two *different* administrative authorities." *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991). In this particular "split-enforcement" scheme, the FAA and the Coast Guard have "regulatory and enforcement authority," while the NTSB is an "impartial adjudicator." *Garvey*, 190 F.3d at 573-74; *Hinson*, 57 F.3d at 1147 n.1 (analogizing NTSB to a district court, holding that NTSB was not a proper party on an appeal of its decision and granting FAA's motion to strike NTSB's brief).

Adjudications of this type do not involve the exercise of executive power such that the President must have unfettered removal power over its members. *See Wiener v. United States*, 357 U.S. 349, 356 (1958) (holding that President lacked authority to remove members of an

15

adjudicatory commission, even in the absence of explicit removal protections);[11] *Collins v. Yellen*, 594 U.S. 220, 250 n.18 (2021) (recognizing that an adjudicatory body has "a unique need for 'absolute freedom from Executive interference'"). The NTSB's removal protections are important to ensuring that the individuals before them receive due process, which, of course, "demands impartiality on the part of those who function in judicial or quasi-judicial capacities," as the NTSB does in these cases. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Morrison v. Olson*, 487 U.S. 654, 691 n.30 (1988) ("It is not difficult to imagine situations in which Congress might desire that an official performing 'quasi-judicial' functions, for example, would be free of executive or political control.").

Defendants earlier contended that, even if an administrative agency's activities take a "'judicial' form," it is nevertheless an exercise of executive power. Defs.' Cross-MSJ at 21 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 216 n.2 (2020)). But even if so, as discussed above, the Supreme Court has repeatedly recognized that adjudicatory bodies are different. *Slaughter* too recognized that adjudicatory bodies like the Tax Court pose different questions than agencies like the FTC, 2026 WL 1855612, at *18, even though the Tax Court also "exercises Executive authority as part of the Executive Branch," *Kuretski v. Comm'r of Internal Revenue*, 755 F.3d 929, 932 (D.C. Cir. 2014); *see also Crim v. Comm'r of Internal Revenue*, 66 F.4th 999, 1001 (D.C. Cir. 2023). Thus, in *Slaughter*, the Supreme Court expressly reserved judgment as to adjudicators in entities like the Tax Court and the Court of Federal Claims. *Slaughter*, 2026 WL 1855612, at *18. The D.C. Circuit in *Harris* similarly declined to address "purely adjudicatory" agencies like the NTSB. *Harris*, 160 F.4th at 1256 (distinguishing MSPB from "[p]urely adjudicatory agencies—ones designed to be an 'independent adjudicator' with no policymaking authority" and citing *Hinson*); *Hinson*, 57 F.3d at 1147 n.1 (describing NTSB's role as "purely adjudicatory").

---

[11] *Slaughter* did not purport to overrule *Wiener*.

Because the NTSB investigates and makes safety recommendations in aid of Congress's legislative function and its appellate function is purely adjudicatory, NTSB members' removal protections do not pose a separation of powers problem.

## III. The Court should award relief to Mr. Brown.

Because Mr. Brown's removal violated 49 U.S.C. § 1111(c) and the statute is constitutional, the Court should grant Mr. Brown declaratory relief. The Court should also grant a writ of mandamus or, alternatively, injunctive relief.

### A. The Court should declare Mr. Brown's removal unlawful.

The Court should grant declaratory relief to Mr. Brown. Under the Declaratory Judgment Act, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Court's "duty . . . to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), applies even when the person violating the law is the President. *See, e.g.*, *Clinton v. New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment against the President).

In determining whether to exercise their discretion to grant declaratory relief, courts may consider various, non-dispositive factors, including "the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976). In the D.C. Circuit, "declaratory judgment will ordinarily be granted only when it will either 'serve a useful purpose in clarifying the legal relations in issue' or 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (quoting Edwin Borchard, *Declaratory Judgments* 299 (2d ed. 1941)); *see also New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022).

