**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ALVIN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-1764 (DLF) |
| | ) | |
| DONALD J. TRUMP, in his Official Capacity as President of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

|  |  |  |
|---|---|---|
| ALVIN BROWN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 26-1249 (DLF) |
| | ) | |
| JOHN DELEEUW, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN *BROWN I*, IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT IN *BROWN I* AND IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS THE PETITION IN *BROWN II***

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.      Statutory Background ................................................................................................ 3

II.     Factual Background ................................................................................................... 9

III.    Procedural History .................................................................................................. 11

LEGAL STANDARD........................................................................................................... 13

ARGUMENT ....................................................................................................................... 14

I.      The NTSB's For-Cause Removal Provision Is Unconstitutional ...................................... 14

      A.     Article II of the Constitution Grants the President Authority to Remove Heads of Executive Branch Agencies, Such as the NTSB ................................. 14

      B.     The NTSB Is an Executive Branch Agency that Exercises Executive Power ................................................................................................................. 17

            1.     The NTSB Wields Executive Power in Executing its Statutory Investigation Function ................................................................... 17

            2.     The NTSB's Role Adjudicating Challenges to Licensing and Registration Decisions of Other Agencies Constitutes Executive Power ....................................................................................... 24

II.     Brown Fails to State a Claim to Challenge His Removal Based on Fifth Amendment Equal Protection................................................................................... 28

      A.     Brown Fails to Plausibly Allege that His Removal Was Motivated by Race....... 28

      B.     Brown Cannot State a Claim by Invoking the *McDonnell Douglas* Framework ............................................................................................................. 35

      C.     Brown's Equal Protection Claim Is Not Legally Cognizable............................. 39

III.    The Court Lacks Jurisdiction Over the Petition in *Brown II* ........................................... 44

IV.    Brown Is Not Entitled to the Relief He Seeks ................................................................ 46

      A.     Brown Is Not Entitled to Injunctive Relief............................................................ 46

            1.     Brown Has Not Shown Irreparable Harm for Which Monetary Remedies Would Be Inadequate................................................... 47

i

2.      The Balance of Equities Weighs Against Injunctive Relief ..................... 49

B.      Brown Is Not Entitled to a Declaratory Judgment or Mandamus Relief.............. 49

CONCLUSION.................................................................................................................... 50

## TABLE OF AUTHORITIES

**CASES**

*Alston v. City of Madison*,
853 F.3d 901 (7th Cir. 2017) ................................................................................... 29, 31

*Ames v. Ohio Dep't of Youth Servs.*,
605 U.S. 303 (2025) ....................................................................................................... 35

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) ................................................................................ 47, 48

*Andrade v. Lauer*,
729 F.2d 1475 (D.C. Cir. 1984) .................................................................................... 46

\* *Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 13, 14, 31, 34

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 13, 14

*Bellinger v. Bowser*,
No. 1:17-cv-02124-TJK, 2018 WL 4705808 (D.D.C. Sept. 30, 2018) ......................... 31, 33, 34

*Berry v. Reagan*,
No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) ....................................................................................................................... 47, 48

*Blackwell v. Strain*,
496 F. App'x 836 (10th Cir. 2012) ................................................................................ 31

*Bolling v. Sharpe*,
347 U.S. 497(1954) ........................................................................................................ 28

*Brehm v. Marocco*,
No. 25-cv-660 RJL, 2025 U.S. Dist. LEXIS 71326 (D.D.C. Mar. 11, 2025) .............. 47

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................................................... 19

*Burns v. U.S. Gen. Act. Off. Emps. Fed. Credit Union*,
Civ. Action No. 88-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) ....................... 47-48

*Camreta v. Greene*,
563 U.S. 692 (2011) ....................................................................................................... 36

*Carter v. Duncan-Huggins, Ltd.*,
727 F.2d 1225 (D.C. Cir. 1984) .................................................................................... 37

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ................................................................................................ 26

*Collins v. Yellen*,
594 U.S. 220 (2021) ................................................................................................ 23

*Cones v. Shalala*,
199 F.3d 512 (D.C. Cir. 2000) ................................................................................ 36

*Connors v. NTSB*,
844 F.3d 1143 (9th Cir. 2017) ................................................................................ 25

*Consol. Edison Co. v. Ashcroft*,
286 F.3d 600 (D.C. Cir. 2002) ................................................................................ 50

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) .......................................................................... 11

*Davis v. Billington*,
76 F. Supp. 3d 59 (D.D.C. 2014) ............................................................................ 47

*Dellinger v. Bessent*,
No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025), *mot. to vacate denied by*, 2025 WL
935211 (D.C. Cir. Mar. 27, 2025) ........................................................................... 48

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .................................................................................................... 38

*Dvorak v. DHS*,
No. 1:18-cv-1941-DLF, 2019 WL 1491743 (D.D.C. Apr. 3, 2019) ........................ 13

*EEOC v. City of Janesville*,
630 F.2d 1254 (7th Cir. 1980) ................................................................................ 47

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ................................................................................................ 47

*Egbert v. Boule*,
596 U.S. 482 (2022) ................................................................................................ 37

*Farris v. Rice*,
453 F. Supp. 2d 76 (D.D.C. 2006) .......................................................................... 47

* *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................... 14, 15, 17, 24

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960) ................................................................................................ 29

iv

*Grundmann v. Trump*,
770 F. Supp. 3d 166 (D.D.C. 2025) ........................................................ 48

*Grundmann v. Trump*,
No. 25-5165, 2025 WL 1840641 (D.C. Cir. July 3, 2025) ........................................ 48

*Harrington v. DC Winery, LLC*,
No. 1:22-cv-689-TSC, 2023 WL 5561604 (D.D.C. Aug. 29, 2023)........................................ 13

*Harris v. Bessent*,
160 F.4th 1235 (D.C. Cir. 2025) ........................................................ 26

*Harris v. Bessent*,
775 F. Supp. 3d 164 (D.D.C. 2025) ........................................................ 48

*Harris v. Bessent*,
No. 25-1110, --- S. Ct. ---, 2026 WL 1871323 (U.S. June 30, 2026) ........................................ 26

*Heckler v. Ringer*,
466 U.S. 602 (1984) ........................................................ 50

*Hetreed v. Allstate Ins. Co.*,
135 F.3d 1155 (7th Cir. 1998).................................................... 47

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
146 S. Ct. 1391 (2026) ........................................................ 13, 14

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) ................................................ 35-36

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ........................................................ 15

*Husain v. Power*,
630 F. Supp. 3d 188 (D.D.C. 2022) ........................................................ 13

*In re: Admin. Subpoena Issued by NTSB to R.I. Hosp.*,
No. 1:08-mc-33 (D.R.I. June 3, 2008) ........................................................ 19

*In re Navy Chaplaincy*,
738 F.3d 425 (D.C. Cir. 2013) ........................................................ 31

*In re Sealed Case*,
121 F.3d 720 (D.C. Cir. 1997) ........................................................ 42

*Jiggetts v. Cipullo*,
774 F. Supp. 3d 168 (D.D.C. 2025) ........................................................ 36

v

*Joyner v. Morrison & Foerster LLP*,
  140 F.4th 523 (D.C. Cir. 2025) ...................................................................... 35, 38

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*,
  784 F. Supp. 3d 1 (D.D.C. 2025) ...................................................................... 32

*LeBlanc v. U.S. Priv. & Civ. Liberties Oversight Bd.*,
  No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025) ...................................... 50

*Levesque v. Maine*,
  587 F.2d 78 (1st Cir. 1978) ...................................................................... 47

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) ...................................................................... 33

*McDonnell Douglas Corp v. Green*,
  411 U.S. 792 (1973). ...................................................................... 35, 36

* *Mullin v. Doe*,
  146 S. Ct. 2121 (2026) ...................................................................... 34, 38, 43

* *Myers v. United States*,
  272 U.S. 52 (1926) ...................................................................... *passim*

*Newman v. U.S. of Am. ex rel. Frizzell*,
  238 U.S. 537 (1915) ...................................................................... 44, 46

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................... 47

*NTSB v. Campbell*,
  No. 1:93-cv-2217, (E.D.N.Y. May 26, 1993) ...................................................................... 18

*NTSB v. Carnival Cruise Lines, Inc.*,
  723 F. Supp. 1488 (S.D. Fla. 1989)...................................................................... 18

*Pharm. Rsch. & Mfrs. of Am. v. HHS*,
  43 F. Supp. 3d 28 (D.D.C. 2014) ...................................................................... 5

*Rubino v. City of Mount Vernon*,
  707 F.2d 53 (2d Cir. 1983)...................................................................... 47

*Sampson v. Murray*,
  415 U.S. 61 (1974)...................................................................... 47

*Samuels v. Mackell*,
  401 U.S. 66 (1971)...................................................................... 49

* *Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ................................................................................ *passim*

*Sibley v. Obama*,
   866 F. Supp. 2d 17 (D.D.C. 2012), *aff'd*, No. 12-5198, 2012 WL 6603088 (D.C. Cir. Dec. 6,
   2012).................................................................................................................. 45

*Slaughter v. Trump*,
   791 F. Supp. 3d 1 (D.D.C. 2025) ........................................................... 48

*Stella v. Mineta*,
   284 F.3d 135 (D.C. Cir. 2002) ............................................................... 36

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*
   600 U.S. 181 (2023) ............................................................................ 39-40

*SW Gen., Inc. v. NLRB*,
   796 F.3d 67 (D.C. Cir. 2015) *aff'd* 580 U.S. 288 (2017) ....................... 46

*Taitz v. Obama*,
   707 F. Supp. 2d 1 (D.D.C. 2010) ............................................................ 46

*Trump v. Boyle*,
   606 U.S. ---, 145 S. Ct. 2653 (2025) ..................................................... 49

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................................... 42, 43

*Trump v. Slaughter*,
   --- S. Ct. ---, 2025 WL 2582814 (U.S. Sept. 8, 2025).......................... 48, 50

* *Trump v. Slaughter,*
   609 U.S. ---, 2026 WL 1855612 (June 29, 2026)............................. *passim*

*Trump v. United States*,
   603 U.S. 593 (2024) ............................................................................ 2, 39

* *Trump v. Wilcox*,
   145 S. Ct. 1415 (2025) ...................................................................... *passim*

*United States v. Arthrex, Inc.*,
   594 U.S. 1 (2021).   ................................................................................ 27

*United States v. Barrera-Vasquez*,
   617 F. Supp. 3d 400 (E.D. Va. 2022)...................................................... 38

*United States v. Collins*,
   No. 09-cv-6473, 2009 WL 5058813 (W.D.N.Y. Sept. 17, 2009) ........................ 8, 18

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ................................................................................................ 19

*United States v. Virginia*,
  518 U.S. 515 (1996) ................................................................................................ 40

*United States v. Williams*,
  No. 6:93-mc-107 (D. Kan. Feb. 11, 1993) ............................................................. 19

\* *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................................ *passim*

*Wallace v. Anderson*,
  18 U.S. (5 Wheat) 291 (1820) ................................................................................ 44

*Washington v. Davis*,
  426 U.S. 229 (1976) ......................................................................................... 28, 29

*Wilcox v. Trump*,
  775 F. Supp. 3d 215 (D.D.C. 2025) ....................................................................... 48

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ................................................................................................ 29

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ................................................................................................ 37

**CONSTITUTIONAL PROVISIONS**

\* U.S. Const. art. II ...............................................................................................*passim*

**STATUTES**

5 U.S.C. § 1204 ............................................................................................................ 26

15 U.S.C. § 46(f) .......................................................................................................... 21

26 U.S.C. § 7441 .......................................................................................................... 27

28 U.S.C. § 2202 .......................................................................................................... 49

42 U.S.C. § 1981 .......................................................................................................... 35

42 U.S.C. § 1983 .......................................................................................................... 36

49 U.S.C. § 1101-1155 .................................................................................................. 4

49 U.S.C. § 1111(c) ..................................................................................... 1, 4, 11, 14

49 U.S.C. § 1113...........................................................................................6, 18, 22

49 U.S.C. § 1116..............................................................................................5, 21

49 U.S.C. § 1131..............................................................................................*passim*

49 U.S.C. § 1132...............................................................................................5, 18

49 U.S.C. § 1133...............................................................................................9, 24

49 U.S.C. § 1134...........................................................................................6, 18, 22

49 U.S.C. § 1135...............................................................................................7, 20

49 U.S.C. § 1136...........................................................................................8, 17, 18

49 U.S.C. § 1139...............................................................................................8, 17

49 U.S.C. § 1151...............................................................................................6, 18

49 U.S.C. § 1153.....................................................................................................9

49 U.S.C. § 1155.........................................................................................6, 8, 18

49 U.S.C. § 44106..................................................................................................9

49 U.S.C. § 44703..................................................................................................9

49 U.S.C. § 44709..................................................................................................9

49 U.S.C. § 44710..................................................................................................9

D.C. Code § 16-3502 ...........................................................................................44

D.C. Code § 16-3503 ..................................................................................44, 45, 46

Air Commerce Act of 1926,
    Pub. L. No. 69-254, 44 Stat. 568...................................................................... 3

Civil Aeronautics Act of 1938,
    Pub. L. No. 75-706, 52 Stat. 973...................................................................... 3

Department of Transportation Act,
    Pub. L. No. 89-670, 80 Stat. 931 (1966) ......................................................3, 21

Independent Safety Board of Act of 1974,
    Pub. L. No. 93-633, 88 Stat. 2156 (1975). ...................................................4, 21

ix

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................ 13

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

49 C.F.R. pt. 821 ................................................................................................... 9, 27

49 C.F.R. pt. 825 .................................................................................................... 25

49 C.F.R. pts. 800-850 ............................................................................................. 6

49 C.F.R. § 821.47 ................................................................................................. 27

49 C.F.R. § 831.5 ................................................................................................... 22

49 C.F.R. § 831.11 ................................................................................................. 23

49 C.F.R. § 831.21 ................................................................................................. 23

*Collins v. Nitkin*,
   NTSB Order No. EM-193, 2002 WL 1723747 (N.T.S.B. July 23, 2002) ............................... 25

