**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALVIN BROWN,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his Official Capacity as President of the United States, *et al.*,<br><br>Defendants. | Civil Action No. 25-1764 (DLF) |
| ALVIN BROWN,<br><br>Petitioner,<br><br>v.<br><br>JOHN DELEEUW,<br><br>Respondent. | Civil Action No. 26-1249 (DLF) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT IN *BROWN I* AND IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS THE PETITION IN *BROWN II***

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................. 3

I. The NTSB's For-Cause Removal Provision Is Unconstitutional ........................... 3

A. Brown Wrongly Minimizes the Supreme Court's Ruling in *Slaughter* ...... 3

B. The NTSB Wields Executive Power When it Investigates Transportation Accidents ..................................................................................... 4

C. The NTSB Exercises Executive Power in Adjudicating Challenges to Licensing and Registration Decisions of the FAA and Coast Guard ........ 11

II. Brown Fails to State an Equal Protection Claim ................................................ 14

A. Brown Fails to Plausibly Allege that He Was Removed Because of Race ..................................................................................... 14

1. Brown Fails to Engage with *Arlington Heights*, the Governing Analytical Framework for Fifth Amendment Equal Protection Claims ..................................................................................... 14

2. The *McDonnell Douglas* Framework Does Not Apply to Brown's Fifth Amendment Challenge to His Removal .................................. 15

3. Brown Has Failed to Identify a Comparator ..................................... 18

B. Brown's Equal Protection Claim Is Not Legally Cognizable .................. 20

1. Brown's Novel Legal Theory Contravenes Supreme Court Precedent ..................................................................................... 20

2. Brown's Contrary Arguments Are Unpersuasive ............................. 20

III. The Court Should Dismiss the Petition in *Brown II* for Lack of Jurisdiction ....... 27

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 28

*Ames v. Ohio Dep't of Youth Servs.*,
605 U.S. 303 (2025) .......... 16

*Andrews v. Warden*,
958 F.3d 1072 (11th Cir. 2020) .......... 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 14, 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 15

*Brown v. Sessoms*,
774 F.3d 1016 (D.C. Cir. 2014) .......... 19

*Camreta v. Greene*,
563 U.S. 692 (2011) .......... 17

*Carter v. Duncan-Huggins, Ltd.*,
727 F.2d 1225 (D.C. Cir. 1984) .......... 18

*Cisco Sys., Inc. v. Doe I*,
609 U.S. ---, 146 S. Ct. 1882 (2026) .......... 28

*Clinton v. Jones*,
520 U.S. 681 (1997) .......... 21

*Collins v. NTSB*,
351 F.3d (D.C. Cir. 2003) .......... 13

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 6

*Cones v. Shalala*,
199 F.3d 512 (D.C. Cir. 2000) .......... 16, 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 18

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 21

*Harris v. Bessent*,
160 F.4th 1235 (D.C. Cir. 2025),
*cert. denied*, --- S. Ct. ---, 2026 WL 1871323 (June 30, 2026) .......... 12

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. ---, 146 S. Ct. 1391 (2026) .......... 15

*Hinson v. NTSB*,
57 F.3d 1144 (D.C. Cir. 1995),
*cert. denied*, --- S. Ct. ---, 2026 WL 1871323 (June 30, 2026) .......... 12

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) .......... 16

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935) .......... 1

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) .......... 26

*Jiggetts v. Cipullo*,
774 F. Supp. 3d 168 (D.D.C. 2025) .......... 16, 17

*Jo v. District of Columbia*,
582 F. Supp. 2d 51 (D.D.C. 2008) .......... 17

*Joyner v. Morrison & Foerster LLP*,
140 F.4th 523 (D.C. Cir. 2025) .......... 16, 19, 24

*Kobell v. Suburban Lines, Inc.*,
731 F.2d 1076 (3d Cir. 1984) .......... 23

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .......... 2, 14, 16, 18

* *Myers v. United States*,
272 U.S. 52 (1926) .......... 7, 13, 20, 27

*Nanko Shipping, USA v. Alcoa, Inc.*,
850 F.3d 461 (D.C. Cir. 2017) .......... 20

*Rosemond v. Hudgins*,
92 F.4th 518 (4th Cir. 2024) .......... 22

*Schick v. Reed*,
419 U.S. 256 (1974) .......... 22

* *Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 6, 12

* *Sibley v. Obama*,
866 F. Supp. 2d 17 (D.D.C. 2012),
*aff'd*, No. 12-5198, 2012 WL 6603088 (D.C. Cir. Dec. 6, 2012) .......... 28, 30

*Stella v. Mineta*,
284 F.3d 135 (D.C. Cir. 2002) .......... 16

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 22

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .......... 8

* *Trump v. Slaughter*,
609 U.S. ---, 146 S. Ct. 2283 (2026) .......... *passim*

* *Trump v. United States*,
603 U.S. 593 (2024) .......... *passim*

*Trump v. Vance*,
591 U.S. 786 (2020) .......... 21, 22

*United States v. Barrera-Vasquez*,
617 F. Supp. 3d 400 (E.D. Va. 2022) .......... 18

*United States v. Brennick*,
908 F. Supp. 1004 (D. Mass. 1995) .......... 30

*United States v. Lopez*,
514 U.S. 549 (1995) .......... 6

*United States v. Nixon*,
418 U.S. 683 (1974) .......... 26

* *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 2, 14, 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 21

**U.S. CONSTITUTION**

U.S. Const. art. I, § 8, cl. 3 ........ 6

U.S. Const. art. I, § 8, cl. 4 ........ 22

U.S. Const. art. I, § 8, cl. 18 ........ 6

* U.S. Const. art. II, § 1, cl. 1 ........ 6

* U.S. Const. art. II, § 3 ........ 7

**STATUTES**

5 U.S.C. § 7512 ........ 13

5 U.S.C. § 7513(d) ........ 13

5 U.S.C. § 7701(a) ........ 13

28 U.S.C. § 516 ........ 8

42 U.S.C. § 2000e-2(a)(1) ........ 23

49 U.S.C. § 1101-1155 ........ 6

49 U.S.C. § 1111(d) ........ 19

49 U.S.C. § 1111(e) ........ 19

49 U.S.C. § 1113(a)(4) ........ 8

49 U.S.C. § 1131(a)(2) ........ 9

49 U.S.C. § 1131(a)(2)(A) ........ 5

49 U.S.C. § 1131(a)(3) ........ 9

49 U.S.C. § 1133 ........ 12

49 U.S.C. § 1134(b)(2) ........ 10

49 U.S.C. § 1134(d) ........ 10

49 U.S.C. § 1135(a) ........ 5, 8

49 U.S.C. § 1135(d) .......... 5

49 U.S.C. § 1136 .......... 11

49 U.S.C. § 1139 .......... 11

49 U.S.C. § 1151(a) .......... 8

D.C. Code § 16-3502 .......... 30

* D.C. Code § 16-3503 .......... 27, 28, 30

D.C. Code § 29-305.52 .......... 28

**RULES**

Fed. R. Civ. P. 12(a)(2) .......... 29

Fed. R. Civ. P. 25(d) .......... 29

**REGULATIONS**

49 C.F.R. § 831.5(a)(3) .......... 10

49 C.F.R § 831.5(a)(4) .......... 10

**OTHER AUTHORITIES**

30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939) .......... 17

H.R. Rep. No. 97-108 (1981) .......... 5

H.R. Rep. No. 104-793 (1996) .......... 11

ICAO, *Annex 13 to the Convention on International Civil Aviation: Aircraft Accident & Incident Investigation* (13th ed. 2024), https://perma.cc/HVN9-MT49 .......... 10-11

