**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALVIN BROWN,<br>*Plaintiff*,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>*Defendants*. | No. 25-cv-01764 (DLF) |

## MEMORANDUM OPINION

Alvin Brown once served on the National Transportation Safety Board, a federal agency charged with coordinating the Nation's response to transportation accidents. His tenure ended when President Trump removed him from office. Believing that the President fired him without cause and because of his race, Brown filed this action to contest his removal. Before the Court are Brown's Motion for Partial Summary Judgment, Dkt. 35, and the defendants' Motion to Dismiss, Dkt. 36. For the reasons that follow, the Court will deny Brown's motion, grant the defendants' motion, and dismiss this case.

### I. BACKGROUND[1]

In 1966, Congress consolidated several agencies, forming the National Transportation Safety Board. Department of Transportation Act, Pub. L. No. 89-670, § 5(a), 80 Stat. 931, 935–36 (1966). That agency, Congress declared, would "report periodically to Congress" on how the Nation could "reduce the likelihood of transportation accidents." 49 U.S.C § 1116(a). It would also investigate "the cause or probable cause of" aircraft accidents. *Id.* § 1131(a). And it would

[1] On reviewing a motion to dismiss, the Court takes the allegations in the complaint as true. Except as otherwise noted, the following facts are derived from Brown's complaint.

issue rules "governing the notification and reporting" of those accidents and manage crash-scene debris. *Id.* §§ 1132(b), 1134(b)(2).

From its inception, the Board has operated as an independent agency. The Act establishing the Board declared that it "shall be independent." § 5(f), 80 Stat. at 936. Congress also took several steps to limit the President's influence over its functions. The Board must be balanced along partisan lines, with no more than three of its five members "appointed from the same political party." 49 U.S.C. § 1111(b). Members serve five-year terms, outlasting any one President's administration. *Id.* § 1111(c). And the President may remove a member only "for inefficiency, neglect of duty, or malfeasance in office." *Id.*

Alvin Brown joined the Board in March of 2024, after his nomination by President Biden and confirmation by the Senate. Am. Compl. ¶ 32, Dkt. 25. He began serving shortly thereafter, filling the remainder of a five-year term set to expire on December 31, 2026. *Id.* Brown's appointment made him one of three Democrats and the only Black person to serve on the Board. *Id.* ¶¶ 37–38.

Just over a year later, President Trump removed Brown from office. *Id.* ¶¶ 34–35. The President offered no reason for the removal. *Id.* He simply thanked Brown for his service and terminated him, effective immediately. *Id.*

Brown brings this action against the President, the Board, and its Chair. *Id.* ¶ 16–18. He asserts two claims. First, he contends that the President fired him without cause under 49 U.S.C. § 1111(c), which limits the circumstances in which the President may remove the Board's members. Am. Compl. ¶¶ 52–57. Second, he alleges that the President fired him because of his race, violating the Fifth Amendment. *Id.* ¶¶ 58–63. Brown asks this Court to declare his removal

unlawful and enjoin the defendants to restore him to office. Brown has moved for partial summary judgment, Dkt. 35, and the defendants have moved to dismiss, Dkt. 36.

## II. LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (citation modified). To "nudge a claim" into the realm of plausibility, the complaint must tend "to rule out 'obvious alternative explanations' for the defendant's conduct." *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. 580, 589–90 (2026) (quoting *Twombly*, 550 U.S. at 567) (citation modified).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *Iqbal*, 556 U.S. at 679, and the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" will not suffice. *Id.* Ultimately, "[d]etermining whether a complaint states a plausible

claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III. ANALYSIS

Brown brings two challenges to his removal. First, he argues that the President failed to heed 49 U.S.C. § 1111(c), which forbids removing a member of the Board absent "inefficiency, neglect of duty, or malfeasance in office." Second, Brown argues that the President fired him because of his race, in violation of the Fifth Amendment. Because neither theory states a claim to relief, the Court will dismiss this case.

### A. Statutory Claim under 49 U.S.C. § 1111(c)

Brown is correct that his removal by the President violated 49 U.S.C. § 1111(c). The President, after all, removed Brown without ever suggesting he was "inefficien[t]," "neglect[ed]" his "dut[ies]," or committed "malfeasance in office," as the statute requires. 49 U.S.C. § 1111(c). But a statute that violates the Constitution is a nullity, and the protection from removal in § 1111(c) is incompatible with the separation of powers.