A declaration that Mr. Brown's termination violated 49 U.S.C. § 1111(c) would serve these ends here. It would clarify the illegality of and end the controversy over his removal. The legal question before the Court is also "one of significant 'public importance,' given that it concerns the structure and independence of a federal agency." *Harris*, 775 F. Supp. 3d at 179. Numerous courts

17

have granted declaratory relief in similar cases where they found removals unlawful.[12] While in some of these cases, higher courts have determined that the removals were lawful, higher courts have not reached the question of what final relief is appropriate when removals are unlawful. *See Harris*, 160 F.4th at 1257 ("[B]ecause we hold that the President permissibly removed Wilcox and Harris, we do not consider whether wrongfully removed principal officers may obtain declaratory, equitable, or mandatory relief against the President or other government officials.").[13] Thus, the district court decisions remain persuasive authority.

### B. The Court should issue a writ of mandamus.

The Court should also issue a writ of mandamus. A district court has "original jurisdiction of any action in the nature of mandamus" where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)). "[M]andamus jurisdiction under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910. A court "can analyze the clear right to relief and clear duty to act requirements for mandamus 'concurrently.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020)). Those first two requirements are satisfied here. As the D.C. Circuit has held, "a duty to comply with [statutory] removal restrictions . . . if it exists, is ministerial and not discretionary, for the President is bound to abide

---

[12] *Harris*, 775 F. Supp. 3d at 179 (quoting *Hanes*, 531 F.2d at 592 n.4), *rev'd on other grounds,* 160 F.4th 1235 (D.C. Cir. 2025), *cert. denied,* No. 25-1110, 2026 WL 1871323 (U.S. June 30, 2026); *Harper v. Bessent*, 795 F. Supp. 3d 28, 42 (D.D.C. 2025); *Boyle v. Trump*, 791 F. Supp. 3d 585, 602 (D. Md. 2025); *Grundmann v. Trump*, 770 F. Supp. 3d 166, 181 (D.D.C. 2025), *vacated and remanded on other grounds,* No. 25-5165, 2026 WL 303730 (D.C. Cir. Feb. 4, 2026); *Wilcox v. Trump*, 775 F. Supp. 3d 215, 240 (D.D.C. 2025), *rev'd sub nom. Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. 2025), *petition for cert. filed,* No. 26-5 (June 27, 2026); *Slaughter v. Trump*, 791 F. Supp. 3d 1, 24 (D.D.C. 2025), *rev'd and remanded on other grounds,* No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026).

[13] *Slaughter*, similarly, never reached the second question on which the Court granted certiorari: "Whether a federal court may prevent a person's removal from public office, either through relief at equity or at law." *Trump v. Slaughter*, 146 S. Ct. 18 (2025).

18

by the requirements of duly enacted and otherwise constitutional statutes." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

As for the third requirement, where an individual "has been and now is being illegally excluded from [his office], it is clear that mandamus is the most adequate remedy to restore him to his rights." *Kalbfus v. Siddons*, 42 App. D.C. 310, 321 (D.C. Cir. 1914). Although questions regarding final relief were not squarely before the Supreme Court in its recent *Trump v. Cook* case, which was at a preliminary injunction stage, in *Cook* the Supreme Court stated that, "[a]t least as a historical matter, . . . courts of equity would 'not interfere by injunction to determine questions concerning the appointment of public officers or their title to office.'" *Trump v. Cook*, No. 25A312, 2026 WL 1855613, at *10 (U.S. June 29, 2026). Rather, "that was a question only a court of law could settle (again, historically) by *quo warranto* or mandamus." *Id.* Mr. Brown has, in an abundance of caution, petitioned for a writ of quo warranto in *Brown II*. To the extent that an injunction or quo warranto is not available, however, then there is no other adequate remedy, and the Court should grant a writ of mandamus.