*Dickson v. Defreitas*,
   NTSB Order No. EA-5906, 2021 WL 3929998 (N.T.S.B. Aug. 24, 2021) .............................. 25

*Papp v. Ailsworth*,
   NTSB Order No. EM-211, 2011 WL 7141395 (N.T.S.B. Dec. 28, 2011) .............................. 25

Reorganization Plan No. IV, § 7, 54 Stat. 1234 (1940) ................................................. 3

**OTHER AUTHORITIES**

30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939) .................................... 14, 16, 24

Amy Howe, *Biden reiterates promise to nominate a Black woman, lauds Breyer as "model
   public servant"*, SCOTUSblog (Jan. 27, 2022), https://www.scotusblog.com/2022/01/biden-
   reiterates-promise-to-nominate-a-black-woman-lauds-breyer-as-model-public-servant/. .. 41-42

CBS News, A Cabinet That Looks Like America (Jan. 5, 2001),
   https://www.cbsnews.com/news/a-cabinet-that-looks-like-america/ ....................................... 41

Ellen  L. Weintraub (@EllenLWeintraub), X (Feb. 6, 2025),
   https://x.com/EllenLWeintraub/status/1887648967300694270 .............................................. 32

FAA, FAA Statement on NTSB Recommendations for DCA,
   https://www.faa.gov/newsroom/faa-statement-ntsb-recommendations-dca (Mar. 14, 2025) ... 20

Fed. Election Comm'n, Shana M. Broussard,
  https://www.fec.gov/about/leadership-and-structure/shana-m-broussard/...........................32-33

Federal Reserve, https://www.federalreserve.gov/aboutthefed/bios/board/jefferson.htm............ 32

Fox News, Obama: Attacks on Cabinet Diversity are Premature (updated Jan. 10, 2017),
  https://www.foxnews.com/politics/obama-attacks-on-cabinet-diversity-are-premature .......... 41

Katz Banks Kumin, *Lisa Banks and Debra Katz to Represent Former EEOC Chair and
  Commissioner Charlotte A. Burrows* (Jan. 28, 2025),
  https://katzbanks.com/news/burrows/. ................................................................................ 32

MSPB, Member Raymond A. Limon Retiring,
  https://www.mspb.gov/publicaffairs/press_releases/Ray_Limon_Farewell_Press_Release.pdf
  (Feb. 28, 2025). ................................................................................................................ 49

NTSB Annual Report to Congress (2025),
  https://www.ntsb.gov/about/reports/Documents/2025%20ARC%20Final%20Published.pdf
  ("2025 Annual Report"). .................................................................................... *passim*

NTSB, Board Members, John DeLeeuw,
  https://www.ntsb.gov/about/board/Pages/John-DeLeeuw.aspx................................................ 10

NTSB, Budget and Performance Reports,
  https://www.ntsb.gov/about/reports/Pages/default.aspx. ........................................................ 21

NTSB, Investigation Report,
  https://www.ntsb.gov/investigations/AccidentReports/Pages/Reports.aspx............................. 5

NTSB, Merchant Marine Appeal Process,
  https://www.ntsb.gov/legal/alj/Pages/marine_appeals.aspx ................................................... 25

NTSB, NTSB Makes Urgent Recommendations on Helicopter Traffic Near Reagan National
  Airport (Mar. 11, 2025),
  https://www.ntsb.gov/news/press-releases/Pages/NR20250311.aspx ..................................... 20

NTSB, NTSB Chairman Homendy,
  https://www.ntsb.gov/about/board/Pages/Jennifer-Homendy.aspx ......................................... 34

NTSB, Member Chapman,
  https://www.ntsb.gov/about/board/Pages/Thomas-Chapman.aspx.......................................... 34

NTSB, Office of Administrative Law Judges – Processes,
  https://www.ntsb.gov/legal/alj/Pages/ALJ%20Processes.aspx................................................. 9

NTSB, Recommendations Spotlight Archive,
  https://www.ntsb.gov/investigations/Pages/RecommendationsArchive.aspx............................ 7

PBS News, Meet Joe Biden's Cabinet Picks (Jan. 20, 2021),
https://www.pbs.org/newshour/politics/meet-joe-bidens-cabinet-picks ................................. 41

PBS, *Trump Promises to Replace Ginsburg with a Woman – and Soon* (Sep. 20, 2020),
https://www.pbs.org/newshour/politics/trump-promises-to-replace-ginsburg-with-a-woman-
and-soon ...................................................................................................................... 41

President Donald Trump Fires Fed Governor Lisa Cook (Aug. 25, 2025),
https://www.documentcloud.org/documents/26074125-cook-letter/........................................ 32

Statement of John F. DeLeeuw, Nominee, Member of the National Transportation Safety Board,
Before the Committee on Commerce, Science, and Transportation, United States Senate
(Nov. 6, 2025) https://www.commerce.senate.gov/services/files/71796430-6957-4B47-965B-
7C0D09D6416F ....................................................................................................................... 11

Supreme Court, *Sandra Day O'Connor: First Woman on the Supreme Court*,
https://www.supremecourt.gov/visiting/exhibitions/SOCExhibit/Section3.aspx (last visited
July 29, 2026)................................................................................................................ 41

The Associated Press, The Gainesville Sun, In Cabinet, Obama goes for experience, pragmatism,
(Dec. 20, 2008), https://www.gainesville.com/story/news/nation-world/2008/12/20/in-cabinet-
obama-goes-for-experience-pragmatism/31590871007/ ...................................................... 40-41

The Federalist No. 72 (A. Hamilton)...............................................................................1, 16

The Federalist No. 77 (A. Hamilton) (Clinton Rossiter ed., 1961) ..............................................43

The White House (archived), The Clinton Presidency: Building One America, Recore of
Progress, https://clintonwhitehouse5.archives.gov/WH/Accomplishments/eightyears-11.html
.................................................................................................................................... 40

Truth Social, https://truthsocial.com/@realDonaldTrump/posts/116336247856387679 (Apr. 2,
2026)............................................................................................................................. 45

Wilcox Letter, https://myprivateballot.com/wp-content/uploads/2025/01/Abruzzo-Wilcox-Firing-
Letter.pdf ...................................................................................................................... 32

**INTRODUCTION**

The Constitution vests the "'executive Power'—all of it"—in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). That executive power encompasses the authority "to 'select those who . . . act for him' and 'remov[e] those for whom he can not continue to be responsible.'" *Trump v. Slaughter*, 609 U.S. ---, 2026 WL 1855612, at *5 (June 29, 2026) (quoting *Myers v. United States*, 272 U.S. 52, 117 (1926)). On May 5, 2025, President Trump exercised this power when he removed Alvin Brown as a member of the National Transportation Safety Board ("NTSB"), an Executive Branch agency that exercises executive power. In two related lawsuits, *Brown v. Trump*, No. 1:25-cv-1764 (D.D.C.) ("*Brown I*"), and *Brown v. DeLeeuw*, No. 1:26-cv-1249 (D.D.C.) ("*Brown II*"), Brown challenges his removal, seeking an order reinstalling him to his former office. He relies first on the NTSB's statutory for-cause removal provision, 49 U.S.C. § 1111(c), and second on a claim that his removal constituted racial discrimination in violation of the equal protection component of the Fifth Amendment. The Court should reject both of these arguments, dismiss the Amended Complaint in *Brown I* and the Petition in *Brown II*, and deny Brown's Motion for Partial Summary Judgment in *Brown I*.

*First*, *Slaughter* removes any doubt that the NTSB's for-cause removal protection is unconstitutional, and the President has authority under Article II to remove NTSB members at will. *Slaughter* held that the Constitution "establish[es] a hierarchy—a 'Chief Magistrate' with whom the buck stops, and below him various 'assistants or deputies' who 'derive their offices from his appointment' and remain 'subject to his superintendence.' To remain accountable to the President, those officers must be removable by the President." 2026 WL 1855612, at *7 (quoting The Federalist No. 72, at 436 (A. Hamilton)). Members of the NTSB must be removable because

the NTSB is an executive agency that exercises executive power.  It conducts the Executive Branch's priority investigations of transportation accidents.  The NTSB's investigations and recommendations are an important part of the Executive Branch's execution of the laws, both because they inform how the Department of Transportation regulates transportation, and because they generate evidence on which other executive agencies rely to enforce the laws.  The NTSB also exercises executive power when it engages in administrative adjudications that decide on disciplinary measures for aviation professionals and mariners.  Brown's effort to distinguish *Slaughter* by reframing the NTSB as a hybrid between a legislative adjunct and an Article I court is unconvincing.

*Second*, Brown cannot raise an equal protection challenge to his removal.  He fails to plausibly allege that President Trump removed him on the basis of race.  Lacking any direct allegations of discriminatory intent, Brown tries to construct a claim out of an amalgam of circumstantial allegations, such as anecdotal evidence that a few other black officials have been removed, and that the President has criticized diversity, equity, and inclusion measures.  Yet he fails to allege plausibly that "invidious discriminatory purpose was a motivating factor" in his removal.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

In any event, no court has ever endorsed Brown's novel legal theory that the Fifth Amendment constrains the President's selection of principal officers.  "[T]he President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive" Presidential power that "may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (quoting *Myers*, 272 U.S. at 106).  The logic of Brown's position, that the President's exercise of even plenary Article II authorities is constrained by the equal protection component of the Fifth Amendment, would extend equally to

2

appointments of principal officers as to removals.  Yet virtually all recent Presidents have proudly admitted that they considered race and sex when choosing the principal officers who led their administrations.  The Court should not adopt a novel legal theory that would deem such conduct a constitutional violation while placing district court judges in the untenable position of having to peer into the President's mind to divine his intent when he makes his most sensitive and important personnel decisions.

## BACKGROUND

### I.      Statutory Background

1.       Since shortly after the dawn of aviation, Congress has recognized that investigation of major transportation accidents is an important executive function and has tasked an agency of the Executive Branch to perform that function. In 1926, Congress tasked the Secretary of Commerce with "investigat[ing], record[ing], and mak[ing] public the causes of accidents in civil air navigation in the United States."  Air Commerce Act of 1926, Pub. L. No. 69-254, § 2(e), 44 Stat. 568, 569.  In 1938, Congress established an Air Safety Board within the Civil Aeronautics Authority (the executive agency that regulated aviation at the time), and empowered it to investigate aviation accidents.  *See* Civil Aeronautics Act of 1938, Pub. L. No. 75-706, §§ 201(a), 701(a), 702(a), 52 Stat. 973, 981, 1012, 1013.  A subsequent reorganization consolidated the Air Safety Board with the Civil Aeronautics Authority, renamed it the Civil Aeronautics Board, and placed it within the Department of Commerce.  *See* Reorganization Plan No. IV, § 7, 54 Stat. 1234, 1235-36 (1940).  In 1966, when Congress established the Department of Transportation, it also established the NTSB as a subagency of the Department and empowered the NTSB to investigate transportation accidents.  *See* Department of Transportation Act, Pub. L. No. 89-670, §§ 3, 5, 80 Stat. 931, 931, 935 (1966).  In 1975, Congress established the NTSB in its current form, as an

3

Executive Branch agency separate from the Department of Transportation. Independent Safety Board of Act of 1974, Pub. L. No. 93-633, § 303, 88 Stat. 2156, 2167 (1975).

2.      In statutory provisions codified at Chapter 11 of Title 49 of the U.S. Code, *see* 49 U.S.C. §§ 1101-1155, Congress has directed the Executive Branch to investigate major transportation accidents and empowered the NTSB to execute this law.  The NTSB is "composed of 5 members appointed by the President, by and with the advice and consent of the Senate.  Not more than 3 members may be appointed from the same political party."  49 U.S.C. § 1111(b).  Members serve a term of five years and can continue to serve after their term until a successor is confirmed.  *Id.* § 1111(c).  The President designates a Chair with the advice and consent of the Senate and also designates a Vice Chair.  *Id.* § 1111(d).  Both the Chair and Vice Chair serve three-year terms in those positions, and the Chair serves as "the chief executive and administrative officer of the Board."  *Id.* § 1111(e).  Congress appropriates funds to the NTSB each year, with the amounts authorized to be appropriated increasing from $140 million in fiscal year 2024 to $154 million in fiscal year 2028.  *Id*. § 1118(a).

Regarding removal of members, the statute provides: "The President may remove a member for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1111(c).  As explained below, Defendants' position is that this for-cause removal provision is unconstitutional, and the President may remove NTSB members at will.

3.      Congress tasked the NTSB with investigating civil aircraft and other major transportation accidents and issuing reports about their circumstances and probable causes.  The NTSB has general authority to "investigate . . . and establish the facts, circumstances, and cause or probable cause of" civil aircraft accidents and certain highway, railroad, pipeline, and marine accidents as well as other catastrophic transportation accidents.  49 U.S.C. § 1131(a)(1).  NTSB

investigations "ha[ve] priority over any investigation by another department, agency, or instrumentality of the United States Government," *id.* § 1131(a)(2)(A), except that the Federal Bureau of Investigation investigates suspected intentional criminal acts that may have caused accidents, *id.* § 1131(a)(2)(B).  Congress called for the NTSB and other agencies that may be involved in investigating an accident to "ensure that appropriate information developed about the accident is exchanged in a timely manner."  *Id.* § 1131(a)(3).  The NTSB "shall prescribe regulations governing the notification and reporting of accidents involving civil aircraft."  *Id*. § 1132(b).