NTSB, Annual Report to Congress (2025), https://perma.cc/TL8H-F73K .......... 11

The Federalist No. 72 (Alexander Hamilton) (Clinton Rossiter ed., 1961) .......... 3

The Federalist No. 77 (Alexander Hamilton) (Clinton Rossiter ed., 1961) .......... 27

## INTRODUCTION

In *Trump v. Slaughter*, 609 U.S. ---, 146 S. Ct. 2283 (2026), the Supreme Court explained that because the Constitution vests all of the executive power in the President and entrusts him to take care that the laws are faithfully executed, at least the principal officers who lead Executive Branch agencies "must be removable by the President" in order "[t]o remain accountable to the President," *id.* at 2293. Plaintiff Alvin Brown's theory that the leaders of the National Transportation Safety Board (NTSB) can be shielded from removal is at war with *Slaughter*. The NTSB is an Executive Branch agency that executes the laws calling for investigation of transportation accidents, conducts priority investigations of such accidents within the Executive Branch, helps the President execute the transportation laws by generating recommendations for how to regulate transportation, and issues binding administrative adjudications that impose professional discipline on airmen and mariners. In his Opposition,[1] Brown disputes none of this. Instead, he argues that many of the NTSB's functions are similar to functions of Congress or the judiciary. Such arguments might have had purchase in an era in which leaders of Executive Branch agencies could be shielded from removal if their work was "predominantly quasi judicial and quasi legislative," rather than "purely executive." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 624, 628 (1935). But in overruling *Humphrey's Executor*, the Supreme Court explained that "we long ago abandoned the notion that there are some powers that are only *partly* executive." *Slaughter*, 146 S. Ct. at 2302.

Brown's defense of his Fifth Amendment race discrimination claim fares no better. Brown has no real response to Defendants' showing that his constellation of weak statistical patterns and

---

[1] Pl.'s Reply in Supp. of Partial Mot. for Summ. J. / Opp'n to Defs.' Mot. to Dismiss & Pet'r's Opp'n to Resp't's Mot. to Dismiss, ECF No. 40, *Brown v. Trump*, No. 1:25-cv-1764 (D.D.C.) (*Brown I*) ("Opp'n"). That filing was ECF No. 15 in *Brown v. DeLeeuw*, 1:26-cv-1249 (D.D.C.) ("*Brown II*"). Citations to "ECF No. __" are to *Brown I* unless indicated as being to *Brown II*.

inapposite atmospheric allegations of the President's attitudes on race-related issues do not plausibly support the claim that the President removed Brown because of his race. Instead, Brown argues that the Court should borrow a burden-shifting framework adopted by the Supreme Court to interpret certain civil rights statutes in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and that under that standard, it is sufficient that he identifies one white person who was not removed and who is purportedly similar to him in some respects. But Brown cites no case law applying *McDonnell Douglas* to a claim brought not under a civil rights statute that expressly confers a cause of action and broad remedies, but directly under the Constitution. Under the standard governing constitutional equal protection claims, Brown must prove (and plausibly allege at the pleading stage) that "invidious discriminatory purpose was a motivating factor" for the challenged action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Even if *McDonnell Douglas* applied, other NTSB members are not adequate comparators because they had different qualifications, experience, and duties than Brown.

Brown's Opposition also underscores why the Court should not recognize Brown's equal protection claim as legally cognizable. Brown does not dispute that no Court has ever entertained an equal protection claim based on the President's removal of a principal officer, nor does he dispute that the Supreme Court recently held that the President's removal of officers he appoints is a "'conclusive and preclusive' Presidential authority[,]" which "may not be . . . reviewed by the courts." *Trump v. United States*, 603 U.S. 593, 620-21 (2024). Indeed, the Supreme Court in *Slaughter* further recognized this "inherent" and "unitary" "executive power" to appoint, oversee, control, and remove subordinate officers "at will" under the Constitution's Vesting Clause. 146 S. Ct at 2294-95 (citations omitted). Particularly given how little Brown contends is required to state such a claim and shift the burden to the President, allowing claims such as Brown's would

give rise to extensive litigation over presidential removals, and perhaps even appointments, in which the President would be placed in the intolerable position of having either to produce privileged evidence of his own motivations or concede the merits of the claim.

Finally, this Court lacks jurisdiction over Brown's quo warranto petition in *Brown II* because his request to institute a petition was never refused by the U.S. Attorney and Attorney General. The Court should reject Brown's entreaty to invent an atextual private right of action upon non-response, rather than refusal. This Court should dismiss *Brown I* and *Brown II*.

## ARGUMENT

### I. The NTSB's For-Cause Removal Provision Is Unconstitutional

#### A. Brown Wrongly Minimizes the Supreme Court's Ruling in *Slaughter*

Brown suggests that *Slaughter* left in place a legal regime under which the heads of many important Executive Branch agencies could be shielded from removal by the President. He contends that under *Slaughter*, the President need only have the power to remove the heads of so-called "'unitary' agencies" that "substantively regulate primary conduct" or "have the combination of substantive rulemaking, enforcement, and adjudication functions" that the Federal Trade Commission has. Opp'n 1. But *Slaughter* shut the door to any such argument.

Contrary to Brown's proposed reading, *Slaughter* rejected the notion that some executive agencies are not executive enough or not important enough for the President to have unconstrained removal authority over the officers appointed to lead them. *Slaughter* instead held that the Constitution "establish[es] a hierarchy—a 'Chief Magistrate' with whom the buck stops, and below him various 'assistants or deputies' who 'derive their offices from his appointment' and remain 'subject to his superintendence.' To remain accountable to the President, those officers must be removable by the President." *Slaughter*, 146 S. Ct. at 2293 (quoting The Federalist No. 72, at 436 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

Brown cites two statements in *Slaughter* to support his reading, but he takes both statements out of context. First, he argues: "As *Slaughter* acknowledged, 'not all offices created by Congress necessarily come with executive or even sovereign power attached.'" Opp'n 8 (quoting *Slaughter*, 146 S. Ct. at 2305). But the exemplars of such offices for which the President need not have removal authority are the leaders of "the Boy Scouts of America, the Society of American Florists and Ornamental Horticulturalists, and Georgetown University," *Slaughter*, 146 S. Ct. at 2305-06 (citations omitted), not an Executive Branch agency like the NTSB.

Second, Brown argues that "Congress is still free 'to establish independent agencies to assist it with its functions.'" Opp'n 8 (quoting *Slaughter*, 146 S. Ct. at 2302). Yet in the very next sentence, the Supreme Court explained, "[b]ut [Congress] may not foist those agencies upon the President, and thus deprive him of the executive power vested [in him] by the Constitution." *Slaughter*, 146 S. Ct. at 2302 (last alteration in original) (citation omitted). That is, Congress can establish independent *legislative agencies*, but not independent *executive agencies*. If Congress wishes to establish an independent Legislative Transportation Investigation Agency whose sole purpose is to help the House and Senate gather information to generate proposals for new transportation legislation, it may do so. But it cannot create an independent agency, investigative or otherwise, in the Executive Branch. As explained below, the NTSB is an executive agency whose leaders must be accountable to the President through the removal power.