Precedent compels that conclusion. Last Term in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), the Supreme Court upheld the President's decision to fire a member of the Federal Trade Commission. *Id.* at 2291. That removal, the Court acknowledged, violated a statute that allowed commissioners to be removed only for cause. *Id.* at 2292. But the Court held that such protection from removal was "contrary to the separation of powers." *Id.* at 2291. That was so, the Court explained, because Article II "vests the whole executive power in the President alone." *Id.* at 2302 (citation modified); *see* U.S. Const. art. II, § 1. The President may of course delegate that power to "lesser executive officers." *Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting 30 *Writings of George Washington* 334 (J. Fitzpatrick ed. 1939)) (citation modified). But that choice

is his to make. Because the executive power belongs to the President, an officer may exercise it only with the President's consent. *Slaughter*, 146 S. Ct. at 2295. Congress, then, may not bar the President from removing an officer who holds "part of the executive power." *Id.* at 2302.

That principle disposes of Brown's challenge. The Board holds a wide range of executive powers. *First*, the Board seeks judicial relief against private parties on behalf of the United States. The Attorney General "may bring a civil action" to "enforce" prohibitions related to aircraft accidents, such as bans on tampering with wreckage and soliciting victims. 49 U.S.C. § 1151(a). And at a minimum, the Board has the statutory authority to "participate" in such enforcement actions at the Attorney General's request. *Id.* § 1151(c). As such, the Board plays a role in enforcing federal law, a quintessentially executive function. *See Morrison v. Olson*, 487 U.S. 654, 691 (1988).

*Second*, the Board manages parts of the Nation's disaster response after aircraft accidents. To give just a few examples: The Board "facilitat[es] the recovery and identification of" victim remains. 49 U.S.C. § 1136(b). The Board coordinates victim "support services," including by "designat[ing]" a nonprofit to provide "emotional care, psychological care, and family support." *Id.* § 1136(a)(2), (c). The Board serves as a "point of contact" for victims. *Id.* § 1136(a)(1), (e). And the Board investigates transportation accidents, exchanges information with federal law-enforcement agencies, and acts to preserve evidence of potential criminal acts. *Id.* § 1131(a); *see also id.* § 1134; 49 C.F.R. §§ 831.5, 831.11.

These roles are executive in nature. If "any power whatsoever" belongs to the executive, "it is the power . . . [to] execute the laws." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010). By coordinating the recovery and identification of victim remains, the Board carries out the statutory scheme that Congress enacted—in other words, it executes the laws. *See* 49 U.S.C.

§ 1136(b). So too when the Board arranges for psychological support for victims and their families. *See id.* § 1136(a)(2), (c). And by investigating accidents in coordination with law enforcement, the Board participates in a "quintessential" executive task: gathering evidence for a potential prosecution. *United States v. Lujan*, 504 F.3d 1003, 1007 (9th Cir. 2007); *see* 49 U.S.C. § 1136(a)(1), (e).

Brown's contrary arguments do not undermine the executive character of these functions. He downplays the Board's role in supporting victims, but executive power is defined by the nature of authority, not its extent. *See Slaughter*, 146 S. Ct. at 2302. Brown also argues that the Board's accident investigations serve the "legislative function" of gathering information for Congress. Pl. Br. at 12–13, Dkt. 35-1. But as discussed already, the Board's investigations serve executive actors, too. As one example, federal law-enforcement agencies may enlist the Board to "ensure that evidence of [a] criminal act is preserved." 49 U.S.C. § 1131(a)(2)(C). That Congress may also benefit from the Board's investigations does not diminish its role in supporting law enforcement.

*Third*, the Board issues substantive rules that regulate primary conduct. "[T]he power[] to promulgate substantive rules" that "implement[] … statutes" is executive in nature. *Harris v. Bessent*, 160 F.4th 1235, 1247, 1250–51 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 2814 (2026). And the Board prescribes "regulations governing the notification and reporting of accidents involving civil aircraft" and the preservation and relocation of debris. 49 U.S.C. §§ 1132(b), 1134(b)(2).