Defendants previously argued that back pay was an adequate alternative remedy. Defs.' Cross-MSJ at 28. But, as Professor Samuel Bray has pointed out, the Supreme Court has historically recognized that courts can determine the title to a public office "by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*, according to the circumstances of the case, and the mode of procedure, established by the common law or by statute." *In re Sawyer*, 124 U.S. 200, 212 (1888). The Court's "words [in *Sawyer*] are manifestly incompatible with the idea that a wrongfully removed public officer could seek only damages for lost wages." Samuel L. Bray, *Remedies in the Officer Removal Cases*, 17 J. Legal Analysis 236, 242 (2025); *cf. Cook*, 2026 WL 1855613, at *10 (citing Bray and rejecting the government's view that "all that a court may do is wait, and perhaps award backpay later—even if the President fires a member of the Board for an absurd reason, or no reason, and even if the court holds that he broke the law in doing so").

19

### C.  Alternatively, the Court should grant a permanent injunction.

In the alternative, the Court should enjoin Defendants Homendy and NTSB from treating Mr. Brown as having been removed and from impeding his ability to continue serving as a member of the NTSB. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584, 589 (1952) (affirming a judgment enjoining Secretary of Commerce from implementing a Presidential directive that exceeded the President's constitutional authority).

A plaintiff seeking a permanent injunction must demonstrate that: (1) he has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). The latter two merge when the defendant is the government. *See Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2023). The D.C. Circuit has recognized that injunctive relief is available in cases involving removal of federal officials. *See Severino*, 71 F.4th at 1042-43; *Swan*, 100 F.3d at 980.

#### 1.  Mr. Brown is suffering irreparable harm and there is no adequate remedy available at law.

Plaintiff meets all four factors for injunctive relief. Mr. Brown is suffering irreparable injury from Defendants' unlawful conduct and money damages are not an adequate remedy for that harm. Mr. Brown is being prevented from carrying out the statutorily mandated duties he is supposed to perform until December 31, 2026. Depriving a principal officer of "[his] statutory right to function in [his] office" constitutes an irreparable harm. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (per curiam) (D.C. Cir. 1983); *Grundmann*, 770 F. Supp. 3d at 187; *Wilcox*, 775 F. Supp. 3d at 236; *Harris*, 775 F. Supp. 3d at 185.

Defendants' conduct also "inflicts an exceptionally unique harm" to Mr. Brown and the NTSB "due to the loss of the office's independence." *Slaughter*, 791 F. Supp. 3d at 26; *Wilcox*, 775 F. Supp. 3d at 236. The NTSB has no authority to compel other agencies or private persons to

20

adopt its safety recommendations. They do so because the NTSB has a "reputation for objectivity and thoroughness."[14] The NTSB's "character and perception as neutral and expert-driven is damaged by [Mr. Brown's] unlawful removal" and money "cannot make up for that kind of intangible and reputational harm." *Wilcox*, 775 F. Supp. 3d at 236; *Grundmann*, 770 F. Supp. 3d at 188 ("A check in the mail does not address the gravamen of this lawsuit."); *Slaughter*, 791 F. Supp. 3d at 27 ("A remedial paycheck is cold comfort if the FTC's very independence can be tossed aside at the relatively low cost of providing backpay."). And, in any event, Mr. Brown is not seeking monetary relief here.

### 2.    The balance of the equities and public interest favor an injunction.

The balance of the equities and the public interest factors also weigh in favor of a permanent injunction.

First, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Second, the independence of this agency from political interference is important to its mission, as Congress found when it enacted the Independent Safety Board Act. When planes fall out of the sky or bridges collapse, the public relies on the NTSB to conduct "vigorous investigation of accidents," write reports, and make safety recommendations to protect the public without fear or favor to the President or other agencies. Pub. L. No. 93-633, § 302, 88 Stat. at 2166-67. The recent January 29, 2025 collision between a U.S. Army helicopter and commercial passenger plane over the Potomac River that killed 67 people illustrates the importance of the NTSB's independence. The day after the crash, President Trump immediately blamed the crash on diversity, equity, and inclusion initiatives for air traffic controllers.[15] But after conducting a detailed investigation, including interviewing witnesses and examining the wreckage, the NTSB in January 2026 "determined that the probable cause of this accident was," among other

---

[14] *See* NTSB, *Fiscal Year 2027 Budget Request* 8, https://perma.cc/U98C-NGMU.
[15] Glenn Kessler, *Trump Launched Air Controller Diversity Program That He Now Decries*, Wash. Post (Jan. 30, 2025), https://perma.cc/693L-JZ5R.