The NTSB publishes a variety of reports of its activities.  Congress directed that the NTSB "shall report on the facts and circumstances of each accident" it investigates and "shall make each report available to the public."  *Id*. § 1131(e); *see also* NTSB, Investigation Report, https://www.ntsb.gov/investigations/AccidentReports/Pages/Reports.aspx (collecting reports of NTSB's accident investigations).[1]  Beyond reports on specific accidents, the NTSB submits reports to advocate reforms to reduce accidents and minimize injuries, carries out studies about transportation safety, and submits an annual report to Congress summarizing its work.  *Id.* § 1116; *see generally* NTSB Annual Report to Congress (2025), https://www.ntsb.gov/about/reports/Documents/2025%20ARC%20Final%20Published.pdf ("2025 Annual Report").  In 2025, the NTSB adopted 1,436 investigative reports and issued 131 new safety recommendations.  2025 Annual Report at 3.

**4.**     Congress gave the NTSB a wide variety of powers to carry out its functions.  The NTSB, its members, or employees designated by the NTSB "may conduct hearings to carry out

---

[1] Courts can "take[] judicial notice of information posted on official public websites of government agencies." *Pharm. Rsch. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

this chapter, administer oaths, and require, by subpoena or otherwise, necessary witnesses and evidence." 49 U.S.C. § 1113(a)(1). A witness or evidence "may be summoned or required to be produced from any place in the United States to the designated place of the hearing." *Id.* § 1113(a)(2). The NTSB also "may prescribe regulations to carry out this chapter." *Id.* § 1113(f). The NTSB's regulations collectively comprise seventeen parts in the Code of Federal Regulations. *See* 49 C.F.R. pts. 800-850. Congress gave the NTSB many specific powers to conduct investigations, including the authority to:

- "enter property" where an accident has occurred or wreckage is located "and do anything necessary to conduct an investigation," and "inspect any record . . . related to an accident investigation." 49 U.S.C. § 1134(a);

- "inspect and test" civil aircraft involved in commercial air accidents, *id.* § 1134(b)(1);

- "order an autopsy to be performed" or "obtain a copy of an autopsy report" when necessary for an investigation, *id.* § 1134(f); and

- obtain "any recorder or recorded information pertinent to the accident" and "design specifications or data" related to equipment, *id.* § 1134(g).

The NTSB has authority to bring civil actions in federal court to effectuate and enforce several of its powers. The NTSB can "bring a civil action" to enforce subpoenas, orders, and inspection notices. *Id.* § 1113(a)(4). The NTSB may also "bring a civil action" to enforce its authority to investigate aircraft accidents, inspect accident sites and wreckage, conduct testing, perform autopsies, enforce its regulations related to those authorities, or enforce a prohibition on attorney solicitations within 45 days of an aircraft accident. *Id.* § 1151(a). The NTSB may also request that the Attorney General bring such civil actions on its behalf. *Id.* § 1151(b). In such actions, the NTSB or Attorney General may seek civil penalties of up to $1,000 for each day that a violation continues. *Id.* § 1155(a)(1).

5.      Congress enacted several provisions designed to ensure that the NTSB's investigations would be incorporated into the decisionmaking process for the Department of Transportation and its transportation regulatory agencies.  For example, "[w]hen the [NTSB] submits a recommendation about transportation safety to the Secretary of Transportation," Congress required the Secretary to provide "a formal written response to each recommendation" within 90 days.  *Id.* § 1135(a).  The response must indicate whether the Secretary intends to carry out the recommendation or refuse to do so; it must provide proposed timetables for carrying out recommendations and "detail the reasons for the refusal to carry out" any recommendations.  *Id.* § 1135(b).  The NTSB must make its recommendations and responses to those recommendations public, *id.* § 1135(c), which it accomplishes by maintaining a searchable online database of its investigations and recommendations, *see* NTSB, Case Analysis and Reporting Online, https://carol.ntsb.gov/.

As Congress intended, NTSB's recommendations regularly have concrete impacts on transportation regulation.  Since the establishment of the NTSB in 1967, it has issued more than 15,700 safety recommendations; the recommended action has been implemented for 82 percent of NTSB's recommendations that have been closed.  *See* 2025 Annual Report at 7.  Each month, the NTSB highlights specific recommendations that have led to concrete results by spurring the Department of Transportation, transportation companies, and others to implement reforms.  *See* NTSB,                Recommendations                Spotlight                Archive, https://www.ntsb.gov/investigations/Pages/RecommendationsArchive.aspx.

6.      The NTSB participates in the United States' foreign relations concerning aviation accident investigations.  "The NTSB is charged with fulfilling the US obligation for accident and incident investigations" under Annex 13 of the Chicago Convention on International Civil

7

Aviation. 2025 Annual Report at 15. The NTSB participates in international investigations of aviation accidents in foreign states involving an aircraft operated by, designed by, manufactured by, or registered to an American company. *Id.* For example, in 2025, the NTSB assisted with 479 international investigations and deployed investigators to support three investigations. *Id.*

7. The NTSB's Transportation Disaster Assistance Division plays a critical role in the response to fatal aircraft and passenger rail accidents. *See generally id.* at 50-51 (describing the division's work). For such accidents, an NTSB employee "shall be responsible for acting as a point of contact within the Federal Government for the families of the passengers involved in the accident and a liaison between [the carrier] and the families." 49 U.S.C. § 1136(a)(1) (aircraft accidents); *id.* § 1139(a)(1) (passenger rail accidents). The NTSB also must "designate an independent nonprofit organization" to be responsible "for coordinating the emotional care, psychological care, and family support services of passengers involved in the accident and the families of such passengers." *Id.* §§ 1136(a)(2), 1139(a)(2). The NTSB has "primary Federal responsibility for facilitating the recovery and identification of fatally-injured passengers involved in" such an accident. *Id.* §§ 1136(b), 1139(b). The NTSB also has continuing responsibility to ensure that families of passengers are briefed about the accident and investigation and are allowed to attend public hearings. *Id.* §§ 1136(e), 1139(e). The statute prohibits lawyers from soliciting clients for personal injury and wrongful death actions related to such accidents within 45 days of the accident, 49 U.S.C. §§ 1136(g)(2), 1139(g)(2). Violations of this prohibition are punishable through civil penalties, *id.* § 1155(a)(1), and the NTSB may "bring[] a civil action" to seek such penalties, *id.* § 1155(a)(5); *see also*, *e.g.*, Compl., *United States v. Collins*, No. 09-cv-6473, 2009 WL 5058813 (W.D.N.Y. Sept. 17, 2009) (seeking civil penalties for legal solicitations within 45 days of an aviation accident in violation of 49 U.S.C. § 1136(g)(2)). In 2025, NTSB staff assisted

3,891 victims, family members, and family contacts, and engaged with family members associated with 63 different accidents each week, on average. 2025 Annual Report at 51.

8.      Distinct from its function of investigating transportation accidents, the NTSB also adjudicates appeals of certain licensing and certification decisions by the Federal Aviation Administration (FAA) and Coast Guard. Specifically, the NTSB "shall review on appeal" "the denial, amendment, modification, suspension, or revocation of" an airman's certificate under 49 U.S.C. §§ 44703, 44709, 44710, "the revocation of a certification of registration" for an aircraft under 49 U.S.C. § 44106, or a Coast Guard decision denying, revoking, or suspending a license, certificate, document, or register. 49 U.S.C. § 1133. Appeals involving airmen or aircraft are first heard by NTSB Administrative Law Judges. *See* NTSB, Office of Administrative Law Judges – Processes, https://www.ntsb.gov/legal/alj/Pages/ALJ%20Processes.aspx; *see generally* 49 C.F.R. pt. 821 (rules of practice in airman appeals). The parties can then seek review of an ALJ's decision before the full NTSB; the NTSB's final decision is reviewable in federal court. *See* NTSB, Office of      Administrative      Law      Judges      –      Processes, https://www.ntsb.gov/legal/alj/Pages/ALJ%20Processes.aspx; 49 U.S.C. § 1153.

## II.    Factual Background[2]

Brown was a Democratic member of the NTSB who was nominated by President Biden and confirmed by the Senate in 2024 to serve a term expiring on December 31, 2026. *See* Am. Compl. ¶ 3, ECF No. 25[3]; Defs.' Resp. to Pl's. Statement of Material Facts Regarding Pl.'s Mot. for Partial Summ. J. ¶ 1 ("Defs.' SOMF Resp."), ECF No. 20-1. President Biden appointed Brown as vice chair on December 20, 2024. Am. Compl. ¶ 3; Defs.' SOMF Resp. ¶ 3.

---

[2] This section is drawn from Brown's factual allegations in the Amended Complaint in *Brown I* and Petition in *Brown II* (which are assumed to be true on a motion to dismiss) and from statements in his Statement of Undisputed Material Facts that Defendants do not dispute.

[3] Citations to court filings are to filings in *Brown I*, unless specified as being from *Brown II*.

On May 5, 2025, President Trump removed Brown from his position as a member of the NTSB, via email from Trent Morse, the Deputy Director of Presidential Personnel of the White House. *See* Am. Compl. ¶ 34; Defs.' SOMF Resp. ¶¶ 4-5. The email read:

> Alvin,
>
> On behalf of President Donald J. Trump, I am writing to inform you that your position on the National Transportation Safety Board is terminated effective immediately.
>
> Thank you for your service.
>
> Trent Morse
> Deputy Director
> Presidential Personnel

Am. Compl. ¶ 34.

Brown is a Black man. *Id.* ¶ 37. At the time of his removal, the other four members of the NTSB were white. *Id.* Two of the other members are Democratic, and two were Republican. *Id.* Brown does not allege that the President or anyone else in the Trump Administration ever said anything attributing Brown's removal to or even mentioning his race. Since Brown filed his Amended Complaint, President Trump removed one of the white Republican members of the NTSB, J. Todd Inman. *See* Notice, ECF No. 33.

President Trump nominated John DeLeeuw to serve as a member of the NTSB in the position vacated by Brown's removal. Am. Compl. ¶ 36. After being confirmed by the Senate, Member DeLeeuw took the oath of office as a member of the NTSB on March 16, 2026. *See* Pet. For Leave to Issue Writ of Quo Warranto ("Pet.") ¶ 4, *Brown II*, No. 26-cv-01249, ECF No. 1; NTSB, Board Members, John DeLeeuw, https://www.ntsb.gov/about/board/Pages/John-DeLeeuw.aspx. As Member DeLeeuw explained to the Senate Committee on Commerce, Science, and Transportation, he served as a pilot in the U.S. Air Force for seven and a half years, including in Desert Storm; he became a pilot with American Airlines, with over 19,000 flight hours; and he

rose through the ranks to become the Managing Director of Safety and Efficiency at American Airlines, where he led and supported teams that implement the airline's safety management system.[4]  Member DeLeeuw is white.  Am. Compl. ¶ 36.

### III.    Procedural History

In *Brown I*, Brown filed his original Complaint on June 4, 2025, *see* Compl., ECF No. 1, and filed his Amended Complaint on December 4, 2025, *see* Am. Compl.  Brown's Amended Complaint names President Trump, the NTSB, and NTSB Chair Jennifer Homendy as Defendants. In Count I, Brown claims that his removal was ultra vires in violation of the NTSB's for cause removal provision, 49 U.S.C. § 1111(c).  *See* Am. Compl. ¶¶ 52-57.

In Count II, Brown claims that his removal constitutes race discrimination in violation of the equal protection component of the Fifth Amendment Due Process Clause.  *See id.* ¶¶ 58-63. He alleges that he was removed and "was treated differently from similarly situated people, the other members of the Board, and particularly the white Democratic members." *Id.* ¶ 60.  He alleges that "President Trump has not offered a non-discriminatory reason for his choice to remove Mr. Brown," *id.* ¶ 61, and that "[e]ven if the Defendants assert a non-discriminatory reason, any purported non-discriminatory reason is pretextual, and race was at least in part the reason for removing Mr. Brown," *id.* ¶ 62.  He asks the Court to declare that his removal was unlawful and issue and injunction and a writ of mandamus against Chair Homendy and the NTSB that would *de facto* reinstate him in office by directing them to treat him as a member of the NTSB.  *See id.*, Request for Relief.

---

[4] *See* Statement of John F. DeLeeuw, Nominee, Member of the National Transportation Safety Board, Before the Committee on Commerce, Science, and Transportation, United States Senate (Nov. 6, 2025) https://www.commerce.senate.gov/services/files/71796430-6957-4B47-965B-7C0D09D6416F.  Congressional testimony is subject to judicial notice.  *See*, *e.g.*, *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020).

Defendants moved to stay this case pending the Supreme Court's resolution of *Trump v. Slaughter*, No. 25-332. *See* Defs.' Mot. to Stay, ECF No. 26. The Court granted in part and denied in part the stay motion, staying Count I but proceeding with Count II. *See* Minute Order (Dec. 29, 2025). Defendants then filed, and the parties briefed, a Motion to Dismiss Count II. *See* Defs.' Mot. to Dismiss Count II of Am. Compl., ECF No. 30; Pl.'s Opp'n to Defs.' Mot to Dismiss, ECF No. 31; Reply in Supp. of Defs.' Mot. to Dismiss Count II of Am. Compl., ECF No. 32.

Brown initiated *Brown II* by filing his Petition on April 14, 2026, naming Member DeLeeuw as respondent. *See* Pet., *Brown II*. In *Brown II*, Brown asks this Court to issue a writ of quo warranto to oust Member DeLeeuw from his position as a member of the NTSB, and to reinstate Brown to his former position. *See id.*, Request for Relief. Brown contends that he "was never lawfully terminated from the NTSB," and "[b]ecause [he] was never properly removed, there was no vacancy for Mr. DeLeeuw to lawfully fill." *Id.* ¶¶ 51, 54. His reasons for why his removal was unlawful are the same as in *Brown I*: violation of the NTSB's for-cause removal restriction (which corresponds to Count I in *Brown I*), *see id.* ¶ 52, and race discrimination in violation of the Fifth Amendment (which corresponds to Count II in *Brown I*), *see id.* ¶ 53.

On June 29, 2026, the Supreme Court decided on *Trump v. Slaughter*, 609 U.S. ---, 2026 WL 1855612 (June 29, 2026). This Court then entered an order in *Brown I* calling for further briefing, denying the Motion to Dismiss without prejudice, and asking the parties to propose a schedule to govern briefing on dispositive motions. *See* Minute Order (June 30, 2026).