**B. The NTSB Wields Executive Power When it Investigates Transportation Accidents**

**1.** Brown's Opposition confirms that the NTSB wields executive power, and does not act as a mere legislative aid, when it investigates accidents. *See* Mem. 17-24.[2] Brown admits that

[2] Mem. of Law in Opp'n to Pl's. Mot. for Partial Summ. J. in *Brown I*, in Supp. of Defs.' Mot. to Dismiss the 1st Am. Compl. in *Brown I* & in Supp. of Resp't's Mot. to Dismiss the Pet. in *Brown II*, ECF No. 36-1 ("Mem.").

a primary purpose of the NTSB is to produce safety recommendations that "the Secretary of Transportation must consider," Opp'n 8, and that the Department of Transportation (DOT) "t[a]k[es] up" recommendations that it believes "would enhance safety," *id.* at 9; *see also* Mem. 7 (explaining that over the course of its existence, "82 percent of NTSB's recommendations" have been implemented). Also, the "priority" status of the NTSB's investigations, 49 U.S.C. § 1131(a)(2)(A), means that NTSB has priority access to key evidence from transportation accidents; pursuant to the NTSB's statutory authority, the NTSB and other Executive Branch agencies ensure that appropriate information developed about the accident is exchanged in a timely manner, including for law enforcement investigations. *See* Mem. 21-23; *infra*, pp. 9-10. The NTSB's "investigative" powers are "quintessentially executive." *Slaughter*, 146 S. Ct. at 2302.

Brown argues that the statutory requirement that the Secretary of Transportation report to Congress annually about its implementation of NTSB aviation safety recommendations, 49 U.S.C. § 1135(d), is to "serve[] Congress's own legislative purposes" to determine whether new legislation is necessary. Opp'n 9. But the purpose of the NTSB's recommendations to DOT, and the requirement that the Secretary respond to such recommendations, 49 U.S.C. § 1135(a), is to encourage DOT to take NTSB's recommendations seriously and implement them when doing so would improve safety. To the extent the Court finds legislative history relevant, that purpose is reflected in the same House Report cited by Brown, which states that although "it is not likely that every safety suggestion made by the Board will be accepted by the appropriate federal agency . . . the [House] Committee [on Energy and Commerce] believes that the agencies must seriously consider and evaluate the Board's safety recommendations." H.R. Rep. No. 97-108, pt. 1, at 2 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1729, 1731.

Brown gives the game away when he admits that NTSB's "primary function" is "to prevent future accidents" through its investigations and recommendations. Opp'n 8. Congress undoubtedly has authority under the Commerce Clause and the Necessary and Proper Clause to enact laws to prevent accidents on our nation's roadways, railways, waterways, and airways. *See* U.S. Const. art. I, § 8, cls. 3, 18; *United States v. Lopez*, 514 U.S. 549, 558 (1995) ("Congress may regulate the use of the channels of interstate commerce."). Congress did so, in part, by enacting laws creating the NTSB and empowering it to investigate accidents and make recommendations to promote transportation safety. *See generally* 49 U.S.C. §§ 1101-1155. When the NTSB performs its statutory functions to achieve the purposes for which it is created, it is executing those laws. In other words, it is exercising "[t]he executive Power," which the Constitution "vest[s] in [the] President of the United States of America." U.S. Const. art. II, § 1, cl. 1.

Brown emphasizes that the NTSB's recommendations are nonbinding, and that DOT, not the NTSB, regulates transportation. Opp'n 8-9. Yet even before *Slaughter*, the Supreme Court rejected the notion that presidential removal authority was unimportant for the head of an agency that "administers only 1" statute rather than "19 statutes," explaining that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head. The President's removal power serves vital purposes even when the officer subject to removal is not the head of one of the largest and most powerful agencies." *Collins v. Yellen*, 594 U.S. 220, 251-52 (2021). By overruling *Humphrey's Executor*, the Supreme Court rejected the idea that the President need not be able to remove the leaders of a multimember agency that exercises executive power, so long as the agency "do[es] not wield substantial executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020). That the NTSB executes the laws calling for transportation accident investigations, while DOT executes other laws

that substantively regulate transportation, does not change the conclusion that the President's "assistants or deputies" who lead the NTSB "must be removable by the President" in order "[t]o remain accountable to the President." *Slaughter*, 146 S. Ct. at 2293 (citation omitted).

The NTSB also helps the President perform his constitutional power and duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, which is part of the constitutional basis of his removal authority, *see Slaughter*, 146 S. Ct. at 2291 ("the President must be permitted to 'select those who . . . act for him' and 'remov[e] those for whom he can not continue to be responsible.' '[T]o hold otherwise would make it impossible for the President' to fulfill his constitutional obligation 'to take care that the laws be faithfully executed.'" (quoting *Myers v. United States*, 272 U.S. 52, 117, 164 (1926))). The NTSB and DOT play important, and complementary, roles in ensuring that the transportation laws are faithfully executed. DOT regulates transportation, and the NTSB conducts investigations and generates crucial insights (reflected in its reports and recommendations) for DOT to consider in determining how to regulate transportation. Brown is correct that the Secretary of Transportation is not bound to accept the NTSB's recommendations, but the Secretary is accountable to the President. If the President disagrees with how DOT is implementing, or not implementing, NTSB recommendations, he can remove the Secretary. But if the President lacked confidence in the NTSB, that would hinder his ability to hold the Secretary to account. "To 'discharg[e] the duties of his trust,' the President must have the assistance of officers he can trust." *Slaughter*, 146 S. Ct. at 2310 (alteration in original) (citation omitted). The President's trust is not just to execute the laws, but also to take care that the laws are faithfully executed. To take care that the *transportation* laws are faithfully executed, the President must have confidence in the leaders of *both* the DOT and the NTSB.

**2.** The NTSB exercises executive power by wielding many traditional tools of Executive Branch agencies to execute laws, such as issuing subpoenas, taking testimony, and enforcing its authorities in federal court. Mem. 17-18. Brown's contrary arguments are unpersuasive. Brown argues that when the NTSB issues subpoenas, it "is analogous to how congressional committees use subpoenas—to investigate facts and develop proposals for Congress as a whole to consider." Opp'n 10. Yet congressional subpoena "power is justified solely as an adjunct to the legislative process," and therefore it "must serve a valid legislative purpose; it must concern a subject on which legislation could be had." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862-63 (2020) (citations modified). By contrast, a primary purpose of the NTSB's investigations is to generate recommendations for DOT, which are effectively proposals for how to execute the laws. *See* 49 U.S.C. § 1135(a) (requiring the Secretary to indicate whether he intends "to carry out" or "to refuse to carry out" NTSB recommendations "[w]hen the [NTSB] submits a recommendation about transportation safety to the Secretary"). If *congressional* subpoenas to generate information to develop *legislative proposals* are *legislative*, then by analogy, *NTSB* subpoenas to conduct investigations to develop *executive proposals* are *executive*.

The NTSB's authority to "bring a civil action" in federal district court to enforce its subpoena authority and other investigative authorities, 49 U.S.C. §§ 1113(a)(4), 1151(a), further indicates that the NTSB exercises executive power. Mem. 18. Brown resists this conclusion by arguing that the NTSB lacks *independent* litigating authority, which would mean that it must be represented by attorneys from the Department of Justice (DOJ) in federal court. Opp'n 10-11. Yet most executive agencies lack independent litigating authority and thus rely on the DOJ to represent them in court. *See* 28 U.S.C. § 516. Although the Court need not decide the question, even

assuming that Brown is correct that the NTSB lacks independent litigating authority,[3] that would merely mean that when the NTSB comes to court to enforce its authorities, represented by DOJ lawyers, it is exercising executive power in conjunction with another executive agency, the DOJ.

**3.** As Defendants explained, NTSB's statutory "priority" over other Executive Branch investigations of transportation accidents (except for investigations of intentional criminal conduct by the Federal Bureau of Investigation), 49 U.S.C. § 1131(a)(2), confirms that its safety investigations are executive. Mem. 21-23. Brown responds that the NTSB is not "a regulator or enforcer," Opp'n 11, and that the NTSB does not "investigate for enforcement purposes," *id.* at 12. But even though the NTSB does not itself investigate for regulatory or enforcement purposes, the NTSB's priority status is relevant because that priority necessarily means that, by Congress's design, its investigations generate information that can be exchanged among other Executive Branch agencies, including for law enforcement investigations. *See* 49 U.S.C. § 1131(a)(3) (requiring the NTSB to work with other executive agencies to "ensure that appropriate information developed about the accident is exchanged in a timely manner").