Brown disputes that these regulations are "substantive." Pl. Br. at 12–13. But substantive rules include those that "impose obligations" on private parties. *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (citation omitted). The Board's regulations do just that,

commanding parties to report incidents, preserve evidence, and more. 49 U.S.C. §§ 1132(b), 1134(b)(2). Those commands are even backed by penalties—up to $1,000 for each day a violation occurs. *Id.* § 1155(a). The Board's regulations thus implement and give content to Congress' scheme.

Under *Slaughter*, then, this case is straightforward. The Board wields "executive Power." U.S. Const. art. II, § 1. Its members therefore cannot be insulated from presidential removal. *Slaughter*, 146 S. Ct. at 2302.

### B. Constitutional Claim of Race Discrimination

Brown also fails to state a claim of race discrimination. The Fifth Amendment prohibits the federal government from discriminating based on race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see* U.S. Const. amend. V. But a facially neutral government action does not violate the Constitution merely "because it results in a racially disproportionate impact." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Rather, a plaintiff must allege that the challenged action was motivated, at least in part, by "racially discriminatory intent or purpose." *Id.* at 266. Although a disparate impact might be so "stark" that it permits no explanation "other than race," such cases are "rare." *Id.* Ordinarily, disparate impact alone is insufficient to establish discriminatory intent. *Id.* at 264–66.

Brown essentially tries to bring a disparate-impact claim. The crux of his complaint is that the President has "disproportionately remov[ed] Black government officials." Am. Compl. ¶¶ 36–51. Brown alleges, for instance, that the President fired only one of the three Democratic members of the Board—the only one who was Black. *Id.* ¶¶ 37–38. And he alleges that this firing fit "a pattern," in which the President removed "75 percent of Black federal officials leading multimember agencies" but only "27 percent of white federal officials." *Id.* ¶ 40.

But this is not the "rare" case where disparate impact alone supports an inference of discriminatory intent. *Arlington Heights*, 429 U.S. at 266. In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), for example, the Court found discriminatory intent when San Francisco permitted all but one of 80 white-owned laundries to operate but shuttered the over 200 Chinese-owned laundries. *Id.* at 373–74. Similarly, in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the Court found discriminatory intent when a redistricting measure removed from a precinct at least 395 of 400 Black voters but not "a single white voter." *Id.* at 341. In both these cases, the vast disparity rendered the official action "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.

Not so here. Start with the disparate treatment between Brown and the other Democrats on the Board. The President may have fired Brown, while retaining the Board's other members, because he believed that the other members held policy views closer to his own, possessed more relevant expertise, or performed to a higher standard. The President may also have disfavored the appointees of his predecessor, regardless of partisan affiliation. A Democratic appointee of President Biden, after all, may not be similarly situated to a Democratic appointee of a Republican President. And in agencies with partisan-balance requirements, it is hardly rare for Democratic officers to have been appointed by Republican Presidents. Each of these possibilities could explain the disparate treatment between Brown and the Board's other members. Yet the complaint does not discount these possibilities. Rather, it alleges almost nothing about the Board's other members beyond their race and partisan affiliation. *See* Am. Compl. ¶¶ 37–38.

Brown's broader statistical arguments suffer from a similar flaw. Although he alleges a "pattern" of Black officials' losing their jobs at higher rates, *id.* ¶¶ 40–42, he provides little information about the officials included in that comparison. The complaint, for example, says

nothing about those officials' partisan affiliations or appointing Presidents. Without that context, the Court cannot "rule out obvious alternative explanations for the [President's] conduct." *Hikma*, 608 U.S. at 590 (citation modified).

The same is true of the complaint's allegations of racial disparities in the President's hirings. *See, e.g.*, Am. Compl. ¶¶ 42, 49, 51. A President's appointments may reflect any number of legitimate considerations, such as partisan affiliation or preexisting relationships. Here, the complaint provides no context about the President's appointees from which to infer that race, rather than other considerations, accounts for the alleged disparities. Brown, again, fails to discount "obvious alternative explanations." *Hikma*, 608 U.S. at 590 (citation modified).

Because Brown's allegations of disparate impact do not, standing alone, support a plausible inference of discriminatory intent, the Court must consider whether other circumstances support such an inference. As pleaded, they do not. The Supreme Court in *Arlington Heights* "set forth a framework for analyzing 'whether invidious discriminatory purpose'" motivated "a government body's decisionmaking." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) (quoting *Arlington Heights*, 429 U.S. at 266). Under that framework, courts assess not only the "disparate impact on a particular group," but also other "circumstantial and direct evidence of intent," such as "contemporary statements by" the decisionmaker. *Arlington Heights*, 429 U.S. at 266; *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) (conducting this analysis at the pleading stage).