things, the FAA's "placement of a helicopter route in close proximity to a runway approach path," "the tower team's loss of situation awareness and degraded performance due to the high workload of the combined helicopter and local control positions," and "the Army's failure to ensure pilots were aware of the effects of error tolerances on barometric altimeters in their helicopters, which resulted in the crew flying above the maximum published helicopter route altitude."[16] The public's confidence in the NTSB members' ability to neutrally investigate accidents, to deliberate, and to put forth unbiased safety recommendations would be undermined if the courts enable the President to manipulate the Board by arbitrarily firing members without cause.

The injunction that Plaintiff seeks would not work significant hardship on Defendants. The Constitution does not give the President an absolute right to remove Mr. Brown from office. Nor do Defendants Homendy and NTSB have the legal right to treat Mr. Brown as if he were removed. And every President, including President Trump in his first term, has co-existed with the removal protections for decades. In any event, an injunction would not prevent the President from "shap[ing] [NTSB's] leadership and thereby influenc[ing] its activities." *Seila Law*, 591 U.S. at 225. NTSB member Thomas Chapman is a holdover whose term expired at the end of 2023. The President could nominate a Republican to replace Mr. Chapman at any time and, if confirmed, there would then be a Republican majority on the Board. *See Wilcox*, 775 F. Supp. 3d at 239 (rejecting government's argument that an injunction would cause control of the executive branch to slip from the President's control, where the President could fill vacant seats).

In two recent stay orders, the Supreme Court determined that the CPSC and NLRB wielded "considerable" executive power and that the government "face[d] greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (quoting *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025)); *see also Grundmann*

---

[16] NTSB, Aviation Investigation Rep. AIR-26-02, *Midair Collision over the Potomac River PSA Airlines Flight 5342, Mitsubishi Heavy Industries (MHI) RJ Aviation CL-600-2C10 (CRJ700), and US Army Priority Air Transport Flight 25, Sikorsky UH-60L*, 299 (Jan. 29, 2025), https://perma.cc/S62Y-UBBD.

*v. Trump*, 2025 WL 1840641, at \*1 (D.C. Cir. July 3, 2025) (finding that FLRA "possesses powers substantially similar to those of the NLRB"). Here, however, the NTSB does not wield considerable executive power. The NTSB's primary function is to investigate accidents and recommend safety improvements. Its recommendations are not binding on the President, other agencies, or private persons. Thus, in this case, any harm to the President is slight in comparison to the harm to Mr. Brown and to the public.[17]

## CONCLUSION

For the foregoing reasons, Mr. Brown respectfully requests that the Court grant his Motion for Partial Summary Judgment.

Dated: July 15, 2026                    Respectfully submitted,

                                        */s/ Cynthia Liao*
                                        Cynthia Liao (DC Bar No. 90036947)
                                        Ross Snyder (D.C. Bar No. 90037922)
                                        Catherine M.A. Carroll (D.C. Bar No. 497890)
                                        Elena Goldstein (D.C. Bar No. 90034087)
                                        **DEMOCRACY FORWARD FOUNDATION**
                                        P.O. Box 34553
                                        Washington, DC 20043
                                        (202) 808-1982 (Liao)
                                        cliao@democracyforward.org

                                        Jon M. Greenbaum (D.C. Bar No. 489887)
                                        **JUSTICE LEGAL STRATEGIES PLLC**
                                        P.O. Box 27015
                                        Washington, D.C. 20038
                                        (202) 601-8678
                                        jgreenbaum@justicels.com

                                        *Counsel for Plaintiff*

---

[17] Those stay orders also concerned the appropriateness of a stay pending appeal, which is a distinct matter from the appropriateness of final relief, at issue here. In the context of a motion for stay pending appeal, for instance, courts balance competing harms that may occur during the pendency of the appeal, a different time horizon. *See Wilcox*, 145 S. Ct. at 1415 ("A stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers *during the pendency of this litigation*.") (emphasis added).

23