The parties then indicated that Brown intended to file a Motion for Partial Summary Judgment on Count I in *Brown I*, and Defendants[5] intended to file motions to dismiss the Amended

---

[5] This brief uses "Defendants" to refer collectively to the defendants in *Brown I* and Respondent DeLeeuw in *Brown II*.

12

Complaint and Petition, respectively, in *Brown I* and *Brown II*.  *See* Joint Status Report at 3, ECF No. 34.  The parties proposed briefing these motions on a four-brief staggered briefing schedule, *id.*, which the Court adopted, *see* Minute Order (July 3, 2026).  Pursuant to that schedule, Brown filed his Motion for Partial Summary Judgment, ECF No. 35 ("Pl.'s SJ Mot."); *see also* Mem. of P.&A. in Supp. of Pl.'s Mot. for Partial Summ. J., ECF No. 35-1 ("Pl.'s SJ Mem.").

Accordingly, this brief is in support of Defendants' Opposition to Brown's Motion for Partial Summary Judgment in *Brown I* and in support of Defendants' Motion to Dismiss the Amended Complaint in *Brown I* and Motion to Dismiss the Petition in *Brown II*.

## LEGAL STANDARD

"Summary judgment is warranted if a party can 'show[] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law.'"  *Husain v. Power*, 630 F. Supp. 3d 188, 194 (D.D.C. 2022) (quoting Fed. R. Civ. P. 56(a)).

"A motion for dismissal under Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction.  Federal district courts are courts of limited jurisdiction, and it is presumed that a cause lies outside this limited jurisdiction."  *Dvorak v. DHS*, No. 1:18-cv-1941-DLF, 2019 WL 1491743, at *1 (D.D.C. Apr. 3, 2019) (citation modified).

"A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint."  *Harrington v. DC Winery, LLC*, No. 1:22-cv-689-TSC, 2023 WL 5561604, at *2 (D.D.C. Aug. 29, 2023).  "In order to proceed to discovery, a plaintiff must 'state a claim to relief that is plausible on its face.'"  *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 146 S. Ct. 1391, 1399 (2026) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "If the complaint 'pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Instead, to nudge a claim 'across the line from conceivable to

13

plausible,' a plaintiff must plead facts that, if true, 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and to rule out 'obvious alternative explanation[s]' for the defendant's conduct." *Id.* (quoting *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 567).

**ARGUMENT**

### I.    The NTSB's For-Cause Removal Provision Is Unconstitutional[6]

#### A.    Article II of the Constitution Grants the President Authority to Remove Heads of Executive Branch Agencies, Such as the NTSB

Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id*. § 3). "In light of '[t]he impossibility that one man should be able to perform all the great business of the State,' the Constitution provides for executive officers to 'assist the supreme Magistrate in discharging the duties of his trust.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)).

"[T]he executive power of the government" vested in the President encompasses "the general administrative control of those executing the laws, including the power of appointment and removal of executive officers." *Myers*, 272 U.S. at 163-64. To discharge his responsibilities, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund*, 561 U.S. at 513-14. Because "[i]t is *his* responsibility to take care that the laws be faithfully executed . . . the President therefore must have some 'power of removing

---

[6] This argument is in opposition to Brown's Motion for Partial Summary Judgment in *Brown I*, Defendants' Motion to Dismiss Count I of the Amended Complaint in *Brown I*, and in support of the Motion to Dismiss the Petition in *Brown II* insofar as it invokes 49 U.S.C. § 1111(c), as a reason why Brown's removal was unlawful, *see* Pet. ¶ 52, *Brown II*.

14

those for whom he can not continue to be responsible.'" *Id.* at 493 (quoting *Myers*, 272 U.S. at 117). Restricting the President's removal of such officers "would make it impossible for the President . . . to take care that the laws be faithfully executed." *Seila Law*, 591 U.S. at 214 (quoting *Myers*, 272 U.S. at 164); *see also Free Enter. Fund*, 561 U.S. at 514 ("Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else.").

Before this June, there was arguably some quantum of doubt about the scope of the President's authority to remove heads of Executive Branch agencies. That is because in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court reasoned that some executive agency heads could be insulated from removal on the grounds that their agencies' work was not "purely executive," *id.* at 628, but was "predominantly quasi judicial and quasi legislative," *id.* at 624. More recently, the Supreme Court took opportunity after opportunity to narrow *Humphrey's Executor*. *See*, *e.g.*, *Free Enter. Fund*, 561 U.S. at 514; *Seila Law*, 591 U.S. at 218, 232; *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). That pattern of cases led the Chief Justice to remark that "*Humphrey's Executor* is just a dried husk of whatever people used to think it was." Oral Arg. Tr. 109:12-13, *Trump v. Slaughter*, No. 25-332 (Dec. 8, 2025), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-332_7lhn.pdf. Yet until this June, the Supreme Court had not formally overruled *Humphrey's Executor*.

In *Slaughter*, the Supreme Court made clear what was becoming increasingly evident, that *Humphrey's Executor* is inconsistent with the separation of powers, and Article II demands that the President have authority to remove at will the heads of Executive Branch agencies. As the Court explained, "[n]early 250 years ago, the Framers decided to vest '[t]he executive Power' in one person—'a President of the United States of America.'" *Slaughter*, 2026 WL 1855612, at *5

15

(quoting U.S. Const. art. II, § 1, cl. 1).  Because officers in the Executive Branch help the President exercise the executive power, "the President must be permitted to 'select those who . . . act for him' and 'remov[e] those for whom he can not continue to be responsible.'  '[T]o hold otherwise would make it impossible for the President' to fulfill his constitutional obligation 'to take care that the laws be faithfully executed.'"  *Id.* (quoting *Myers*, 272 U.S. at 117, 164).  The Constitution "establish[es] a hierarchy—a 'Chief Magistrate' with whom the buck stops, and below him various 'assistants or deputies' who 'derive their offices from his appointment' and remain 'subject to his superintendence.'  To remain accountable to the President, those officers must be removable by the President."  *Id.* at *7 (quoting The Federalist No. 72, at 436 (A. Hamilton)).

In recognizing the President's authority to remove the heads of executive agencies, the Supreme Court "overrule[d]" *Humphrey's Executor*.  *See Slaughter*, 2026 WL 1855612, at *15.  "*Humphrey's* framework," in which Executive Branch agencies could be independent from the President because they were quasi-legislative or quasi-judicial, "has not withstood the test of time," as the Supreme Court "long ago abandoned the notion that there are some powers that are only *partly* executive."  *Id.* at *14.  As the Court concluded,

> To 'discharg[e] the duties of his trust,' the President must have the assistance of officers he can trust.  Although it is up to the Senate to decide whether to confirm those with whom the President would *prefer* to work, neither Congress nor the courts may saddle him with those with whom he *cannot* work.  Subordinates who exercise the President's power are subject to removal by him.

*Id.* at *21 (quoting 30 Writings of George Washington, at 334).

*Slaughter* makes this an easy case.  The NTSB is an Executive Branch agency that performs important work to execute the laws and to help take care that the laws are faithfully executed. Because the President's "[s]ubordinates" who lead the NTSB "exercise the President's power," they must be "subject to removal by him."  *Id.*

16

B.    **The NTSB Is an Executive Branch Agency that Exercises Executive Power**

1.    **The NTSB Wields Executive Power in Executing its Statutory Investigation Function**

As Brown acknowledges, the NTSB executes the laws enacted by Congress calling for the Executive Branch to investigate major transportation accidents. Pl.'s SJ Mem. 5-6. That alone constitutes "executive power," *Seila Law*, 591 U.S. at 218, such that the NTSB's leaders must be removable. Congress charged the NTSB with "investigat[ing] . . . and establish[ing] the facts, circumstances, and cause or probable cause" of civil aircraft accidents and other major transportation accidents. 49 U.S.C. § 1131(a)(1). The NTSB performs not just traditional investigative tasks but also facilitates recovery and identification of bodies, coordinates support services for families, and ensures that victims and their families are not troubled by unlawful attorney solicitations. *See id.* §§ 1136, 1139. No one would contest that the Federal Emergency Management Agency exercises executive power when it provides support to victims of disasters. The same is true of the NTSB when it provides support to victims of transportation accidents. The President's duty to take care that the laws are faithfully executed includes the responsibility to ensure that federal resources are brought to bear to handle crises and catastrophes. After a major plane crash or other transportation catastrophe, the American people expect the federal government to handle the scene, comfort the victims and their families, and get to the bottom of what happened. It cannot be that when the Executive Branch performs such functions, "the buck would stop somewhere else," not with the President but with an Executive Branch agency led by unaccountable principal officers. *Free Enter. Fund*, 561 U.S. at 514. If that were the case, then "the President could not be held fully accountable for discharging his own responsibilities." *Id.*

Furthermore, in performing its investigatory functions, the NTSB wields many of the tools traditionally used by Executive Branch agencies to execute laws. These include the power to

17

promulgate regulations, 49 U.S.C. §§ 1113(f), 1132(b); obtain physical and documentary evidence, with enforcement by subpoena if necessary, *id.* §§ 1113(a)(1), 1134; hold hearings and take testimony, again backed by subpoena authority, *id.* § 1113(a)(1), (a)(4); and bring civil actions to enforce these authorities, *id.* §§ 1113(a)(4), 1151. If someone obstructs an aircraft accident investigation, interferes with autopsies or testing, or makes unlawful attorney solicitations after a fatal accident, the NTSB may bring a civil action (or request that the Attorney General bring such an action) and may seek civil monetary penalties of up to $1,000 for each day that a violation continues. *See id.* §§ 1151(a), (b), 1155(a). The Supreme Court has recognized such authorities as indicative of substantial executive power. *See Seila Law*, 591 U.S. at 206 (pointing to agency's authority to "conduct investigations" and "issue subpoenas"); *id.* at 218 (pointing to agency's "authority to promulgate binding rules" to "flesh[] out" federal statutes); *id.* at 219 (characterizing the ability to seek "monetary penalties against private parties on behalf of the United States in federal court" as "a quintessentially executive power"); *Slaughter*, 2026 WL 1855612, at *17 (listing among the FTC's executive powers that it "investigates businesses" and can "file[] civil suits" seeking remedies including "civil penalties").[7]

---

[7] Brown points out that the NTSB has only rarely resorted to bringing civil actions. Pl's. SJ Mem. 6 n.3. But the NTSB has brought litigation on occasion. *See*, *e.g.*, Compl., *United States v. Collins*, No. 09-cv-6473, 2009 WL 5058813 (W.D.N.Y. Sept. 17, 2009) (seeking civil penalties for legal solicitations within 45 days of an aviation accident in violation of 49 U.S.C. § 1136(g)(2)); Order Granting Motion to Compel, *In re: Admin. Subpoena Issued by NTSB to R.I. Hosp.*, No. 1:08-mc-33, ECF No. 8 (D.R.I. June 3, 2008) (granting motion to compel compliance with NTSB administrative subpoena); Order to Show Cause, *NTSB v. Campbell*, No. 1:93-cv-2217, ECF No. 5 (E.D.N.Y. May 26, 1993) (order to show cause why individual should not be compelled to obey NTSB subpoenas); Petition, *United States v. Williams*, No. 6:93-mc-107, ECF No. 1 (D. Kan. Feb. 11, 1993) (petition to enforce NTSB subpoena); *NTSB v. Carnival Cruise Lines, Inc.*, 723 F. Supp. 1488, 1494 (S.D. Fla. 1989) (dismissing petition to enforce NTSB subpoenas based on holding that NTSB lacked authority to investigate marine accident in international waters). That the NTSB has not brought litigation more frequently reflects that through NTSB's ample statutory authority, backed by the threat of litigation, NTSB is generally able to secure compliance without suing.

18

In addition, the NTSB plays a role in foreign affairs as the United States Government's representative in international aviation accident investigations.  *See supra*, pp. 7-8; 2025 Annual Report at 15-16.  Just last year, the NTSB assisted with 479 foreign investigations.  2025 Annual Report at 15.  NTSB investigators deployed to India to help investigate a major aviation accident with more than 240 fatalities and also deployed to Canada to help investigate an aviation accident involving a U.S. airline.  *Id.*  As the Supreme Court famously declared, the Constitution makes the President "the sole organ of the federal government in the field of international relations" who "alone has the power to speak or listen as a representative of the nation."  *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-20 (1936).  That the NTSB represents the United States in sensitive international investigations underscores that the NTSB wields executive power and must be accountable to the President.

Brown argues that the NTSB's investigation function is not executive at all, but the NTSB merely works for Congress as a legislative aid.  Pl.'s SJ Mem 12.  Brown relies primarily on a parenthetical in *Slaughter*, which implies that "powers 'of an investigative and informative nature,' which may 'be regarded as merely in aid of the legislative function of Congress'" could be located in a body beyond the President's removal authority.  *Slaughter*, 2026 WL 1855612, at *18 (quoting *Buckley v. Valeo*, 424 U.S. 1, 137-38 (1976)).  The Supreme Court further explained this point by stating that "[i]f Congress wishes to establish independent agencies to assist it with its functions, it may do so.  But it may not foist these agencies upon the President."  *Id.* at *14.  The Court also repeatedly described investigation as executive, calling the FTC's "investigative" powers "quintessentially executive," *id.* at *15, and listing the fact that the FTC "investigates businesses" as an example of its executive power, *id.* *17.  Although these references to investigation as both legislative and executive seem to contradict, they can be reconciled.  When Congress hires its own

19

investigators merely to assist Congress in its legislative functions, that is not the exercise of executive power. But investigation by Executive Branch agencies is also a key tool through which the Executive Branch executes the law.