As Brown points out, other Executive Branch agencies can and do investigate accidents in parallel with the NTSB. Opp'n 12; 49 U.S.C. § 1131(a)(3). But Brown understates the importance of NTSB's priority as merely "[d]esignating the NTSB to coordinate" "information-sharing" among agencies. Opp'n 13. Transportation accidents often involve physical wreckage, and the NTSB generally takes custody of that wreckage. For aviation accidents, Congress specifically provided that "[a]ny civil aircraft, aircraft engine, propeller, appliance, or property on an aircraft involved in an accident in air commerce shall be preserved, and may be moved, only as provided

---

[3] Defendants are not aware of any court deciding whether NTSB has independent litigating authority. Defendants acknowledge that in past lawsuits, lawyers from the DOJ have represented the NTSB. *See* Opp'n 11 & n.8.

by regulations of the Board." 49 U.S.C. § 1134(b)(2). The NTSB's regulations provide that the NTSB "has first right to access wreckage, information, and resources, and to interview witnesses the NTSB deems pertinent to its investigation," 49 C.F.R. § 831.5(a)(3), and "has exclusive authority to decide when and how the testing and examination of evidence will occur," *id.* § 831.5(a)(4); *see also* 49 U.S.C. § 1134(d) ("Only the Board has the authority to decide on the way in which testing under this section will be conducted, including decisions on the person that will conduct the test, the type of test that will be conducted, and any individual who will witness the test."). Thus, Brown oversimplifies matters by saying that "other agencies are free to do their own witness interviews, testing, or requests if they would like." Opp'n 13. Given NTSB's exclusive authority to decide when and how the testing and examination of evidence occur, other agencies depend on the NTSB for access to crucial evidence that may later be used for law enforcement and other investigations arising from transportation accidents. Consequently, a recalcitrant NTSB could not only hinder the President's ability to take care that the transportation laws are faithfully executed, but could also hinder investigations by other executive agencies, including law enforcement investigations. That underscores that the NTSB's leaders must "remain accountable to the President" through removal. *Slaughter*, 146 S. Ct. at 2310.

**4.** If all that were not enough, the NTSB exercises executive power by participating in the foreign relations of the United States when conducting international aviation investigations alongside investigators from other countries. Mem. 19. Brown's responses are unconvincing. Brown notes that Annex 13 of the Convention on International Civil Aviation, which governs international aviation investigations, requires that each nation's "accident investigation authority" be "independent from State aviation authorities." Opp'n 13 (quoting ICAO, *Annex 13 to the Convention on International Civil Aviation: Aircraft Accident & Incident Investigation* § 3.2 (13th

ed. 2024), https://perma.cc/HVN9-MT49). But that is true of the NTSB, which is independent from the federal government's aviation authority, the Federal Aviation Administration (FAA). Brown also points out that the NTSB "work[s] closely with [the] Department of State" and shares responsibility with the FAA in dealing with the International Civil Aviation Organization. Opp'n 14-15. But the fact that the NTSB participates in foreign relations alongside other executive agencies makes even clearer that the NTSB, like the State Department and the FAA, is executive.

**5.** The NTSB also exercises executive power by providing assistance to survivors and their families after fatal aircraft and passenger rail accidents. *See* Mem. 17; 49 U.S.C. §§ 1136, 1139. Brown responds that in providing such assistance, "the NTSB is not like FEMA." Opp'n 16. Defendants acknowledge that NTSB's role in providing assistance is more limited than FEMA's role in providing assistance to those affected by disasters within FEMA's purview (for example, FEMA provides monetary assistance and funds disaster recovery work), but the work is nonetheless important. Last year, for example, NTSB staff assisted 3,891 victims, family members, and family contacts, engaging on average with family members associated with 63 different accidents each week. *See* NTSB, Annual Report to Congress 51 (2025), https://perma.cc/TL8H-F73K ("2025 Annual Report"). Indeed, Brown acknowledges that NTSB works "to 'speed' the recovery and identification of passengers" who died in accidents "'as may be necessary.'" Opp'n 17 (quoting H.R. Rep. No. 104-793, at 9 (1996)). He does not even attempt to argue that in dong so, NTSB exercises legislative or judicial power, rather than executive power.

### C. The NTSB Exercises Executive Power in Adjudicating Challenges to Licensing and Registration Decisions of the FAA and Coast Guard

Members of the NTSB must be removable because the NTSB exercises executive power in adjudicating challenges to licensing and registration decisions of the FAA and Coast Guard. Mem. 24-27. The Supreme Court has repeatedly characterized an agency's authority to issue

binding administrative adjudications as an important executive power. *See Seila Law*, 591 U.S. at 219; *Slaughter*, 146 S. Ct. at 2305. Brown cannot evade the force of these precedents.

Brown first attempts to distinguish the NTSB from the Merit Systems Protection Board (MSPB), a largely adjudicatory agency whose removal protections were ruled unconstitutional by the D.C. Circuit. Opp'n 19. Brown points to language from the D.C. Circuit that the MSPB's litigating authority "cut[] against" the plaintiff's position because "[p]urely adjudicatory agencies—ones designed to be an independent adjudicator with no policymaking authority—are generally not proper parties to defend their decisions on review, just as district judges are generally not proper parties to defend their decisions on appeal." *Harris v. Bessent*, 160 F.4th 1235, 1256 (D.C. Cir. 2025) (quotation omitted) (citing *Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995)), *cert. denied*, --- S. Ct. ---, 2026 WL 1871323 (June 30, 2026). But in *Harris*, the D.C. Circuit was bound by *Humphrey's Executor* and accordingly analyzed whether the MSPB's powers "exceed the powers deemed to be quasi-legislative or quasi-judicial in *Humphrey's Executor*." *Id.* Yet under *Slaughter*, "[w]hen an agency 'executes' a congressional mandate against private parties, it exercises executive power—no ifs, ands, or quasis about it." *Slaughter*, 146 S. Ct. at 2302. The NTSB does so when it issues binding orders determining sanctions for airmen and mariners. *See* 49 U.S.C. § 1133. Even if the NTSB's adjudicatory role were analogous to "powers deemed to be . . . quasi-judicial in *Humphrey's Executor*," *Harris*, 160 F.4th at 1256, that would not help Brown in a post-*Humphrey's Executor* world.

Brown also notes that the NTSB operates within a split-enforcement regime where another agency (FAA for aviation cases and Coast Guard for marine cases) issues orders, and then those orders are appealed to the NTSB. Opp'n 20-21. But the same is largely true of the MSPB, which does not itself issue adverse actions to federal employees such as firing, suspension, or demotion,

5 U.S.C. § 7512, but instead hears "appeal[s]" of such actions by other agencies, 5 U.S.C. §§ 7513(d), 7701(a).[4] Brown also points out that under certain circumstances, the NTSB must defer to decisions of the FAA and Coast Guard. *See* Opp'n 20 & n.17. Yet in one of the cases Brown cites, the D.C. Circuit explained that where the NTSB reviews a Coast Guard decision, that "vertical split of enforcement" just means there are "two different executive agencies" (the NTSB and the Coast Guard) involved in enforcing the statute through administrative adjudication. *Collins v. NTSB*, 351 F.3d 1251 (D.C. Cir. 2003); *see also id.* ("Assuming that some deference to the executive is proper in this case, the next question is *which executive branch agency—the Coast Guard or the NTSB*—is entitled to it." (emphasis added)). Thus, the D.C. Circuit has long recognized that when the NTSB adjudicates, it is functioning as an Executive Branch agency.