Applying that framework here, Brown's other allegations do not plausibly suggest that race motivated his removal. To add to his disparate-impact evidence, Brown relies on statements by administration officials attacking "diversity, equity, and inclusion" (DEI) efforts. Am. Compl. ¶¶ 43–48. But at most, these alleged statements suggest that the President opposed steps to *foster*

diversity, not that he sought to *inhibit* diversity by firing people because of their race. In fact, the complaint attributes at least some of the President's firings to the removed officials' support for DEI initiatives. *Id.* ¶ 48. Firing people because of their policy views is not tantamount to firing them because of their race. Even considered alongside the alleged disparities in removals and appointments, administration officials' DEI-related statements do not plausibly suggest that race motivated Brown's removal.

Brown's remaining allegations do not fill the void. He emphasizes that his removal was a "departure from the norm," as his "removal contravened the [governing] statute." Pl. Br. at 35. But as explained, that statute is an invalid restriction on the President's removal power, challenged by the same administration. The "obvious alternative explanation[]" is that the President did not view the statute as a valid restriction on his authority, not that he contravened it in order to discriminate. *Hikma*, 608 U.S. at 590 (citation modified). The Court is not inclined to give this fact significant weight. Considering the complaint as a whole, Brown has failed to state a claim.

Unable to prevail under *Arlington Heights*, Brown urges the Court to apply a different standard: the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* held that in actions under Title VII, a plaintiff alleging intentional employment discrimination may carry his initial burden by identifying a similarly situated comparator whom his employer treated differently. *Id.* at 800–02. The burden then "shift[s] to the employer to articulate some legitimate, non-discriminatory reason" for the disparate treatment. *Id.* The Court did not extend that framework to constitutional claims. *Id.* This Circuit, however,

has applied that framework to a constitutional equal-protection claim brought under 42 U.S.C. § 1983. *Oates v. District of Columbia*, 824 F.2d 87, 90 (D.C. Cir. 1987).[2]

This Court need not decide whether *McDonnell Douglas* applies to suits brought directly under the Fifth Amendment because, even assuming it does, Brown has failed to state a claim. Under *McDonnell Douglas*, a plaintiff proceeding on "a comparator theory must plead enough facts about those comparators and the relevant context to allow a plausible inference that he was treated differently because of his race." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025); *accord Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014). Brown relies on two comparators: the white, Democratic members of the Board whom the President did not fire. Am. Compl. ¶¶ 37–38. Although Brown and those members held the same office and belonged to the same political party, the complaint does not describe whether the other members shared relevant similarities. The complaint is mostly silent, for instance, as to those members' policy views, qualifications, performance, or appointing President. Any of those facts might explain why President Trump retained them while removing Brown. Without more, the Court cannot "rule out obvious alternative explanations for" their different treatment. *Hikma*, 608 U.S. at 590 (2026) (citation modified). Taking into account all of the allegations, including the similarities between

[2] Although Brown argues that *McDonnell Douglas* governs his claim of intentional discrimination, he does not argue that this Court should apply Title VII's prohibition on employment practices that inflict a disparate impact. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Even if he did, his claim would fail because the "statistical disparities" he alleges are not "sufficiently substantial that they raise . . . an inference of causation." *See Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 (1988) (opinion of O'Connor, J.).

Brown and the other Board members, the complaint does not plausibly allege that the President treated Brown differently because of his race. The Court will thus dismiss this case.[3]

## CONCLUSION

For the foregoing reasons, the Court denies Brown's Motion for Partial Summary Judgment, Dkt. 35, and grants the defendants' Motion to Dismiss, Dkt. 36. Count I of the amended complaint is dismissed with prejudice, and Count II is dismissed without prejudice. A separate order consistent with this decision accompanies this memorandum opinion.

Dabney L. Friedrich

DABNEY L. FRIEDRICH
United States District Judge

October 31, 2026

[3] The defendants also argue that the Fifth Amendment does not constrain the President's removal power at all. On their telling, the removal power is absolute—and permits the President to discriminate openly based on race, sex, or anything else. The Court has no occasion to reach that theory because the complaint does not plausibly allege that the President discriminated based on race.