The NTSB is not a legislative agency that investigates merely in aid of Congress's legislative functions. Congress placed the NTSB within the Executive Branch and enacted several provisions that ensure that the NTSB's investigations play an important role in the execution of the laws. In particular, the Secretary of Transportation is required to consider NTSB's recommendations, offer formal written responses within 90 days, and explain any refusals to carry out the NTSB's recommendations. *See* 49 U.S.C. § 1135. As a prominent recent example, after the January 2025 fatal airplane and helicopter collision at Ronald Reagan Washington National Airport (DCA), the NTSB issued an urgent recommendation that the FAA prohibit helicopter operations near DCA when certain runways are in use. *See* NTSB, NTSB Makes Urgent Recommendations on Helicopter Traffic Near Reagan National Airport, https://www.ntsb.gov/news/press-releases/Pages/NR20250311.aspx (Mar. 11, 2025). Within three days, the FAA announced that it was implementing the recommendation in part, taking a series of steps including restricting non-essential helicopter operations around DCA. *See* FAA, FAA Statement on NTSB Recommendations for DCA, https://www.faa.gov/newsroom/faa-statement-ntsb-recommendations-dca (Mar. 14, 2025); *see also* 2025 Annual Report at 3 ("the Secretary of Transportation acted . . . immediately" on NTSB's recommendations). The authority of an Executive Branch agency to "conduct investigations" in support of Executive Branch activities is executive. *Seila Law*, 591 U.S. at 206.

Congress specifically provided that NTSB would issue reports to the public, the Executive Branch, and other interested parties, belying the notion that the investigations are merely for

20

Congress's benefit. NTSB's accident reports are made "to the public," 49 U.S.C. § 1131(e), and its periodic reports of recommendations are made "to Congress, departments, agencies, and instrumentalities of the United States Government and State and local governmental authorities concerned with transportation safety, and other interested persons," *id.* § 1116(a). Like other executive agencies, the NTSB also makes reports to Congress. *Compare id.* § 1116(c) (NTSB annual report to Congress), *and id.* § 1116(d)(1) (NTSB 5-year retrospective review reports to congressional committees), *with* 15 U.S.C. § 46(f) (FTC annual and special reports to Congress). But NTSB makes those reports to Congress available to the public on its website. *See* NTSB, Budget and Performance Reports, https://www.ntsb.gov/about/reports/Pages/default.aspx.

History also shows that Congress has always looked at the function of investigating aviation accidents as executive. For nearly four decades, the aviation accident investigation function was within the Department of Commerce. *See* supra, p. 3. Congress then created the NTSB but made it a subagency of the Department of Transportation for the next nine years. *See* Department of Transportation Act, Pub. L. No. 89-670, §§ 3, 5, 80 Stat. 931, 931, 935 (1966). It is true that Congress then moved the NTSB outside the Department of Transportation. Independent Safety Board of Act of 1974, Pub. L. No. 93-633, § 303, 88 Stat. 2156, 2167 (1975). But while that freed the NTSB from control by the Department of Transportation (an important recipient of the NTSB's recommendations), it did not transform what was always an executive function into a legislative function or alter NTSB's status as an Executive Branch agency.

The priority relationship that NTSB investigations have with respect to other Executive Branch investigations confirms that these investigations are executive. The NTSB's investigations take "priority" over any other government investigation, with the exception of FBI investigations of intentional criminal conduct, 49 U.S.C. § 1131(a)(2)(A), (B). That means that when an accident

21

within the NTSB's jurisdiction occurs, the NTSB typically arrives on the scene, *see id.* § 1134(a)(1) (NTSB employees "may enter property where a transportation accident has occurred or wreckage from the accident is located and do anything necessary to conduct an investigation"), collects and preserves evidence, and has authority to conduct appropriate tests of physical evidence, *see id.* § 1134(b)(1), (c), (f), (g).

Other Executive Branch agencies also investigate accidents for a variety of purposes, including enforcing laws that may have been violated in an accident. Congress accounted for such investigations by providing that NTSB would preserve evidence and coordinate with other executive agencies to exchange information as appropriate. Specifically, Congress required the NTSB and other agencies to "ensure that appropriate information developed about the accident is exchanged in a timely manner." *Id.* § 1131(a)(3). For aviation accidents, Congress mandated that the aircraft and property on the aircraft "shall be preserved, and may be moved, only as provided by regulations of the Board." *Id.* § 1134(b)(2). Pursuant to its authority to promulgate regulations, *id.* § 1113(f), the NTSB has provided that it "has first right to access wreckage, information, and resources, and to interview witnesses the NTSB deems pertinent to its investigation." 49 C.F.R. § 831.5(a)(3). The NTSB further "has exclusive authority to decide when and how the testing and examination of evidence will occur." *Id.* § 831.5(a)(4). Yet "[t]he NTSB and other Federal agencies will exchange information obtained or developed about the accident in the course of their investigations in a timely manner." *Id.* § 831.5(a)(5). Although other agencies can investigate an accident, they "are expected to coordinate with the NTSB [investigator-in-charge] to avoid interference with, and duplication of, the NTSB's investigative efforts." *Id.* § 831.5(b)(1).

NTSB regulations further allow the NTSB to work with other executive agencies on investigations. The NTSB may designate other executive agencies "to serve as parties in an

22

investigation," in which case they "provide suitable qualified technical personnel to actively assist in an investigation." *Id.* § 831.11(a)(1). The FAA has the *right* to serve as a party in aircraft accident investigations. *Id.* §§ 831.11(a)(2), 831.21(a). Thus, NTSB investigations can and often do proceed in active coordination with other executive agencies, such as the FAA.

These provisions underscore that when the NTSB investigates an accident, it is not doing so "merely in aid of the legislative function of Congress." *Slaughter*, 2026 WL 1855612, at *18. It is conducting the Executive Branch's priority investigation. It has first access to the key physical evidence of an accident and uses that access to collect, preserve, and test evidence. And it coordinates with other executive agencies so that those other agencies may obtain from the NTSB the evidence and information that they need to carry out law enforcement and other investigative functions. In short, the NTSB's "investigative" powers are "quintessentially executive." *Id.* at *15.

Brown also argues that the NTSB does not exercise executive power because it does not regulate transportation, and "[o]ther agencies or private parties can freely choose to follow the NTSB's recommendations or not." Pl.'s SJ Mem. 13. Yet Congress determined that accident investigation itself was an important function that it needed the Executive Branch to perform. In assessing an agency's executive power, the Supreme Court has rejected distinguishing between an agency that "administers 19 statutes" and an agency that "administers only 1." *Collins v. Yellen*, 594 U.S. 220, 251 (2021). That is because "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head. The President's removal power serves vital purposes even when the officer subject to removal is not the head of one of the largest and most powerful agencies." *Id.* at 251-52. *Slaughter* made this point even clearer by overruling *Humphrey's Executor*, which had been used to justify

23

shielding from removal the heads of "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218.  The fact that the NTSB does one important thing (investigate transportation accidents) but does not do another important thing (regulate transportation safety) does not detract from the fact that the NTSB exercises executive power.

Given its investigation and recommendation functions, the NTSB provides valuable assistance to the President in faithfully executing the transportation laws.  If the President lacked confidence in the NTSB and its investigations of transportation accidents, that would seriously hinder his ability to take care that the Secretary of Transportation and his subordinates are faithfully executing the transportation laws.  The Supreme Court has repeatedly made clear that the President's constitutional removal authority stems, in part, from his constitutional duty to ensure the faithful execution of laws.  *See Slaughter*, 2026 WL 1855612, at *5 (restricting the President's authority to remove executive officers "would make it impossible for the President to fulfill his constitutional obligation to take care that the laws be faithfully executed") (quoting *Myers*, 272 U.S. at 164).  The President's removal authority therefore must include members of the NTSB, who "assist the supreme Magistrate in discharging the duties of his trust." *Free Enter. Fund*, 561 U.S. at 483 (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)).

### 2. The NTSB's Role Adjudicating Challenges to Licensing and Registration Decisions of Other Agencies Constitutes Executive Power

The NTSB's authority to review and adjudicate appeals of licensing and registration decisions of the FAA and Coast Guard alone constitutes substantial executive power such that its leaders must be removable.  Congress tasked the NTSB with "review[ing] on appeal" adverse decisions by FAA with respect to airman certificates or a certificate of aircraft registration and adverse decisions by the Coast Guard with respect to certain merchant marine licenses.  49 U.S.C. § 1133.  Cases arising from FAA orders are initially heard by ALJs employed by the NTSB, and

24

the NTSB then reviews the decisions of the ALJs.  *See supra*, p. 9.  In marine cases, the NTSB hears appeals directly from actions of the Commandant of the Coast Guard.  *See* 49 C.F.R. pt. 825 (regulations governing such cases); NTSB, Merchant Marine Appeal Process, https://www.ntsb.gov/legal/alj/Pages/marine_appeals.aspx.

The NTSB regularly exercises its authority to reject or approve FAA decisions.  For example, in *Dickson v. Defreitas*, NTSB Order No. EA-5906, 2021 WL 3929998 (N.T.S.B. Aug. 24, 2021), the NTSB rejected the FAA's decision to revoke a mechanic's certificate based on substance abuse issues, mitigating the sanction to a 180-day suspension, *id.* at *12.  In *Connors v. NTSB*, 844 F.3d 1143, 1144 (9th Cir. 2017), the NTSB affirmed an FAA decision to revoke an aircraft registration certificate because the aircraft was used to transport drugs, a ruling upheld by the court of appeals.  In 2025, the NTSB's Office of Administrative Law Judges received 284 cases, closed 295 cases, and held 16 hearings.  2025 Annual Report at 48.

The NTSB also can approve or reject decisions by the Commandant (or the Vice Commandant acting on delegation from the Commandant) regarding merchant marine licenses. For example, in *Papp v. Ailsworth*, NTSB Order No. EM-211, 2011 WL 7141395 (N.T.S.B. Dec. 28, 2011), the NTSB rejected the Vice Commandant's decision to revoke a mariner's merchant marine license as sanction for negligently causing a collision, instead modifying the sanction to a 12-month suspension, *id.* at *6.  In *Collins v. Nitkin*, NTSB Order No. EM-193, 2002 WL 1723747 (N.T.S.B. July 23, 2002), the NTSB rejected the Vice Commandant's decision to suspend the license of a tank vessel pilot after a collision, finding that the record did not show that the pilot was at fault.  *Id.* at *1-2.

As the Supreme Court has explained, an agency's authority to issue binding administrative adjudications is an important executive power.  *See Seila Law*, 591 U.S. at 219; *Slaughter*, 2026

25

WL 1855612, at *17. In issuing adjudications that approve or reject the decisions of other federal agencies, the NTSB exercises executive power in a manner similar to the MSPB, whose primary function is adjudicating challenges to adverse employment actions of federal agencies. *See* 5 U.S.C. § 1204. In *Wilcox*, the Supreme Court concluded that the MSPB likely "exercise[s] considerable executive power." 145 S. Ct. at 1415. The D.C. Circuit then ruled that the MSPB's removal restrictions violated Article II because the MSPB exercised substantial executive power, *see Harris v. Bessent*, 160 F.4th 1235, 1254-57 (D.C. Cir. 2025), and the Supreme Court denied certiorari the day after it decided *Slaughter*, *see Harris v. Bessent*, No. 25-1110, --- S. Ct. ---, 2026 WL 1871323 (U.S. June 30, 2026) (denying certiorari). Just as the MSPB exercises executive power, so does the NTSB when it exercises the extraordinary authority to overrule certain decisions of the leader of one of the country's Armed Forces and also regularly adjudicates challenges to FAA decisions.

Brown's contrary arguments are misguided. Brown characterizes the adjudicatory function of NTSB as judicial, rather than executive in nature. *See* Pl.'s SJ Mem. 15. But in *Seila Law*, the Supreme Court characterized an Executive Branch agency's power to conduct "administrative adjudications" as executive. 591 U.S. at 219-20. That is because "even though the activities of administrative agencies 'take legislative and judicial forms,' 'they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power.'" *Id.* at 216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) and U.S. Const. art. II, § 1, cl.1) (citation modified). Brown also points out that the NTSB reviews decisions of other agencies rather than engaging in direct enforcement through adjudication. Pl.'s SJ Mem. 15. But the NTSB's role of adjudicating the lawfulness of a disciplinary action imposed by another agency is very similar to the MSPB's role in hearing administrative appeals of adverse employment actions.

26

Finally, Brown analogizes the NTSB to Article I courts such as the Tax Court, noting that the Supreme Court expressly reserved the question of the constitutionality of removal protections for judges on such courts in *Slaughter*. *See* Pl.'s SJ Mem. 16; *Slaughter*, 2026 WL 1855612, at *18. This analogy fails on multiple levels. The Tax Court is a "court of record" established "under article I of the Constitution of the United States" that Congress declared "is not an agency of, and shall be independent of, the executive branch of the Government." 26 U.S.C. § 7441. By contrast, the NTSB operates through the familiar framework of administrative adjudication. For example, review of FAA licensing decisions begin with an administrative hearing before an ALJ under procedural rules set forth in regulations promulgated by the Board, *see* 49 C.F.R. part 821, and the parties can then appeal the ALJ's decision to the Board, *see id.* § 821.47. In addition, the NTSB is not a purely adjudicatory body. As Brown acknowledges, adjudication is a "small, discrete function of the NTSB," Pl.'s SJ Mem. 15, that exists alongside its broader function of investigating transportation accidents.

At bottom Brown is rehashing the tired argument from *Humphrey's Executor* that the NTSB is a quasi-judicial and quasi-legislative agency. But while the "activities of executive officers may "take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power,'" for which the President is ultimately responsible." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021). This is why, in overturning *Humphrey's Executor*, the Supreme Court rejected the notion that such "quasi" functions are protected from the President's removal authority. *Slaughter*, 2026 WL 1855612, at *15. This Court should do the same.