Finally, Brown cannot defend the removal restrictions on NTSB members by analogizing the NTSB to the Tax Court. *See* Opp'n 21. Notably, *Slaughter* did not bless as constitutional the removal restrictions on Tax Court judges, but merely "l[eft] those questions for another day," while reaffirming "that those who fall within the President's 'general administrative control' must be removable by the President at will." *Slaughter*, 146 S. Ct. at 2306 (quoting *Myers*, 272 U.S. at 135). Even if the Supreme Court ultimately holds that Congress can shield the judges on specialized Article I courts from removal, that would not apply to the NTSB, an Executive Branch agency that performs executive functions that go far beyond adjudication.

---

[4] Again trying to distinguish the MSPB from the NTSB, Brown notes that "the MSPB has a different constellation of functions and different relationships with other federal agencies than the NTSB does in its appellate role." Opp'n 19. But the NTSB also has a constellation of functions beyond the MSPB's functions. In arguing that the NTSB is "a purely adjudicatory agency," *id.*, Brown ignores that adjudication is just a small part of what the NTSB does. The bulk of the NTSB's functions are in the heartland of executive power, including conducting the priority investigation of transportation accidents within the Executive Branch, making recommendations that are intended to help DOT execute the transportation laws, and participating in the United States' foreign relations concerning international aviation investigations. *See supra*, pp. 4-11.

## II. Brown Fails to State an Equal Protection Claim

### A. Brown Fails to Plausibly Allege that He Was Removed Because of Race

Brown all but ignores Defendants' arguments under *Arlington Heights*, the appropriate framework for Fifth Amendment equal protection claims. Brown instead asserts that his equal protection claim is governed by the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Not so. The *McDonnell Douglas* standard is a doctrine of statutory interpretation used to interpret statutes that provide a cause of action for employment discrimination, such as Title VII, Section 1981, and the Age Discrimination in Employment Act. Brown cites no cases applying *McDonnell Douglas* to a claim brought directly under the Fifth Amendment, let alone a claim against the President for removal of a principal officer.

Even if *McDonnell Douglas* did apply here, Defendants have shown that Brown's alleged comparators, other members of the NTSB, are differently situated from Brown. Moreover, Brown's theory of Fifth Amendment equal protection vindication would be practically unworkable and would enable chaos throughout the government.

Accordingly, Brown fails to state a claim under either framework.

#### 1. Brown Fails to Engage with *Arlington Heights*, the Governing Analytical Framework for Fifth Amendment Equal Protection Claims

Under *Arlington Heights*, a plaintiff bringing an equal protection claim must prove (and plausibly allege at the pleading stage) that "invidious discriminatory purpose was a motivating factor" for the challenged action. *Vill. of Arlington Heights*, 429 U.S. at 266; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Where the claim is invidious discrimination in contravention of the . . . Fifth Amendment[], our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose."). Defendants showed that Plaintiff failed to meet this standard. Mem. 28-35. Brown alleged no direct evidence, only tenuous atmospheric

and circumstantial evidence that did not raise a plausible inference of intentional racial discrimination. *Id.* Because these allegations are patently insufficient to create a plausible inference of intentional discrimination, Brown barely even attempts to respond. Rather, across two paragraphs, he simply summarizes his allegations, and asserts without citation to any authority that they "are sufficient to state a claim for intentional discrimination at this stage under any applicable standard." Opp'n 34-35. That blithe dismissal of his pleading burden cannot be squared with well-established federal pleading standards. "If the complaint 'pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. ---, 146 S. Ct. 1391, 1399 (2026) (quoting *Iqbal*, 556 U.S. at 678). "Instead, to nudge a claim 'across the line from conceivable to plausible,' a plaintiff must plead facts that, if true, 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and to rule out 'obvious alternative explanation[s]' for the defendant's conduct." *Id.* (first quoting *Iqbal*, 556 U.S. at 678; and then quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

As Brown's argument that he plausibly pleads intentional discrimination is so weak, he instead focuses most of his argument on a novel legal theory that would let him bypass the constitutionally required *Arlington Heights* framework, needing only to allege the existence of a single comparator under *McDonnell Douglas*, a doctrine developed in a Title VII case and applied in cases involving other civil rights statutes. As shown below, Brown is wrong.

**2. The *McDonnell Douglas* Framework Does Not Apply to Brown's Fifth Amendment Challenge to His Removal**

The *McDonnell Douglas* framework applies to Title VII and certain other civil rights statutes, but not to equal protection claims brought directly under the Fifth Amendment. In *McDonnell Douglas*, the Supreme Court considered "the proper order and nature of proof in

actions under Title VII of the Civil Rights Act of 1964." 411 U.S. at 793-94. The Court developed the burden-shifting framework to make it easier for a Title VII plaintiff to make out a prima facie case, given that "[t]he language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *Id.* at 800. Each of the other cases cited by Brown that applies the *McDonnell Douglas* framework likewise involves either Title VII or another federal statute that expressly confers a cause of action on individuals for violations of their civil rights. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025) (a Title VII case); *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025) (a 42 U.S.C. § 1981 and Title VII case); *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (a Title VII case); *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (a Title VII case); *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) (a Title VII case); *Jiggetts v. Cipullo*, 774 F. Supp. 3d 168 (D.D.C. 2025) (a 42 U.S.C. § 1983 case). In sum, Brown's cases merely support the proposition that the *McDonnell Douglas* framework is a doctrine of statutory interpretation that courts have developed to interpret certain civil rights statutes.

But Brown does not sue under Title VII, Section 1981, or any other civil rights statute. Rather, he brings a claim directly under the equal protection component of the Fifth Amendment. Brown has not cited to, and Defendants have been unable to locate, any case in which the *McDonnell Douglas* analysis was used for a naked Fifth Amendment claim. Brown acknowledges as much, yet argues that this is because of his unique status as a Senate-confirmed presidential appointee who is not protected by any employment discrimination statute. Opp'n 28-29. But the fact that Congress chose not to enact a statute giving principal officers the rights and remedies to challenge employment discrimination that other employees may assert does not suggest that the

Court should import doctrines from federal employment statutes into the Fifth Amendment and apply them to principal officers. Rather, the relationship between a President and a principal officer is fundamentally different from a typical employment relationship. Principal officers are chosen by the President "to assist [him] in discharging the duties of his trust." *Slaughter*, 146 S. Ct. at 2294 (30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)). When a President removes a principal officer, he is implementing the Constitution's "hierarchy," under which "the buck stops" with the President, and "[t]o remain accountable to the President, those officers must be removable by the President." *Id.* at 2293.

Brown likewise oversimplifies *Jiggetts* as a "case[ ] brought under the Fifth Amendment." Opp'n 30. *Jiggetts* involved a Fifth Amendment claim brought under Section 1983, which the opinion acknowledges. *Jiggetts*, 774 F. Supp. 3d at 185-86. Moreover, *Jiggetts*, which is not binding as a district court case, *see Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011), was also likely wrongly decided. The *Jiggetts* court does not analyze whether *McDonnell Douglas* is the correct framework for a Section 1983 claim based on equal protection; instead, it relies on a series of cases, apparently originating from *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 60-61 (D.D.C. 2008), in which each subsequent court presumed *McDonnell Douglas* applied to Section 1983 claims. Yet the *Jo* court fails to articulate reasoning for *McDonnell Douglas*'s application to Section 1983. Instead, it relies on a Title VII case, *Cones v. Shalala*, 199 F.3d 512, as justification for *McDonnell Douglas*'s application to Section 1983 claims. Even still, *Jiggetts* applied *McDonnell Douglas* to claims involving the removal of low-level municipal District of Columbia employees, a context that more closely resembles an ordinary Title VII case. *Jiggetts* provides no support for applying *McDonnell Douglas* to the President's removal of a principal officer.