27

II.    **Brown Fails to State a Claim to Challenge His Removal Based on Fifth Amendment Equal Protection**[8]

    A.    **Brown Fails to Plausibly Allege that His Removal Was Motivated by Race**

Even assuming that the Fifth Amendment constrains the President's authority to remove principal officers on the basis of race,[9] Brown fails to state a Fifth Amendment claim because he fails to allege plausibly that the President removed him because of his race. "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497(1954)). But while the Fifth Amendment, and the Fourteenth Amendment's Equal Protection Clause, address "invidious[ ]" discrimination, Supreme Court "cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional Solely [sic] because it has a racially disproportionate impact." *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266.

Brown makes no factual allegations that, if credited, would constitute direct evidence of discriminatory intent. The message removing him simply informed him of his removal and said, "[t]hank you for your service." Am. Compl. ¶ 34. And Brown does not allege that the President or anyone in his administration made any other statement mentioning Brown's race or tying his removal to his race.

---

[8] This section is in support of Defendants' Motion to Dismiss Count II of the Amended Complaint in *Brown I* and the Motion to Dismiss the Petition in *Brown II* insofar as the Petition invokes Fifth Amendment equal protection as a reason why Brown's removal was unlawful, *see* Pet. ¶ 53.

[9] *But see infra*, Part II.C.

Thus, Brown's claim rests solely on circumstantial factual allegations of discriminatory intent. Brown relies in part on alleged statistical data purportedly showing a pattern of removal of Black members of multi-member agencies, akin to a disparate impact argument. *See id.* ¶¶ 40-41. But the Supreme Court has set the bar extremely high for when evidence of disparate outcomes, without more, can demonstrate discriminatory intent, and Brown's alleged statistical evidence comes nowhere close to that bar. Whether an action "bears more heavily on one race than another," *Davis*, 426 U.S. at 242, may provide a starting point, but "[a]bsent a pattern as stark as that in *Gomillion*[ *v. Lightfoot*, 364 U.S. 339 (1960)] or *Yick Wo*[ *v. Hopkins*, 118 U.S. 356 (1886)], impact alone is not determinative, and the Court must look to other evidence," *Vill. of Arlington Heights*, 429 U.S. at 266.

In both *Gomillion* and *Yick Wo*, referenced above, there were indisputable patterns of racial discrimination. In *Gomillion*, Tuskegee officials redrew city boundaries to exclude all but four or five Black residents out of 400, without removing a single white resident. 364 U.S. at 341. In *Yick Wo*, the City of San Francisco required the owners of all wooden laundry houses to seek permission to continue operating, and every Chinese owner's petition was denied while every non-Chinese person's petition was approved—with one exception. 118 U.S. at 362. As one court explained, for statistical evidence of disparate outcomes to meet the standard of *Gomillion* and *Yick Wo*, "[t]he statistics must be so stark that they are unexplainable on grounds other than race, leading to the inescapable conclusion, tantamount for all practical purposes to a mathematical demonstration, of discriminatory intent." *Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017) (citations omitted).

Here, Brown attempts to suggest a similar statistical pattern: Brown first argues his removal was based on race, not political affiliation, because two white Democratic members of the NTSB

29

were not removed.  Am. Compl. ¶ 38.  Brown also contends that 75 percent of Black officers

leading independent multi-member boards and commissions during the second Trump

Administration have been removed while only 27 percent of the white officers on those same

bodies have been removed.  *Id.* ¶¶ 40-41.

Brown's statistical argument suffers from numerous flaws.  First, these alleged statistics

bear no resemblance to the stark facts of *Gomillion* or *Yick Wo*.  Unlike in those cases, where the

defendants excluded individuals outside the disfavored race from the allegedly discriminatory

actions (completely in *Gomillion* and with one exception in *Yick Wo*), here Brown admits that

President Trump has removed a substantial percentage of white members of multi-member

agencies.  *See* Am. Compl. ¶ 40.[10]  The alleged 75 percent of Black members of multi-member

---

[10] Indeed, one need only view the flood of recent litigation (mostly in this District) challenging the President's removal of executive officers, to see that he has removed many officers of all races. *See*, *e.g.*, *Wilcox v. Trump*, 1:25-cv-334 (D.D.C.) (lawsuit filed by removed Black member of National Labor Relations Board); *Harris v. Bessent*, 1:25-cv-412 (D.D.C.) (lawsuit filed by removed white member of Merit Systems Protection Board); *Grundmann v. Trump*, 1:25-cv-425 (D.D.C.) (lawsuit filed by removed Asian-American member of Federal Labor Relations Authority); *LeBlanc v. Trump*, 1:25-cv-542 (D.D.C.) (lawsuit filed by removed Black member and removed white member of Privacy and Civil Liberties Oversight Board; another removed white member did not join lawsuit); *Slaughter v. Trump*, 1:25-cv-909 (D.D.C.) (lawsuit originally filed by one removed white commissioner and one removed Latino commissioner of Federal Trade Commission); *Samuels v. Trump*, 1:25-cv-1069 (D.D.C.) (lawsuit filed by removed white commissioner of Equal Employment Opportunity Commission; a removed Black commissioner did not join lawsuit); *Harper v. Bessent*, 1:25-cv-1294 (D.D.C.) (lawsuit filed by removed white member and removed Asian-American member of National Credit Union Administration Board); *Corp. for Pub. Broad. v. Trump*, 1:25-cv-1305 (D.D.C.) (lawsuit filed by three removed white members of Board of Corporation for Public Broadcasting); *Primus v. Trump, No. 1:25-cv-3521 (D.D.C.) (lawsuit filed by removed Black member of Surface Transportation Board)*; *Cook v. Trump*, 1:25-cv-2903 (D.D.C.) (lawsuit filed by removed Black member of Board of Governors of the Federal Reserve); *Boyle v. Trump*, 8:25-cv-1628 (D. Md.) (lawsuit filed by two removed white commissioners and one removed Asian-American commissioner of Consumer Product Safety Commission); *Dellinger v. Bessent*, 1:25-cv-385 (D.D.C.) (lawsuit filed by removed white Special Counsel); *Storch v. Hegseth*, 1:25-cv-415 (D.D.C.) (lawsuit filed by eight of seventeen removed Inspectors General; removed officers were white, Black, and Asian-American); *Brehm v. Marocco*, 1:25-cv-660 (D.D.C.) (lawsuit filed by removed white President of United States African Development Foundation); *Aviel v. Gor*, 1:25-cv-778 (D.D.C.) (lawsuit filed by removed

agencies who were removed is markedly less stark than the 100 percent of Chinese laundry owners who were disadvantaged in *Yick Wo* or the 99 percent of Black Tuskegee residents in *Gomillion*. These statistics do not "remotely approach" the starkness of *Gomillion* and *Yick Wo* and are insufficient to demonstrate disparate racial outcomes violative of the Fifth Amendment. *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013). Even a showing that "a substantial majority" of an affected population was Black is insufficient. *Alston*, 853 F.3d at 908.[11]

Second, Brown chooses an invalid basis of comparison. Even though President Trump, apart from his recent removal of NTSB Member Inman, has removed only *Democratic* members of multi-member commissions, Brown compares the percentages of all Black and white members of multimember agencies removed by President Trump, rather than the salient comparison of the percentage of Black and white *Democratic* members removed. *See* Am. Compl. ¶ 40. However, "[t]o be useful" in making out a claim for intentional discrimination, "a statistical comparison" must compare populations of "similarly situated individuals." *Blackwell v. Strain*, 496 F. App'x 836, 839-40 (10th Cir. 2012). There is thus an "obvious alternative explanation," *Bellinger v. Bowser*, No. 1:17-cv-02124-TJK, 2018 WL 4705808, at *6 (D.D.C. Sept. 30, 2018) (quoting *Iqbal*, 556 U.S. at 682), for why President Trump has removed a greater proportion of Black members of

---

white President of Inter-American Foundation); *Perlmutter v. Blanche*, No. 1:25-cv-01659 (D.D.C.) (lawsuit filed by removed white Register of Copyrights).

[11] *See also Alston, 853 F.3d at 908* ("Consider more closely the statistics present in *Gomillion* and *Yick Wo*. There, the statistics showed that minorities were disproportionately affected by the law. But the statistics showed more than disparate impact. They revealed that almost all minorities— every minority in *Yick Wo* and all but five minorities in *Gomillion*—were negatively affected by the law. The statistics also revealed that almost no whites—none in *Gomillion* and only one in *Yick Wo*—were negatively affected by the law. In both cases, it was clear that the statistical disparity at issue was caused by the defendants' actions, which allowed the Court to conclude that statistics alone were enough to prove unconstitutional disparate treatment.").

31

multimember agencies than white members: he has removed almost exclusively Democrats, and

Democrats had greater Black representation on multimember agencies at the time he took office.

Third, Brown's evidence is anecdotal (unlike the hundreds of individuals adversely

affected in *Gomillion* and *Yick Wo*), and those anecdotes do not paint a picture of intentional racial

discrimination.  The 75 percent of Black members removed apparently equates to six out of eight,

or Brown and five other individuals.  *See* Am. Compl. ¶ 41. Regarding other Black members of

multimember agencies, the Court can take judicial notice that:

- Travis LeBlanc, a Black Democratic member of the Privacy and Civil Liberties Oversight Board, was removed alongside two white Democratic members, Edward Felten and Sharon Bradford Franklin. *See LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 13-14 & n.8 (D.D.C. 2025).

- Charlotte Burrows, a Black Democratic commissioner of the Equal Employment Opportunity Commission, was removed alongside a white Democratic Commissioner, Jocelyn Samuels; an Asian-American Democratic commissioner, Kalpana Kotagal, was not removed. *See* Katz Banks Kumin*, Lisa Banks and Debra Katz to Represent Former EEOC Chair and Commissioner Charlotte A. Burrows (Jan. 28, 2025),*https://katzbanks.com/news/burrows/.

- Gwynne Wilcox, a Black member of the National Labor Relations Board, was removed alongside the white General Counsel, Jennifer Abruzzo. President Trump's message removing them raised specific policy disagreements he had with both Ms. Wilcox and Ms. Abruzzo. *See* https://myprivateballot.com/wp-content/uploads/2025/01/Abruzzo-Wilcox-Firing-Letter.pdf.

- President Trump invoked the Federal Reserve's for-cause removal provision in removing Governor Lisa Cook, based on apparent mortgage fraud. *See* President Donald Trump Fires Fed Governor Lisa Cook (Aug. 25, 2025), https://www.documentcloud.org/documents/26074125-cook-letter/.  He did not remove another Black governor, Vice Chair Philip Jefferson, who has not been accused of wrongdoing.  *See* Federal Reserve, https://www.federalreserve.gov/aboutthefed/bios/board/jefferson.htm.

- At the Federal Election Commission, President Trump removed a white Democratic member, Ellen Weintraub, but did not remove a Black Democratic member, Shana Broussard, who remains in office. *See* Ellen  L. Weintraub (@EllenLWeintraub),          X          (Feb.          6,          2025), https://x.com/EllenLWeintraub/status/1887648967300694270;    Fed.    Election

32

Comm'n, Shana M. Broussard, https://www.fec.gov/about/leadership-and-structure/shana-m-broussard/.[12]

Brown also notes that President Trump has removed the Librarian of Congress and the chairman of the Joint Chiefs of Staff, who are Black. Am. Compl. ¶ 42. Brown ignores, however, that the President also has appointed Black officials, including a cabinet Secretary. This demonstrates that such anecdotal evidence "simply cannot support a plausible inference of intentional racial discrimination," even at the pleading stage. *Bellinger*, 2018 WL 4705808, at *7.

Realizing the weakness of these statistical arguments, Brown tries to supplement his statistical evidence with a constellation of discrete circumstantial facts, each attenuated from his case. Brown notes the President and Trump Administration officials complained about "DEI" practices and that certain individuals—but not Brown—were removed because they supported certain "DEI" practices. Am. Compl. ¶¶ 44-48. Brown points to vintage-inspired Labor Department posters featuring white men—though Brown alleges no connection with them or the Labor Department. *Id.* ¶ 49. Brown generally references federal removal statistics for all government employees without alleging any direct or individual presidential involvement. *Id.* ¶ 50. Likewise, Brown generally references presidential nomination statistics for all Senate-confirmed appointees—though Brown was removed from his position rather than passed over for appointment. *Id.* ¶ 51. Ultimately, these facts are insufficient, even taken as true. To show discriminatory purpose, a plaintiff must show that the decisionmaker, the President in this case, "selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (citation omitted). Likewise, there is insufficient proof of discriminatory intent where statements or circumstantial

---

[12] The government is addressing the racial discrimination claim of Robert Primus, former member of the Surface Transportation Board, in its motion to dismiss his complaint, also filed today.

evidence substantively "expresse[s] policy views that could rest on race-neutral justifications." *Mullin v. Doe*, 146 S. Ct. 2121, 2138 (2026).

Ultimately, Brown's removal from the NTSB is not "unexplainable on grounds other than race." *Vill. of Arlington Heights*, 429 U.S. at 266. Rather, there are several, "obvious alternative explanation[s]." *Bellinger*, 2018 WL 4705808, at *10 (quoting *Iqbal*, 556 U.S. at 682). Brown is a prominent Democratic politician, having been elected mayor of one of the largest cities in the country. *See* Am. Compl. ¶ 33. Prior to joining the NTSB, he had no substantial experience relating to transportation safety. *See id.* By contrast, the other Democrats on the NTSB, Chair Homendy and Member Chapman, never served as elected politicians and had substantial experience related to the transportation industry before joining NTSB. *See* NTSB, NTSB Chairman Homendy, https://www.ntsb.gov/about/board/Pages/Jennifer-Homendy.aspx; NTSB, Member Chapman, https://www.ntsb.gov/about/board/Pages/Thomas-Chapman.aspx. Furthermore, while Brown was appointed by President Biden, Am. Compl. ¶ 32, President Trump appointed both Chair Homendy and Member Chapman to the NTSB during his first administration. *See* NTSB, NTSB Chairman Homendy, https://www.ntsb.gov/about/board/Pages/Jennifer-Homendy.aspx; NTSB, Member Chapman, https://www.ntsb.gov/about/board/Pages/Thomas-Chapman.aspx. And as noted above, Member DeLeeuw has strong qualifications as an experienced pilot and manager of safety for American Airlines. *See supra*, pp. 10-11. Nor did President Trump single out Brown for removal. He also removed Inman, a white Republican member of the NTSB. Therefore, President Trump's removal of Brown, nomination of Member DeLeeuw, and retention of Chair Homendy and Member Chapman do not support an inference of intentional racial discrimination.