The *McDonnell Douglas* framework is a pragmatic doctrine, meant to augment the remedial force of civil rights statutes. Indeed, the *McDonnell Douglas* analysis began in a Title VII case based on the broad remedial "purpose of Congress" in enacting Title VII, *McDonnell Douglas Corp.*, 411 U.S. at 800, and has been "borrowed" for other civil rights statutes that provide broad remedies for civil rights violations, *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C. Cir. 1984) (application to Section 1981). That pragmatic interpretation of civil rights statutes finds no doctrinal basis in the Fifth Amendment's equal protection clause.

As explained above, for equal protection claims, the Supreme Court provided the governing framework in *Arlington Heights*. "Proof of racially discriminatory intent or purpose is *required* to show a violation of the Equal Protection Clause," *Vill. of Arlington Heights*, 429 U.S. at 265 (emphasis added), and whether racially discriminatory intent or purpose is present "*demands a sensitive inquiry* into such circumstantial and direct evidence of intent as may be available." *Id.* at 266 (emphasis added). The Supreme Court carefully laid out the factors relevant to this "sensitive inquiry." *Id.* at 265-68. Brown cannot now substitute his preferred test for a constitutionally required one articulated by the Supreme Court. The *Arlington Heights* framework has persisted since 1977, and courts continue to apply it to Fifth Amendment equal protection claims in criminal and civil cases alike. *See*, *e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (applying *Arlington Heights* framework to DACA recission); *United States v. Barrera-Vasquez*, 617 F. Supp. 3d 400, 407 (E.D. Va. 2022) (applying *Arlington Heights* framework to criminal immigration law). Plaintiff fails to justify why it must be uniquely discarded in cases alleging invidious employment discrimination.

### 3. Brown Has Failed to Identify a Comparator

Even if *McDonnell Douglas* applied, Brown has not produced a sufficient "comparator" for the analysis. In *Joyner*, the D.C. Circuit stated that "courts must draw on their 'judicial

experience and common sense' in determining whether" a plaintiff has identified an adequate "comparator." *Joyner*, 140 F.4th at 530. While a comparator's circumstances need not be "'nearly identical' to the plaintiff's in 'all relevant aspects,'" a complaint must "include[] enough detail that [the court] could plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff." *Id.* at 531 (citation omitted). Courts have required a comparator to do more than merely occupy the same role. For example, in *Brown v. Sessoms*, 774 F.3d 1016 (D.C. Cir. 2014), a professor sued her employer for discrimination after she was denied tenure for failing to satisfy a requirement to publish three articles. *Sessoms*, 774 F.3d at 1019. She successfully identified a tenured comparator who had written no articles and showed "equivalent qualifications" to that professor "with regard to teaching and service." *Id.* at 1023. Notably, in *Sessoms*, the plaintiff and her comparator had a similar position and similar relevant qualifications.

Here, Brown's qualifications and experience differ greatly from those of Chair Jennifer Homendy and Member Thomas Chapman. While Homendy and Chapman had extensive relevant experience, Brown had no substantial experience in transportation safety, and his most prominent prior experience was as a prominent elected Democratic politician, having served as mayor of one of America's largest cities. Mem. 34. That is certainly a salient differentiator in evaluating removal of a principal officer by a President of the opposite party. Even if the position were all that mattered, Brown did not have the same position as either Homendy or Chapman: Brown was the Vice Chair of the NTSB, Homendy was the Chair, and Chapman was a member. *See* First Am. Compl. ¶¶ 3, 9, ECF No. 25. The NTSB's authorizing statute gives the Chair and Vice Chair duties that differ from one another and from the other members. *See* 49 U.S.C. § 1111(d), (e).

Brown attempts to bridge the gap between himself and the alleged comparators by arguing they are all Democrats, but *Joyner* requires more. Indeed, courts have repeatedly looked to similar

or identical qualifications before identifying a comparator. *See*, *e.g.*, *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461 (D.C. Cir. 2017). Accordingly, even if *McDonnell Douglas* applied, Brown's qualifications and role are sufficiently different from Homendy and Chapman that they would not qualify as comparators.

### B. Brown's Equal Protection Claim Is Not Legally Cognizable

#### 1. Brown's Novel Legal Theory Contravenes Supreme Court Precedent

Even if Brown had adequately alleged his Fifth Amendment claim as a factual matter, that claim would not be legally cognizable. *See* Mem. 39-44. Brown cannot dispute two key points. First, no court has ever held that the President's removal of a principal officer violated the equal protection component of the Fifth Amendment or even entertained such a claim. *Id.* 43-44. Second, the Supreme Court recently held that "the President's power to remove 'executive officers of the United States whom he has appointed'" is a "conclusive and preclusive Presidential authority," which "may not be regulated by Congress *or reviewed by the courts*." *Trump v. United States*, 603 U.S. at 620-21 (emphasis added) (quoting *Myers*, 272 U.S. at 106). Indeed, "[o]nly if the President's deputies were removable at will would they truly be subordinate to the sole executive magistrate." *Slaughter*, 146 S. Ct. at 2295 (citation omitted).

Brown, of course, seeks to have the President's removal of a principal officer reviewed by a court. That Brown's novel legal theory contravenes Supreme Court precedent is reason enough to reject it. The Framers entrusted the Senate, not the federal courts, with judging the President's selection of principal officers. And if courts could force the President to retain subordinate officers he did not trust, "the unity of the Executive Branch would be destroyed." *Id.* (citation modified).

#### 2. Brown's Contrary Arguments Are Unpersuasive

**a.** None of Brown's arguments would justify this Court taking the extraordinary step of defying clear and recent Supreme Court precedent to recognize a novel legal claim. Brown

mischaracterizes Defendants' position as stating "that the President is immune from judicial review or accountability for any violation of constitutional rights committed through the exercise of any Article II power." Opp'n 39. Defendants' position is far more modest, that the exercise of this particular "conclusive and preclusive Presidential authority[] . . . may not be . . . reviewed by the courts." *Trump v. United States*, 603 U.S. at 620-21 (quotation marks omitted). Whether other Presidential actions would give rise to cognizable claims would present distinct questions.

For similar reasons, Brown's citation of cases that stand for the general proposition that some presidential actions give rise to viable legal or constitutional claims does not establish that his claim is cognizable. For example, *Clinton v. Jones*, 520 U.S. 681, 703 (1997), and *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), cite *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), for the proposition that courts can review the lawfulness of presidential actions for lawfulness or constitutionality. Yet in *Youngstown*, Justice Robert Jackson famously explained in concurrence that the President's seizure of steel mills was unlawful because it violated federal statutes and was not within the President's conclusive and preclusive authority. *See Youngstown*, 343 U.S. at 637-47 (Jackson, J., concurring). *Youngstown* and its progeny provide no support for the proposition that a court can review the President's removal of a principal officer for race discrimination. To the contrary, *Trump v. United States* relied on Justice Jackson's *Youngstown* concurrence for its framework regarding "conclusive and preclusive" presidential authority, *see Trump v. United States*, 603 U.S. at 607 (quoting *Youngstown*, 343 U.S. at 585 (Jackson, J., concurring)), which it applied in holding that the President's removal of officers "may not be . . . reviewed by the courts," *id.* at 621.