34

Brown's reliance on inconclusive data and atmospheric facts, even taken as true, do not demonstrate the President's alleged discriminatory intent and are insufficient to show a violation of the Fifth Amendment.

**B.      Brown Cannot State a Claim by Invoking the *McDonnell Douglas* Framework**

In earlier briefing, Brown signaled that he intends to invoke the burden-shifting framework of *McDonnell Douglas* to avoid the need to plead intentional discrimination under the *Arlington Heights* framework.  Under this view, all Brown would need to do to state a claim is to allege that a single white person who was similar to Brown in at least some relevant respects was not removed. *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss at 1.  Brown fails to justify proceeding to discovery on such an extraordinary claim with such a minimal showing.

At the outset, the *McDonnell Douglas* framework applies to Title VII and certain other civil rights statutes but not to equal protection claims brought directly under the Fifth Amendment. In *McDonnell Douglas Corp. v. Green*, the Supreme Court considered "the proper order and nature of proof in actions under Title VII of the Civil Rights Act of 1964."  411 U.S. 792, 793-94 (1973). The Court developed the burden-shifting framework to make it easier for a Title VII plaintiff to make out a prima facie case, given that "[t]he language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *Id.* at 800 (citation omitted).  Defendants have been unable to identify a case that does not apply the *McDonnell Douglas* framework to either Title VII or another federal statute that expressly confers a cause of action on individuals for violations of their civil rights.  *See*, *e.g.*, *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025) (a Title VII case); *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025) (a 42 U.S.C. § 1981 and Title VII case); *Holcomb*

*v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (a Title VII case); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (a Title VII case); *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) (a Title VII case); *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168 (D.D.C. 2025) (a 42 U.S.C. § 1983 case). Overwhelming case law supports the proposition that the *McDonnell Douglas* framework is a doctrine of statutory interpretation that courts have developed to interpret certain civil rights statutes.

But Brown does not sue under Title VII, Section 1981, or any other civil rights statute. Rather, he brings a claim directly under the equal protection component of the Fifth Amendment. Brown has not cited to, and Defendants have been unable to locate, any case in which the *McDonnell Douglas* analysis was used for a Fifth Amendment claim. In his Opposition to Defendants' first Motion to Dismiss, Brown oversimplified *Jiggetts* as a case brought under the Fifth Amendment. But *Jiggetts* involved a Fifth Amendment claim brought under Section 1983, which the opinion acknowledges, 774 F. Supp. 3d at 185-86 ("To prevail on a Section 1983 claim, a plaintiff must first establish a predicate violation of her constitutional rights . . . . Jiggetts brings three constitutional claims. . . [including] under the Fifth Amendment[.]" (internal citation omitted)). As a district court case, *Jiggetts* is nonbinding. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). But in any event, *Jiggetts* at most suggests that *McDonnell Douglas* applies to claims under Section 1983, a statute that provides for broad remedies for certain violations of civil rights by state and local officials acting "under color of law." *See* 42 U.S.C. § 1983 (providing that an employee of a state or the District of Columbia who violates rights under federal law "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress"); *see also Jiggetts*, 774 F. Supp. 3d at 185-86 ("Where a Section 1983 plaintiff presents

36

circumstantial evidence of racial discrimination, courts in this district apply the burden-shifting framework established in *McDonnell Douglas*[.]") (citations omitted).

The *McDonnell Douglas* framework is a pragmatic doctrine, meant to augment the remedial force of civil rights statutes. Indeed, the *McDonnell Douglas* analysis began in a Title VII case based on the broad remedial "purpose of Congress" in enacting Title VII. The framework has been "borrowed" for other civil rights statutes that provide broad remedies for civil rights violations, *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C. Cir. 1984) (application to Section 1981). The Supreme Court did not design it for routine application to any claim.

That pragmatic purpose finds no doctrinal basis in the Fifth Amendment's equal protection clause. Notably, while *McDonnell Douglas* and its progeny emphasize the broad remedial purposes of civil rights statutes, the Supreme Court has held that implying damages remedies against federal officers for constitutional violations "is 'a disfavored judicial activity.'" *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)). That suggests that courts should be hesitant to import evidentiary doctrines based on the broad remedial purposes of civil rights statutes into an implied cause of action for a violation of the constitution.

For equal protection claims, the Supreme Court provided the governing framework in *Arlington Heights*. "Proof of racially discriminatory intent or purpose is *required* to show a violation of the Equal Protection Clause," *Vill. of Arlington Heights*, 429 U.S. at 265 (emphasis added), and whether racially discriminatory intent or purpose is present "*demands a sensitive inquiry* into such circumstantial and direct evidence of intent as may be available." *Id.* at 266 (emphasis added). The Supreme Court carefully laid out the factors relevant to this "sensitive inquiry." *Id.* at 265-68. Brown cannot now substitute his preferred test for a constitutionally required one articulated by the Supreme Court. The *Arlington Heights* framework has persisted

37

since 1977, and courts continue to apply it to Fifth Amendment equal protection claims in criminal and civil cases alike. *See*, *e.g.*, *See Mullin*, 145 S. Ct. at 2137–38 (applying *Arlington Heights* to the President's determination to end temporary protected status); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (applying *Arlington Heights* framework to DACA recission); *United States v. Barrera-Vasquez*, 617 F. Supp. 3d 400, 407 (E.D. Va. 2022) (applying *Arlington Heights* framework to criminal immigration law). Brown fails to justify why it must be uniquely discarded in cases alleging invidious (that is, purposeful) employment discrimination.

Brown's theory would also place a severe imposition on the President's exercise of his Article II removal authority. Brown's position is that to survive a motion to dismiss, a plaintiff need only allege a single comparator of a different race who is similarly positioned "in at least some relevant respects." *Joyner*, 140 F.4th at 531. If the mere fact that a person of a different race with a similar position (and perhaps of the same party) was not removed is sufficient, then many ordinary presidential removals could meet this standard. For example, each of the 93 U.S. Attorneys has a similar position. At any given time, there will likely be U.S. Attorneys of several different races. If Brown is correct, the President could never remove a U.S. Attorney without giving rise to a race discrimination claim that would survive a motion to dismiss (unless he removed all U.S. Attorneys at once), because there would always be a U.S. Attorney of a different race who was not removed. That would place impermissible burdens on the President's removal powers and decision making. This legal construction would offend a core tenet of the Supreme Court's reasoning in *Slaughter*: "officers [are] subject to the President's superintendence" and "ha[ve] to be removable by him at will." *Slaughter*, 2026 WL 1855612 at *9.

Thus, the *McDonnell Douglas* framework neither applies nor is reconcilable with *Slaughter*, and Brown is unable to state a claim under the *Arlington Heights* analysis.

38

###### C.    Brown's Equal Protection Claim Is Not Legally Cognizable

Even if Brown had adequately alleged that President Trump's removal of him was motivated by race, that would not give rise to a cognizable constitutional claim. "[T]he President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive" Presidential power that "may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. at 620-21 (quoting *Myers*, 272 U.S. at 106).

The President's removal of Brown, a principal officer in the Executive Branch, falls within that conclusive and preclusive authority. As the Supreme Court has explained, "[o]nly if the President's deputies were removable at will would they truly be subordinate to the sole executive magistrate." *Slaughter*, 2026 WL 1855612 at *9 (citation modified). "For another, the power to remove at will was a necessary corollary of the Constitution's design." *Id.* No Court has ever held that when the President exercises his conclusive and preclusive Article II authority to remove a principal officer, the Fifth Amendment empowers a court to review whether such a removal was an act of racial discrimination. The implications of Brown's legal theory are striking.

Although this case concerns an exercise of the President's Article II removal authority, the logic of Brown's position is that more broadly, exercises of the President's core Article II powers are reviewable under the Fifth Amendment to determine whether the President discriminated on the basis of race. *See* Am. Compl. ¶ 7. If Brown's position is correct, then a Presidential *appointment* of a principal officer that considered race would support a Fifth Amendment legal claim just as much as a Presidential *removal* of a principal officer that considered race. Further, if any equal protection claim is cognizable based on alleged racial discrimination in removing a Black official or appointment of a white official, such a claim would be equally cognizable as applied to the removal of a white official or appointment of a Black official (or any other racial permutation). *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,

600 U.S. 181, 206 (2023) ("[T]he Equal Protection Clause . . . applies without regard to any differences of race, of color, or of nationality—it is universal in its application. For the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.") (citation modified). Appointing or removing principal officers on the basis of sex would likewise be constitutionally suspect. *See United States v. Virginia*, 518 U.S. 515, 531-34 (1996).

In sum, Brown invites a legal regime in which federal district court judges would superintend the President's selections of the most important executive officials, the principal officers who lead the Executive Branch, to ensure that race and sex played no role in the President's decision making. Such a regime would come as a shock to the recent Presidents who have acknowledged that they considered race and sex in determining which principal officers would lead the Executive Branch under their administrations. For example, in recounting President Clinton's accomplishments at the end of his Presidency, the White House website boasted that he "[a]ppointed the most diverse cabinet in history," specifically pointing to President Clinton's consideration of race ("he has appointed seven African American Cabinet Secretaries" and "the first Asian American to serve in a Cabinet") and sex ("women make up 44 percent of Clinton Administration appointees, including the first woman to serve as Secretary of State, Madeline Albright, and the first to serve as Attorney General, Janet Reno"). The White House (archived), The Clinton Presidency: Building One America, Recore of Progress, https://clintonwhitehouse5.archives.gov/WH/Accomplishments/eightyears-11.html.

During his first Presidential campaign, President Obama reportedly "promise[d] to have the most diverse Cabinet in history" and "fulfilled his promise" by appointing many Black, Latino, and Asian-American cabinet members. The Associated Press, The Gainesville Sun, In Cabinet,

40

Obama goes for experience, pragmatism, (Dec. 20, 2008), https://www.gainesville.com/story/news/nation-world/2008/12/20/in-cabinet-obama-goes-for-experience-pragmatism/31590871007/.  And although President Obama was criticized when his first four Cabinet nominees for his second term were white men, he reassured supporters that he "intend[ed] to continue" having a cabinet that was "as diverse, if not more diverse . . . than any in history."  Fox News, Obama: Attacks on Cabinet Diversity are Premature (updated Jan. 10, 2017), https://www.foxnews.com/politics/obama-attacks-on-cabinet-diversity-are-premature.

On the campaign trail, President Biden likewise "promised to nominate 'the most diverse Cabinet in history,' stressing that he wanted leaders that look like America."  PBS News, Meet Joe Biden's Cabinet Picks (Jan. 20, 2021), https://www.pbs.org/newshour/politics/meet-joe-bidens-cabinet-picks; *see also id.* ("If all of Biden's nominees are confirmed, his Cabinet will contain more women and people of color than any other Cabinet in U.S. history.").

For his part, President George W. Bush selected a Cabinet that a commentator described as one that "looks like it was chosen by a casting director for a diversity commercial."  CBS News, A Cabinet That Looks Like America (Jan. 5, 2001), https://www.cbsnews.com/news/a-cabinet-that-looks-like-america/.  The commentator concluded that President Bush's apparent consideration of race and sex was "crafty" because "Democrats will have a tough time" opposing a set of nominees that, while ideologically conservative, exhibited racial and gender diversity.  *Id.*

In addition, at least three Presidents have used race or sex to define the candidate pool for Supreme Court nominations.[13]  To state the obvious, none of these Presidents thought that by

---

[13] *See* Supreme Court, *Sandra Day O'Connor: First Woman on the Supreme Court*, https://www.supremecourt.gov/visiting/exhibitions/SOCExhibit/Section3.aspx (last visited July 29, 2026); PBS, *Trump Promises to Replace Ginsburg with a Woman – and Soon* (Sep. 20, 2020), https://www.pbs.org/newshour/politics/trump-promises-to-replace-ginsburg-with-a-woman-and-soon; Amy Howe, *Biden reiterates promise to nominate a Black woman, lauds Breyer as "model*

41

making race or sex determinative for such appointments, they were trampling the Bill of Rights in broad daylight.  Yet under Brown's theory, all of these Presidents violated the Fifth Amendment when exercising their constitutional appointment power.

Additional practical concerns counsel against recognizing Brown's novel legal claim.  If a claim like Brown's is cognizable, then the success of such a claim will turn on the President's motivation, which would place federal district judges in the untenable position of trying to divine the President's intent when he exercises his conclusive and preclusive Article II authority to remove principal officers.  This prospect is made all the more problematic by Brown's apparent belief that the mere act of removing a Black principal officer but not removing an arguably similarly situated white principal officer somehow places the burden on the President to "offer[] a non-discriminatory reason" for the removal.  Am. Compl. ¶ 61.  If that were true, then to defeat a claim, the President would either need to offer his own testimony under oath or communications with his aides regarding his performance of his constitutional functions, which are presumptively subject to executive privilege.  *See In re Sealed Case*, 121 F.3d 720, 742 (D.C. Cir. 1997).

Making matters worse, in Brown's view, judges would then determine whether the President's proffered reasons for removal were sincere or were "pretextual," Am. Compl. ¶¶ 10, 62, based in part on examining "statements by the President and his advisers," which might "cast doubt" on the President's purported "objective" for his action, *Trump v. Hawaii*, 585 U.S. 667, 699 (2018); *see* Am. Compl. ¶¶ 43-47 (citing "several public statements" from "President Trump and high government officials" purportedly supporting the inference that the President's personnel decisions are racially motivated). But courts are rightly wary of giving weight to such statements

*public servant"*, SCOTUSblog (Jan. 27, 2022), https://www.scotusblog.com/2022/01/biden-reiterates-promise-to-nominate-a-black-woman-lauds-breyer-as-model-public-servant/.