Other cases cited by Brown are also far afield. *Trump v. Vance*, 591 U.S. 786 (2020), did not involve judicial review of a presidential action. Rather, it concerned requests for the President

to provide evidence that is relevant to a criminal investigation or case. *Id.* at 795. *Trump v. Hawaii*, 585 U.S. 667, 710 (2018), involved a presidential proclamation limiting entry of certain classes of immigrants. Brown claims that *Hawaii* involved "the President exercis[ing] a 'conclusive and preclusive' power," Opp'n 36, but that is wrong. Immigration is an area within Congress's authority to legislate. *See*, *e.g.*, U.S. Const. art. I, § 8, cl. 4. In *Hawaii*, President Trump invoked a specific statutory delegation from Congress to the President, rather than relying on conclusive and preclusive presidential authority. *See Hawaii*, 585 U.S. at 674-75.

Brown also cites a case concluding that when a presidential pardon or commutation includes "the attachment of [a] condition," a court can review whether that condition "otherwise offend[s] the Constitution." *Schick v. Reed*, 419 U.S. 256, 266 (1974); *see also id.* at 267 (concluding that the condition at issue did not offend the Constitution).[5] Yet that hardly suggests that a pardon would be reviewable for racial discrimination under the Fifth Amendment. If that were true, then a convict whose pardon application was denied could bring a lawsuit claiming that the pardon was denied because of race, citing (much like Brown does here) alleged comparators who received a pardon and statistical data about alleged racial patterns in the President's pardons to try to get past a motion to dismiss and open the doors to discovery about the President's pardon decisions. That has never been the law.

In sum, Brown's cases establish the unremarkable proposition that some constitutional claims can be brought to challenge some presidential actions. But even if this Court had the authority to disregard Supreme Court precedent, Brown's inapposite cases cast no doubt on the

[5] Two other cases cited by Brown briefly cite *Schick* and suggest in dicta that acts of clemency may transgress some other constitutional limitation, before rejecting any such claim in those particular cases. *See Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020); *Rosemond v. Hudgins*, 92 F.4th 518, 525-26 (4th Cir. 2024).

Supreme Court's holding that the President's removal of principal officers "may not be . . . reviewed by the courts." *Trump v. United States*, 603 U.S. at 621.

**b.** As Defendants explained, allowing courts to review removals of principal officers to determine whether the President considered race would have alarming consequences. Mem. 39-43. Brown's efforts to minimize those consequences are unpersuasive. Instead, his arguments validate and exacerbate those consequences. Defendants explained that the logic of Brown's position that removals of principal officers are reviewable for racial discrimination would extend equally to appointments of principal officers, yet most recent Presidents have proudly acknowledged considering race and sex when choosing principal officers. *Id.* 39-40. Brown essentially agrees that Presidents have considered race and sex in appointments, *see* Opp'n 38 (citing "past Presidents' efforts to create diverse and representative cabinets"), yet he argues that "exercising the appointment power is far less likely to transgress constitutional limits" than the removal power, because removal involves "tak[ing] adverse action against a specific person," *id.*

Brown's purported distinction between removals and appointments cannot be squared with his argument that courts handling equal protection claims involving principal officers should apply principles drawn from case law from employment discrimination statutes. *See id.* 26-31. Those employment discrimination statutes make discrimination on the basis of race (or other protected grounds) just as unlawful in the context of hiring as in the context of firing. *See*, *e.g.*, 42 U.S.C. § 2000e-2(a)(1) (making it unlawful to "refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin"); *cf. Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1086 (3d Cir. 1984) (explaining, in an unfair labor practice case, that "[p]osting a sign . . . that reads 'No Blacks Need Apply'" would constitute racial discrimination).

Even if it were possible to cordon off appointments from the ambit of Brown's legal theory, the consequences as to removal are magnified by Brown's position that to survive a motion to dismiss, a plaintiff need only allege a single comparator of a different race who is similarly positioned "in at least some relevant respects." Opp'n 2 (citing *Joyner*, 140 F.4th at 531). And in Brown's view, the mere fact that a person of a different race with a similar position (and perhaps of the same party) was not removed is sufficient. Many ordinary presidential removals could meet this standard. For example, each of the 93 U.S. Attorneys have similar positions leading one of the U.S. Attorney's Offices throughout the country. At any given time, there will likely be U.S. Attorneys of several different races. If Brown is correct, the President could never remove a U.S. Attorney without giving rise to a race discrimination claim that would survive a motion to dismiss (unless he removed all U.S. Attorneys at once), because there would always be at least one other U.S. Attorney of a different race who was not removed.

Likewise, Brown's theory could even hinder a President's ability to remove Cabinet members. Because each Cabinet member leads a department of the Executive Branch, Cabinet members could arguably be considered similarly positioned to each other in at least some relevant respects, if that standard is not construed strictly. If so, then a President with a multiracial Cabinet (such as President Trump and every other recent President) could not remove a single Cabinet member without giving rise to a claim of race discrimination that would survive a motion to dismiss, unless the President removed the entire Cabinet.

Brown might respond that even if these hypothetical claims could survive a motion to dismiss, the government can defeat them if they lack merit. But even allowing such cases to advance to discovery would create immense difficulties both for judges and for the Executive Branch, and Brown's efforts to minimize these consequences are unpersuasive.

Under Brown's legal theory, race discrimination claims by principal officers will turn on the President's subjective motivations when making his most important personnel decisions, specifically whether the President had a "nondiscriminatory reason" for removing a principal officer, and whether that reason was "pretext." Opp'n 23 (citations omitted). Such claims would place intrusive discovery demands on the Executive Branch and place district courts in the untenable position of trying to divine the contents of the President's mind. It is easy to see how such claims would encourage plaintiffs to seek discovery of the President or his closest aides, who are generally the only people who might have knowledge of the President's motivations when deciding who should run Executive Branch agencies. Not to worry, says Brown, because he "*would initially* seek only limited discovery." *Id.* at 40 (emphasis added). In other words, the most aggressive requests would not be in the first tranche of discovery but could be in the second tranche. That is cold comfort.

Brown also states that if and when he seeks discovery of the President's internal deliberations, this Court can address it by resolving claims of executive privilege. Notably, he does not acknowledge that such evidence would be privileged. Rather, he envisions that he would make "requests" for information regarding the President's deliberations, those requests would be "met with assertions of privilege," and then he would oppose the President's assertion of privilege, leaving it to "this Court" to resolve such disputes. *Id.* Yet the fact that this category of claim, challenging the President's removal of principal officers based on his subjective motivations, would inevitably ensnare courts in thorny executive privilege disputes underscores why this Court should not be the first to recognize such a novel claim.

Furthermore, Brown's legal theory would place Presidents in the intolerable position of needing to produce evidence subject to executive privilege to mount a defense. In Brown's view,

he must only meet a "prima facie burden" that "is not onerous," by showing that at least one white person who was similarly positioned in some respects was not removed. *Id.* at 23 (citation omitted). At that point, "the burden then shifts" to the President "to articulate some legitimate, nondiscriminatory reason" for removing Plaintiffs. *Id.* (citation modified). That is, in Brown's view, the President will have a burden to produce evidence showing why he removed Brown, and if the President does not meet that burden, Brown's claim will necessarily succeed. But it is difficult to imagine what other evidence of the President's reasons would exist besides the President's own testimony or evidence of the President's communications with his aides. For the President to provide testimony would be an enormous burden (even if he did so by declaration), especially since a plaintiff would undoubtedly argue that he should be allowed to depose or cross-examine the President regarding his testimony. And evidence of the President's communications with aides about important personnel decisions would surely be covered by executive privilege.[6] The Court should not endorse a novel legal theory that would place Presidents in the untenable position of needing to testify or waive executive privilege over their most sensitive personnel deliberations to defend against equal protection claims.