"in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." *Hawaii*, 585 U.S. at 702; *see also Mullin*, 145 S. Ct. at 2138–39 (declining to find discriminatory intent where a race-neutral justification could exist).

The Constitution instituted a political check, not a judicial check, on the President's selection of principal officers: the requirement of Senate confirmation. *See* U.S. Const. art. II, § 2, cl. 2. If the Senate objects to the President's removal of a Black principal officer, then the Senate is free to reject whomever the President nominates or even insist that they will only confirm a Black nominee to the seat. More generally, the need for Senate confirmation politically constrains the President in making removals and appointments that, for whatever reason, are seen as unacceptable. *See* Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("Where a man in any station had given satisfactory evidence of his fitness for it, a new President would be restrained from attempting a change in favor of a person more agreeable to him, by the apprehension that a discountenance of the Senate might frustrate the attempt, and bring some degree of discredit upon himself."). The Framers entrusted the Senate, not the federal courts, with judging the President's selection of principal officers. And if courts could force the President to retain subordinate officers he did not trust, "the unity of the Executive Branch would be destroyed." *Slaughter,* 2026 WL 1855612 at *9 (citation modified).

Few decisions are as important to a President as the selection of the principal officers who will lead the agencies of the Executive Branch. Article II entrusts the removal decision to the President alone and the appointment decision to the President, subject only to the Senate's advice and consent. This pragmatic boundary insulates the courts from the flood of presidential appointment and removal litigation this case invites. No court has ever held that a district judge

43

can try to peer into the President's mind and reject his exercise of conclusive and preclusive Article II removal authority if done for an improper reason. This Court should not be the first.

## III.    The Court Lacks Jurisdiction Over the Petition in *Brown II*[14]

This Court lacks subject-matter jurisdiction over the Petition in *Brown II* because Brown lacks authority to bring such a petition. Early in American history, the Supreme Court held that "no writ of *quo warranto* can be maintained, but at the instance of the Government." *Wallace v. Anderson*, 18 U.S. (5 Wheat) 291, 292 (1820) (Marshall, C.J.). Thus, in *Wallace*, because an individual sought quo warranto relief "without the authority of Government," the Supreme Court ruled that the writ "cannot be sustained, whatever may be the right of that individual, or of the person who claims to exercise the office, to try the title to which, the writ is brought." *Id.*

Quo warranto actions relating to public offices of the United States are now governed by the D.C. quo warranto statute, which maintains as a general rule the common law principle that the government must initiate a quo warranto action. Specifically, "[t]he Attorney General of the United States or the United States attorney [for the District of Columbia] may institute" such a proceeding. D.C. Code § 16-3502; *see also Newman v. U.S. of Am. ex rel. Frizzell*, 238 U.S. 537, 546 (1915) ("The District Code still treats usurpation of office as a public wrong which can be corrected only by proceeding in the name of the government itself.").

Although the quo warranto statute contains a narrow statutory exception to the rule that only the government may institute a quo warranto action, Brown fails to qualify for it. Under this exception, "[i]f the Attorney General or United States attorney refuses to institute a quo warranto proceeding on the request of a person interested, the interested person may apply to the court by certified petition for leave to have the writ issued." D.C. Code § 16-3503. Even assuming

---

[14] This argument is in support of the Motion to Dismiss the Petition in *Brown II*.

*arguendo* that Brown qualifies as an "interested person" by virtue of his (erroneous) claim to Member DeLeeuw's office, the required requests and refusals have not all occurred. On March 20, 2026, Brown (by letter from his counsel) requested that then-Attorney General Bondi and U.S. Attorney Pirro initiate a quo warranto action, requesting a response by April 3, 2026. *See* Pet. ¶ 49; *id.*, Ex. A, *Brown II*. Neither of them responded, and Brown argues that the non-responses constitute constructive refusals. *Id.* ¶ 50.

Brown's constructive refusal argument fails for two reasons. *First*, as a Court in this district explained, "no law . . . support[s] [the] assertion that a lack of response" to a request to the Attorney General and the United States Attorney to institute a quo warranto proceeding "should be considered a refusal." *Sibley v. Obama*, 866 F. Supp. 2d 17, 20 (D.D.C. 2012) (Bates, J.), *aff'd*, No. 12-5198, 2012 WL 6603088 (D.C. Cir. Dec. 6, 2012). Thus, where the plaintiff had not received a response to such a request, Judge Bates concluded that "[s]ince the refusal condition of D.C. Code § 16-3503 has not been met, plaintiff's quo warranto petition is not ripe." *Id.*

*Second*, even if a non-response could in some circumstances constitute a constructive refusal, that would not be the case here, particularly for the Attorney General. On April 2, 2026, the day before Brown's counsel requested a response, President Trump announced the removal of Attorney General Bondi, and Todd Blanche's designation as Acting Attorney General. *See* Truth Social, https://truthsocial.com/@realDonaldTrump/posts/116336247856387679 (Apr. 2, 2026). Given her removal from office, former Attorney General Bondi's lack of response to Brown's request certainly cannot reasonably be construed as a constructive refusal. And Brown never requested that Acting Attorney General Blanche (who was also the Acting Attorney General at the time of the Petition) institute a quo warranto action. Thus, it is not the case that "the Attorney General" has "refuse[d] to institute a quo warranto proceeding on the request of" Brown. D.C.

Code § 16-3503.  Accordingly, this quo warranto action instituted by a private individual without authorization must be dismissed for lack of jurisdiction.  *See Newman*, 238 U.S. at 551-53; *Taitz v. Obama*, 707 F. Supp. 2d 1, 3-4 (D.D.C. 2010).

In any event, even if the Court were to conclude that it has jurisdiction, it should exercise its discretion to decline to hear this case.  Even where "an 'interested person'" qualifies to "petition the court for leave to have the writ issued in his own name," the court "has broad discretion to deny the writ."  *Andrade v. Lauer*, 729 F.2d 1475, 1498 (D.C. Cir. 1984) (quoting D.C. Code § 16-3503); *accord SW Gen., Inc. v. NLRB*, 796 F.3d 67, 81 (D.C. Cir. 2015) ("Both the Attorney General and the court, however, have 'broad discretion' to decline to make use of quo warranto.") (quoting *Andrade*, 729 F.2d at 1498), *aff'd* 580 U.S. 288 (2017).  Exercising that broad discretion is appropriate here because Brown asks this Court to remove a principal officer who has been nominated by the President and confirmed by the Senate, *see* Pet. ¶ 4, which would be an extraordinary judicial intrusion on the powers of the executive and legislative branches.  This Court should swiftly dismiss the Petition to avoid casting a shadow on Member DeLeeuw's vital work helping to secure the safety of our transportation system based on such doubtful legal claims.

## IV.    Brown Is Not Entitled to the Relief He Seeks[15]

Because Brown's claim fails on the merits, he is not entitled to any relief.  But even if his claim were successful, he would not be entitled to any of the specific forms of relief he seeks.

### A.    Brown Is Not Entitled to Injunctive Relief

A plaintiff seeking a permanent injunction must demonstrate: "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

---

[15] This argument is in opposition to Brown's Motion for Partial Summary Judgment in *Brown I*.

defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). "When the defendant is the government, factors (3) and (4) merge." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Brown has not satisfied any of these factors.

### 1.    Brown Has Not Shown Irreparable Harm for Which Monetary Remedies Would Be Inadequate

Brown can show neither that his injury is irreparable nor that monetary relief is inadequate compensation for any injury. Brown's claimed injury is the inability to "carry[] out the statutorily mandated duties" of his former office, which he contends infringes his "statutory right to function" as an NTSB member. Pl.'s SJ Mem. 20 (quoting *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (per curiam) (D.C. Cir. 1983)). The harm Brown claims amounts to a loss of position. Although Brown's removal deprives him of his employment and salary, such consequences ordinarily do not amount to irreparable injury, "however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). To the contrary, numerous courts have held that loss of employment is generally not irreparable injury—in part because it can be remediated through back pay or other remedies. *See, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65-66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79-80 (D.D.C. 2006). This rule is not limited to rank-and-file employees. Courts have repeatedly held that deprivation of a unique, singular, or high-level position is not irreparable either.[16]

---

[16] *See, e.g.*, *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *EEOC v. City of Janesville*, 630 F.2d 1254 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78 (1st Cir. 1978) (Maine Commissioner of Manpower); *Brehm v. Marocco*, No. 25-cv-660 RJL, 2025 U.S. Dist. LEXIS 71326 (D.D.C. Mar. 11, 2025) (president of U.S. Africa Development Foundation); *Burns v. U.S. Gen. Act. Off. Emps. Fed.*

Indeed, the D.C. Circuit recently rejected this theory of irreparable injury. *See Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025), *mot. to vacate denied by*, 2025 WL 935211 (D.C. Cir. Mar. 27, 2025). There, the court held that even if the discharged Special Counsel's "removal [wa]s statutorily ultra vires," a deprivation of his "statutory right to function in office" was not irreparable. *Id*. at *4.

Brown relies on a decades-old district court decision in *Berry*, but beyond the fact that *Berry* was vacated on appeal, it is inapposite. There, the agency itself was set by statute to terminate within a few weeks—meaning the plaintiff commissioners *could not* be re-appointed to their posts if their removals were eventually deemed unlawful. *See Berry*, 1983 WL 538, at *5. That is obviously not the case here. Brown also cites several recent district court decisions reinstating principal officers removed by President Trump, *see* Pl.'s SJ Mem. 21 (citing *Grundmann v. Trump*, 770 F. Supp. 3d 166 (D.D.C. 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025); *Slaughter v. Trump*, 791 F. Supp. 3d 1 (D.D.C. 2025); *Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. 2025)), but each of those decisions was stayed by the D.C. Circuit or Supreme Court, *see Wilcox*, 145 S. Ct. 1415; *Trump v. Slaughter*, --- S. Ct. ---, 2025 WL 2582814 (Sept. 8, 2025); *Grundmann v. Trump*, No. 25-5165, 2025 WL 1840641 (D.C. Cir. July 3, 2025).

Brown also has not shown that "monetary" relief would be "inadequate to compensate for [his] injury." *Anatol Zuckerman*, 64 F.4th at 1364 (citation omitted). Brown's only cognizable harm is loss of salary, but he does not show that monetary relief could not compensate for this loss. Instead, he merely states that he "is not seeking monetary relief here." Pl.'s SJ Mem. 21. That strategic choice cannot render such relief inadequate, as necessary for injunctive relief.

---

*Credit Union*, Civ. Action No. 88-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors).

### 2.    The Balance of Equities Weighs Against Injunctive Relief

The balance of equities weighs in the government's favor.  "[T]he Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform h[is] statutory duty." 145 S. Ct. at 1415; *see also Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025).  Granting Brown's requested injunction would also cast into doubt the continued service of Member DeLeeuw, who is highly qualified and was confirmed by the Senate, thus interfering with the NTSB's vital work.

Brown argues that given his claim that he was unlawfully removed, there is a greater public interest in him continuing to serve than in the President effectuating his removal.  Pl.'s SJ Mem. 21-22.  The Supreme Court rejected this argument in *Wilcox*, concluding that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power," even if the officer was "wrongfully removed."  145 S. Ct. at 1415.[17]

### B.    Brown Is Not Entitled to a Declaratory Judgment or Mandamus Relief

The Court should reject a declaratory judgment for the same reasons it should reject a permanent injunction.  A declaratory-judgment suit is "essentially an equitable cause of action." *Samuels v. Mackell*, 401 U.S. 66, 70 (1971) (citation omitted).  "[T]he Declaratory Judgment Act provides that after a declaratory judgment is issued the district court may enforce it by granting 'further necessary or proper relief,' 28 U.S.C. § 2202, and therefore a declaratory judgment . . . might serve as the basis for a subsequent injunction."  *Id*. at 72.  "[E]ven if the declaratory

---

[17] Contrary to Brown's argument, Pl.'s SJ Mem. 22, it is of no moment that President Trump could cement a Republican majority on the NTSB by filling an undisputed vacancy.  The same was true of the MSPB in *Wilcox*, where at the time the Supreme Court acted, the three-member MSPB had an undisputed vacancy.  *See* MSPB, Member Raymond A. Limon Retiring, https://www.mspb.gov/publicaffairs/press_releases/Ray_Limon_Farewell_Press_Release.pdf (Feb. 28, 2025).

49

judgment is not used as a basis for actually issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would." *Id.* As a result, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment." *Id.* at 73. To be sure, there may be "unusual circumstances" where "a declaratory judgment might be appropriate" even though "an injunction [would] be withheld." *Id.* But "ordinarily," "where an injunction would be impermissible," "declaratory relief should . . . be denied as well." *Id.* at 73.

Brown is also not entitled to a writ of mandamus. The writ of mandamus "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002) (citation omitted). Brown has not established that the President owes him a "clear nondiscretionary duty" and the President's selection of who should lead an Executive Branch agency is certainly not a mere ministerial task. In addition, Brown has not exhausted all other avenues of relief. He has just made the strategic decision not to seek monetary relief. Pl.'s SJ Mem. 21. Brown cites several district court decisions indicating finding mandamus available to reinstate a removed principal officer, *id*. at. 24, but each of these decisions has been stayed by the Supreme Court or D.C. Circuit, *see Wilcox*, 145 S. Ct. 1415; *Trump v. Slaughter*, --- S. Ct. ---, 2025 WL 2582814 (U.S. Sept. 8, 2025); *LeBlanc v. U.S. Priv. & Civ. Liberties Oversight Bd.*, No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025).

## CONCLUSION

The Court should deny Brown's Motion for Partial Summary Judgment in *Brown I*. The Court should grant Defendants' Motion to Dismiss the Amended Complaint in *Brown I* and Motion to Dismiss the Petition in *Brown II* and enter judgment for Defendants in *Brown I* and *Brown II*.

50

Dated:  July 29, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*