**c.** As Defendants argued, the Framers designed the Constitution to place the political check of Senate confirmation, rather than a judicial check, on the President's selection of principal officers. Mem. 43. Brown counters by arguing that because Senate confirmation applies only to appointments, "courts are the only body that can ensure the President exercises his removal powers within the bounds of constitutional limits." Opp'n 42. Yet this argument again runs afoul of the

---

[6] *See, e.g.*, *In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (explaining that there is "a presumptive privilege for Presidential communications," which is "necessary to guarantee the candor of presidential advisers and to provide a President and those who assist him . . . with freedom to explore alternatives in the process of shaping policies and making decisions" (citation modified) (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974))).

Supreme Court's holding that "the President's power to remove 'executive officers of the United States whom he has appointed' may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. at 621 (quoting *Myers*, 272 U.S. at 106). But the Supreme Court's recognition that neither Congress nor the courts *directly* check presidential removals is tempered by the fact that a President's need to obtain Senate confirmation of a replacement for a removed officer *indirectly* serves as a political check on the President's removals of executive officers. Although Plaintiff is correct that the Senate's "ability to refuse to appoint a replacement" does not "prevent" a President's removal, Opp'n 42, as Alexander Hamilton recognized, the Senate confirmation requirement nonetheless "restrain[s]" the President in removing officers based on "the apprehension that a discountenance of the Senate might frustrate the attempt [to appoint a replacement], and bring some degree of discredit upon himself," The Federalist No. 77, at 459 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

## III. The Court Should Dismiss the Petition in *Brown II* for Lack of Jurisdiction

The Court lacks subject-matter jurisdiction over Brown's quo warranto petition because the governing statute does not permit Brown, as a private citizen, to file such an action. The statute provides a narrow mechanism for interested parties to pursue a quo warranto action after requesting action from the Attorney General and U.S. Attorney for the District of Columbia and being refused. D.C. Code § 16-3503. But Brown never asked the Attorney General to pursue action, and he was never refused by the U.S. Attorney, the current Attorney General (who was Acting Attorney General at the time of the Petition), or the former Attorney General (to whom Brown did make a request). This Court accordingly lacks jurisdiction over his Petition. *See* Mem. 44-46.

Brown acknowledges that U.S. Attorney Jeanine Pirro and former-Attorney General Pamela Bondi never responded to his quo warranto request, and that he relies on a theory that the non-response is a "constructive denial." Opp'n 44 (citation omitted). He also acknowledges that

the only case to address the question whether a non-response is a constructive refusal rejected his position and concluded that actual refusal is required. *See id.* at 45; *Sibley v. Obama*, 866 F. Supp. 2d 17, 20 (D.D.C. 2012) (Bates, J.), *aff'd*, No. 12-5198, 2012 WL 6603088 (D.C. Cir. Dec. 6, 2012). Brown counters that the petition in *Sibley* also failed for other reasons, but Judge Bates's analysis on actual refusal is still persuasive authority for Defendants' position, while no authority supports Brown's position.

Judge Bates's holding is also consistent with the statutory text, which requires "refus[al]" of a "request" of an interested person before the interested person can bring suit. D.C. Code § 16-3503. Congress could have granted interested persons the right to sue upon refusal or lack of response, but it did not. For example, the D.C. Code authorizes a corporate shareholder to commence a derivative proceeding if the shareholder has made a "written demand" and that demand has either "been rejected by the corporation" or "[n]inety days have expired from the date the delivery of the demand was made." D.C. Code § 29-305.52. But the quo warranto statute contains no analogous language authorizing suit based on non-response, rather than refusal.

Brown argues that requiring refusal would run counter to the statute's purposes by making it easier for the government to prevent private parties from instituting quo warranto actions. Opp'n 45. Yet the Supreme Court has held that "courts may not create" a cause of action, "no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). Brown's request to have this Court invent an atextual private right of action upon non-response bears the hallmarks of a now-rejected jurisprudence that "permitted courts to provide redress if Congress remained silent." *Cisco Sys., Inc. v. Doe I*, 609 U.S. ---, 146 S. Ct. 1882, 1890 (2026). Courts look to statutory text to determine the scope of private remedies, because "Congress is better positioned than courts to evaluate the policy tradeoffs of creating liability." *Id.* at 1891.

Even if a non-response could in some circumstances constitute a constructive refusal, that would not be the case here. Brown does not dispute that he never made a request to the current Attorney General, Todd Blanche, who was Acting Attorney General at the time Brown filed the petition. Brown argues that his request to former Attorney General Bondi should be deemed "referred to [then-]Acting Attorney General Blanche following Ms. Bondi's removal," citing the civil procedure rule that automatically substitutes an official capacity litigant with her successor when the litigant ceases to hold office. Opp'n 45 (citing Fed. R. Civ. P. 25(d)). But he cites no authority for importing this rule of civil procedure into the quo warranto statute. The question whether lawsuits involving an officer should continue when a successor takes office is obviously distinct from the question whether Attorney General Blanche should be deemed to have constructively refused a request that was made not to him but to then-Attorney General Bondi.

The Court should also reject the notion that U.S. Attorney Pirro constructively refused Brown's request. Brown argues that because he submitted a request on March 20, 2026, and demanded a response by April 3, 2026, *see* Pet. For Leave to Issue Writ of Quo Warranto, ¶ 49, *Brown II*, ECF No. 1, her "failure to respond by the identified date is best understood as a denial," Opp'n 45. Yet no authority supports reading the failure to respond on an arbitrary 14-day deadline as refusal. *Cf.* Fed. R. Civ. P. 12(a)(2) (providing 60 days from service for the government to respond to a complaint).

Brown next argues that the lack of refusal by the Attorney General does not matter because the U.S. Attorney's "constructive denial is alone sufficient for Mr. Brown to proceed in this Court." Opp'n 45. He relies on the word "or" in the quo warranto statute, which states: "If the Attorney General or United States attorney refuses to institute a quo warranto proceeding on the request of a person interested, the interested person may apply to the court by certified petition for leave to

have the writ issued." D.C. Code § 16-3503. "Ordinarily, the use of the term 'or' in a statute signifies a disjunctive requirement, while 'and' signifies a conjunctive one. However, this is not always the case, the ultimate meaning of these words depends on the context in which they are used." *United States v. Brennick*, 908 F. Supp. 1004, 1015 (D. Mass. 1995) (collecting cases). Here, the Attorney General and the U.S. Attorney each have authority to institute a quo warranto proceeding, D.C. Code § 16-3502, so it makes sense that a private party would need to obtain refusal from both officials. That is what Judge Bates concluded, holding that "an 'interested person' may institute such a proceeding only if the Attorney General *and* the United States Attorney for the District of Columbia refuse to institute one on his request." *Sibley*, 866 F. Supp. 2d at 20 (emphasis added). In any event, as explained above, neither official issued a refusal here.

Finally, Brown acknowledges that this Court has discretion to decline jurisdiction over a quo warranto petition. Opp'n 46. Brown's Petition is an unprecedented attempt to oust a Senate-confirmed principal officer of the United States, Member John DeLeeuw, who is amply qualified for his post and is performing vital work helping to secure the safety of our transportation system on behalf of the President, the Executive Branch, and the American people. The Court would be well within its discretion to decline jurisdiction here.

## CONCLUSION

The Court should grant Defendants' Motions to Dismiss the Amended Complaint in *Brown I* and the Petition in *Brown II* and enter judgment for Defendants in *Brown I* and *Brown II*.

Dated: August 26, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*